*Solicitation Version*

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------- x
                         :

In re:                      :    Chapter 11
                         :

STARRY GROUP HOLDINGS, INC., *et al.*,[1]  :    Case No. 23-10219 (KBO)
                         :

          Debtors.         :    (Jointly Administered)
                         :

-------------------------------------------------------- x

## DISCLOSURE STATEMENT
## FOR AMENDED JOINT CHAPTER 11 PLAN OF
## REORGANIZATION OF STARRY GROUP HOLDINGS, INC. AND ITS
## DEBTOR AFFILIATES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

<div style="display:flex">
<div>

**LATHAM & WATKINS LLP**
Jeffrey E. Bjork (admitted *pro hac vice*)
Ted A. Dillman (admitted *pro hac vice*)
Jeffrey T. Mispagel (admitted *pro hac vice*)
355 South Grand Avenue, Suite 100
Los Angeles, California 90071
Telephone:  (213) 485-1234
Facsimile:  (213) 891-8763
Email:    jeff.bjork@lw.com
          ted.dillman@lw.com
          jeffrey.mispagel@lw.com

- and -

Jason B. Gott (admitted *pro hac vice*)
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9767
Email:  jason.gott@lw.com

*Counsel for Debtors and Debtors in Possession*

</div>
<div>

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Michael R. Nestor (No. 3526)
Kara Hammond Coyle (No. 4410)
Joseph M. Mulvihill (No. 6061)
Timothy R. Powell (No. 6894)
Rodney Square, 1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253
Email:  mnestor@ycst.com
       kcoyle@ycst.com
       jmulvihill@ycst.com
       tpowell@ycst.com

</div>
</div>

March 31, 2023

---

[1]  The debtors in these cases, along with the last four digits of each debtor's federal tax identification number, are:  Starry Group Holdings, Inc. (9355); Starry, Inc. (9616); Connect Everyone LLC (5896); Starry Installation Corp. (7000); Starry (MA), Inc. (2010); Starry Spectrum LLC (N/A); Testco LLC (5226); Starry Spectrum Holdings LLC (9444); Widmo Holdings LLC (9208); Vibrant Composites Inc. (8431); Starry Foreign Holdings Inc. (3025); and Starry PR Inc. (1214).  The debtors' address is 38 Chauncy Street, Suite 200, Boston, Massachusetts 02111.

## IMPORTANT NOTICES

### Plan Voting

**The voting deadline to accept or reject the Plan is 5:00 p.m. Eastern Time (the "Voting Deadline"), on May 15, 2023, unless extended by the Debtors.  The record date for determining which Holders of Claims may vote on the Plan is March 31, 2023 (the "Voting Record Date").**

**For your vote to be counted, you must return your properly completed Ballot in accordance with the voting instructions on the Ballot so that it is actually received by the Debtors' voting agent, Kurtzman Carson Consultants LLC (the "Voting Agent"), before the Voting Deadline.**

**Ballots may be returned to the Voting Agent via:**

**Mail, Courier, or Personal Delivery: Starry Group Holdings, Inc.**
**Ballot Processing**
**c/o Kurtzman Carson Consultants LLC**
**222 N. Pacific Coast Hwy., Ste. 300**
**El Segundo, CA 90245**

**Online Upload:                                    http://www.kccllc.net/Starry**

**Additional details on voting are discussed herein and set forth on Ballots delivered to Holders of Claims entitled to vote on the Plan.**

### Third-Party Release

**You are being deemed to grant releases to third parties under the Plan unless you are permitted to, and you follow the applicable procedures to, "opt out" of granting them.  Pursuant to Article IX.C of the Plan (a) each Holder of a Claim that submits a Ballot accepting the Plan; (b) each Holder of a Claim that votes to reject the Plan but does not affirmatively "opt out" of the releases set forth in Article IX.C of the Plan by checking the box on their respective Ballot; (c) the DIP Lenders and the Prepetition Lenders; (d) any Successful Bidder, if applicable; and (e) all other Released Parties (other than any Debtor Releasing Party) shall be deemed to grant the Third-Party Release.  This release is discussed further in Article V.G of this Disclosure Statement.**

<div style="border:1px solid black; padding:1em;">

**<u>Recommendation by the Board and Creditor Support</u>**

**The board of directors of Starry Group Holdings, Inc. and the board of directors or managers, members, or partners, as applicable, of each of its affiliated Debtors (as of the date hereof) have unanimously approved the transactions contemplated by the Plan and recommend that all creditors whose votes are being solicited submit ballots to accept the Plan.  The Consenting Prepetition Lenders holding 100% in amount of the Prepetition Term Loan Claims and representing 100% in number of the Holders of Prepetition Term Loan Claims have already committed to voting in favor of the Plan.**

</div>

Starry Group Holdings, Inc. ("**Starry Holdings**") and certain of its direct and indirect subsidiaries, as debtors and debtors in possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), are providing you with the information in this Disclosure Statement because you may be a creditor of the Debtors and may be entitled to vote on the Joint Chapter 11 Plan of Reorganization of the Debtors (including all exhibits and schedules thereto, and as maybe amended, modified, or supplemented from time to time, the "**Plan**"). The Plan is attached hereto as **Exhibit A**. All capitalized terms used but not otherwise defined herein have the definition given to them in the Plan.

The Debtors believe that the Plan is in the best interests of the Debtors' creditors and other stakeholders. All creditors entitled to vote on the Plan are urged to vote in favor of the Plan. A summary of the voting instructions is set forth in Article I.B of this Disclosure Statement and in the Disclosure Statement Order (Docket No. 271). More detailed instructions are contained in the Ballots distributed to the creditors entitled to vote on the Plan. To be counted, your Ballot must be properly completed and returned to the Voting Agent (as applicable) in accordance with the voting instructions on such Ballot and *actually received* by the Voting Agent (as defined herein), via regular mail, overnight courier, or personal delivery at the appropriate address or via the Voting Agent's ballot upload site, by the Voting Deadline.

This Disclosure Statement, the Plan Supplement, and any attachments, exhibits, supplements and annexes hereto are the only documents to be used in connection with the solicitation of votes on the Plan, and also may not be relied upon for any purpose other than to determine how to vote on the Plan. Neither the Bankruptcy Court nor the Debtors have authorized any person to give any information or to make any representation in connection with the Plan or the solicitation of acceptances of the Plan other than as contained in this Disclosure Statement, the Plan Supplement, and any attachments, exhibits, supplements or annexes attached hereto. If given or made, such information or representation may not be relied upon as having been authorized by the Bankruptcy Court or the Debtors. The delivery of this Disclosure Statement will not under any circumstances represent that the information herein is correct as of any time after the date hereof.

This Disclosure Statement shall not constitute an offer to sell, or solicitation of an offer to buy, nor will there be any distribution of, any of the securities described herein until the Effective Date of the Plan.

**ALL CREDITORS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE XI BELOW, THE PLAN ATTACHED AS EXHIBIT A, AND THE PLAN SUPPLEMENT BEFORE SUBMITTING BALLOTS IN RESPONSE TO SOLICITATION OF THE PLAN.**

The summaries of the Plan and other documents contained in this Disclosure Statement are qualified in their entirety by reference to the Plan itself, the exhibits thereto that will be included in the Plan Supplement, and documents described therein as filed prior to approval of this Disclosure Statement or subsequently as part of the Plan Supplement. In the event that any inconsistency or conflict exists between this Disclosure Statement and the Plan, or between the Plan Supplement and the Plan, the terms of the Plan will control. Except as otherwise indicated

herein or in the Plan, the Debtors will file all Plan Supplement documents with the Bankruptcy Court and make them available for review at the Debtors' document website located online at http://www.kccllc.net/Starry no later than Seven (7) Days before the Confirmation Hearing.

This Disclosure Statement contains, among other things, descriptions and summaries of provisions of the Plan. The Debtors reserve the right to modify the Plan consistent with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, subject to the terms of the Plan. The statements contained in this Disclosure Statement are made only as of the date of this Disclosure Statement, and there can be no assurance that the statements contained herein will be correct at any time after this date. The information contained in this Disclosure Statement, including the information regarding the history, businesses and operations of the Debtors, the financial information regarding the Debtors and the liquidation analyses relating to the Debtors, is included for purposes of soliciting acceptances of the Plan, but, as to contested matters and adversary proceedings (if any), is not to be construed as an admission or stipulation, but rather as a statement made in settlement negotiations as part of the Debtors' attempt to settle and resolve claims and controversies pursuant to the Plan. This Disclosure Statement will not be admissible in any non-bankruptcy proceeding, nor will it be construed to be conclusive advice on the tax, securities or other legal effects of the Plan as to Holders of Claims against, or Interests in, either the Debtors or the Reorganized Debtors. Except where specifically noted, the financial information contained in this Disclosure Statement and in its exhibits has not been audited by a certified public accountant and has not been prepared in accordance with generally accepted accounting principles in the United States.

The Debtors believe that the solicitation of votes on the Plan made in connection with this Disclosure Statement is exempt from registration under the Securities Act of 1933, as amended (the "**Securities Act**") and related state statutes by reason of the exemption provided by section 1145(a)(1) of the Bankruptcy Code.

The effectiveness of the Plan is subject to material conditions precedent. See Article V.F below and Article VIII of the Plan. There is no assurance that these conditions will be satisfied or waived.

If the Plan is confirmed by the Bankruptcy Court and the Effective Date occurs, all Holders of Claims against, and Interests in, the Debtors (including without limitation those Holders who do not submit Ballots to accept or reject the Plan or who are not entitled to vote on the Plan), will be bound by the terms of the Plan and the transactions contemplated thereby, including (except for those Holders entitled to, and who do, opt out) the third-party releases contained therein.

## FORWARD-LOOKING STATEMENTS

This Disclosure Statement contains forward-looking statements based primarily on the current expectations of the Debtors and projections about future events and financial trends affecting the financial condition of the Debtors' businesses and assets. Forward-looking statements can often be identified by the use of terminology such as "subject to," "believe," "anticipate," "plan," "expect," "intend," "estimate," "project," "may," "will," "should," "would," "could," "can," the negatives thereof, variations thereon and similar expressions, or by discussions of strategy. These forward-looking statements are subject to a number of risks, uncertainties, and assumptions, including those described below in Article XI. In light of these risks and uncertainties, the forward-

looking events and circumstances discussed in this Disclosure Statement may not occur, and actual results could differ materially from those anticipated in the forward-looking statements. The Debtors do not undertake any obligation to update or revise publicly any forward-looking statements, whether as a result of new information, future events, or otherwise.

**THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016 AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAWS. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), ANY STATE SECURITIES COMMISSION OR ANY SECURITIES EXCHANGE OR ASSOCIATION NOR HAS THE SEC, ANY STATE SECURITIES COMMISSION OR ANY SECURITIES EXCHANGE OR ASSOCIATION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.**

<center>**QUESTIONS AND ADDITIONAL INFORMATION**</center>

If you would like to obtain copies of this Disclosure Statement, the Disclosure Statement Order, the Plan, the Plan Supplement, or any of the documents attached hereto or referenced herein, or have questions about the solicitation and voting process or the Debtors' Chapter 11 Cases generally, please contact the Debtors' voting agent, Kurtzman Carson Consultants LLC (the "**Voting Agent**") by (i) visiting the Debtors' document website at http://www.kccllc.net/Starry (ii) calling (781) 575-2040 (international) or (866) 480-0830 (domestic, toll free), or (iii) sending an electronic message to StarryInfo@kccllc.com.

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................................................1

    A.    Material Terms of the Plan .........................................................2
    B.    Voting on the Plan ......................................................................17
    C.    Confirmation Hearing and Deadline for Objections to Confirmation ..................21
    D.    Advisors ......................................................................................22

II. OVERVIEW OF THE DEBTORS' OPERATIONS ........................................22

    A.    The Debtors' Corporate Structure.............................................22
    B.    The Debtors' Corporate History ...............................................23
    C.    The Debtors' Business Operations and Revenue.....................24
    D.    The Debtors' Prepetition Capital Structure...............................27

III. EVENTS LEADING TO COMMENCEMENT OF THE CHAPTER 11 CASES ................29

    A.    Business Combination and Efforts to Improve Liquidity.........29
    B.    Reductions in Force and Other Cost-Saving Measures ...........30
    C.    Further Exploration of Strategic Alternatives..........................31
    D.    Discussions with Prepetition Term Lenders .............................31
    E.    Amendments & Waivers.............................................................31

IV. OVERVIEW OF THE CHAPTER 11 CASES .............................................32

    A.    Commencement of Chapter 11 Cases .......................................32
    B.    First Day Motions ......................................................................32
    C.    Procedural Motions.....................................................................33
    D.    DIP Financing .............................................................................33
    E.    Appointment of Committee ........................................................34
    F.    Exclusivity ..................................................................................34
    H.    Sale-Related Motions.................................................................34

V. SUMMARY OF THE PLAN...........................................................................34

    A.    Classification and Treatment of Claims and Interests under the Plan ..................35
    B.    Acceptance or Rejection of the Plan; Effect of Rejection of Plan........................36
    C.    Treatment of Executory Contracts and Unexpired Leases; Employee Benefits; and Insurance Policies ...............................36
    D.    Provisions Governing Distributions...........................................40
    E.    Procedures for Resolving Disputed, Contingent, and Unliquidated Claims or Interests...................................................40
    F.    Conditions Precedent to Confirmation and the Effective Date............................41
    G.    Releases........................................................................................43
    H.    Standards Applicable to Releases ..............................................49

VI. WIND-DOWN PROCESS IN THE EVENT OF A SALE TRANSACTION /
   CAPITAL STRUCTURE AND CORPORATE GOVERNANCE OF
   REORGANIZED DEBTORS IN THE EVENT OF A RESTRUCTURING...................50

   A.      Sale Transaction..........................................................................................50
   B.      Wind-Down, Plan Administrator, Dissolution of the Boards of
           Directors/Managers, and Closing of the Chapter 11 Cases (In the Event of
           a Sale Transaction)......................................................................................50
   C.      Summary of Capital Structure of Reorganized Debtors (in the event of a
           Restructuring) .............................................................................................52
   D.      Corporate Governance and Management of the Reorganized Debtors (In
           the Event of a Restructuring) ......................................................................54

VII. CONFIRMATION OF THE PLAN .................................................................................55

   A.      Confirmation Hearing ................................................................................56
   B.      Confirmation ...............................................................................................58
   B.      Classification of Claims and Interests.........................................................64
   C.      Consummation ............................................................................................64
   D.      Exemption from Certain Transfer Taxes .....................................................64
   E.      Retiree Benefits...........................................................................................64
   F.      Dissolution of Committee ...........................................................................65
   G.      Amendments ...............................................................................................65
   H.      Revocation or Withdrawal of the Plan........................................................65
   I.      Post-Confirmation Jurisdiction of the Bankruptcy Court ...........................65

VIII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE
   PLAN ...............................................................................................................................68

   A.      Continuation of Chapter 11 Cases ..............................................................68
   B.      Liquidation under Chapter 7 .......................................................................69
   C.      Dismissal of Chapter 11 Cases ...................................................................69

IX. FACTORS TO CONSIDER BEFORE VOTING ...............................................................69

   A.      Certain Bankruptcy Law Considerations.....................................................69
   B.      Risks Relating to the Capital Structure of the Reorganized Debtors.............71
   C.      Risks Relating to the Reorganized Debtors' Business Operations and
           Financial Conditions ...................................................................................74
   D.      Additional Factors.......................................................................................78

X. SECURITIES LAW MATTERS .......................................................................................79

   A.      Issuance & Transfer of 1145 Securities......................................................79

XI. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ...............81

   A.      Introduction.................................................................................................81

B.    Restructuring Steps, Alternative Structures and Steps Memorandum...................83
C.    New Starry .................................................................................................83
D.    U.S. Federal Income Tax Consequences to the Debtors........................................84
E.    U.S. Federal Income Tax Consequences to Holders of Certain Claims ...............88

CONCLUSION AND RECOMMENDATION............................................................................97

EXHIBIT A:  Plan

EXHIBIT B:  Restructuring Support Agreement

EXHIBIT C:  Organizational Chart

EXHIBIT D:  Financial Projections

EXHIBIT E:  Liquidation Analysis

**I.**
## INTRODUCTION

This is the disclosure statement (the "**Disclosure Statement**") of Starry Group Holdings, Inc.; Starry, Inc.; Starry Installation Corp.; Starry (MA) Inc.; Starry Spectrum LLC; Testco LLC; Starry Spectrum Holdings LLC; Widmo Holdings LLC; Connect Everyone LLC.; Starry Foreign Holdings, Inc.; Starry PR Inc.; and Vibrant Composites, Inc. (each, a "**Debtor**," and collectively, the "**Debtors**") in the above-captioned Chapter 11 Cases pending in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), filed pursuant to section 1125 of title 11 of the United States Code (the "**Bankruptcy Code**") and in connection with the *Joint Chapter 11 Plan of Reorganization of Starry Group Holdings, Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* dated February 20, 2023 (the "**Plan**").[2]

The Debtors are proposing the Plan following extensive arm's-length, good-faith discussions with certain of their key stakeholders. These discussions have resulted in significant majorities of the Holders of the Debtors' funded indebtedness agreeing to support the restructuring contemplated by the Plan and vote to accept the Plan pursuant to a Restructuring Support Agreement entered into immediately prior to the commencement of the Chapter 11 Cases by and among the Debtors and certain Holders of Prepetition Term Loan Claims (collectively, the "**Consenting Prepetition Lenders**"). A copy of the Restructuring Support Agreement is attached hereto as **Exhibit B**.

In connection with negotiating the Restructuring Support Agreement, the Debtors and Holders of the Debtors' funded indebtedness exchanged several proposals and counter-proposals regarding the terms of a comprehensive restructuring, and the parties conferred on numerous occasions in an attempt to achieve consensus with respect to the same. The Plan reflects such a consensus, and the Debtors and the Consenting Prepetition Lenders believe the Plan represents the best available option for all creditors and parties in interest.

Having agreed with their key creditor constituencies on the principal terms of the Restructuring, which enjoys broad-based support, as reflected in the Restructuring Support Agreement, the Debtors are also pursuing a competitive sale process for their assets (or reorganized equity) as permitted by the Restructuring Support Agreement. To that end, on February 20, 2023, the Debtors filed a motion with the Bankruptcy Court (the "**Bidding Procedures Motion**"), seeking authorization to conduct a competitive and robust sale process, which the Debtors believe will ensure that they maximize the value of their assets (or reorganized equity). On March 21, 2023, the Bankruptcy Court entered the Bidding Procedures Order [Docket No. 185].

Under the Bidding Procedures and the Plan, the reorganized equity or assets of the Debtors will be marketed pursuant to the Bidding Procedures Order, which shall permit bids to acquire all or substantially all of the assets (or reorganized equity) of the Debtors.

To be a qualified bid, a third party bid must exceed $170,000,000 (the "**Minimum Qualified Bid**") and meet the other requirements established in the Bidding Procedures for the submission of qualified bids. In the event that at least one Minimum Qualified Bid is obtained, the Debtors shall

---

[2] Capitalized terms used in this Disclosure Statement, but not otherwise defined herein shall have the meanings given to them in the Plan. To the extent there are any inconsistencies between this Disclosure Statement and the Plan, the Plan shall govern.

conduct an auction to determine the highest or otherwise best bid for the Debtors' assets (or reorganized equity). Any Qualified Bidder (as defined in the Bidding Procedures Motion), including the DIP Agent and the Prepetition Agent, that has a valid and perfected lien on any assets of the Debtors' estates shall be entitled to credit bid all or a portion of the face value of such secured party's claims against the Debtors. Each of the DIP Agent and the Prepetition Agent shall be deemed to be a Qualified Bidder and, subject to section 363(k) of the Bankruptcy Code and to such party's compliance with the Bidding Procedures, may submit a credit bid of all or any portion of the aggregate amount of their respective secured claims, including any postpetition financing claims, pursuant to section 363(k) of the Bankruptcy Code at any time during the auction, and any such credit bid will be considered a Qualified Bid.

In full and final satisfaction, settlement, release and discharge of and in exchange for release of all Allowed DIP Facility Claims, on the Effective Date, the unpaid Allowed DIP Facility Claims shall be (i) if the Restructuring is consummated, converted on a dollar-for-dollar basis into Rollover Exit Term Loans and shall receive New Warrants in accordance with the Exit Facility Term Sheet (which is attached as Exhibit F to the Restructuring Support Agreement), or (ii) if a Sale Transaction is consummated, unless otherwise agreed to by the Required DIP Lenders and Birch Grove, indefeasibly paid in full in Cash from Sale Transaction Proceeds.

**In addition, the Plan includes certain release, injunctive, and exculpatory provisions described in greater detail below.**

This Disclosure Statement sets forth certain information regarding the prepetition operating and financial history of the Debtors, the events leading up to the commencement of the Chapter 11 Cases, material events that have occurred during the Chapter 11 Cases, and the anticipated organization, operations, and capital structure of the Reorganized Debtors if the Plan is confirmed, the Effective Date occurs, and a Restructuring has been consummated. This Disclosure Statement also describes terms and provisions of the Plan, including certain effects of confirmation and effectiveness of the Plan, certain risk factors (including those associated with any securities to be issued under the Plan), the manner in which distributions will be made under the Plan, and certain alternatives to the Plan.

On March 31, 2023, the Bankruptcy Court entered the Disclosure Statement Order (Docket No. 271) approving this Disclosure Statement as containing "adequate information," *i.e.*, information of a kind and in sufficient detail to enable a hypothetical reasonable investor to make an informed judgment about the Plan.

**THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT CONSTITUTES NEITHER A GUARANTY OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN NOR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.**

### A.    Material Terms of the Plan

The Plan is the product of extensive, vigorous, arm's-length and good-faith negotiations among the Debtors and the Consenting Prepetition Lenders. The Debtors are pursuing on parallel paths both the Restructuring and a Sale Transaction. Any Sale Transaction may be implemented

pursuant to the Plan and the Confirmation Order or pursuant to a separate 363 Sale Order.  The Debtors may sell all or substantially all of their assets or the Reorganized Starry Holdings Equity in a Sale Transaction under the Plan or a 363 Sale Order, in which case the proceeds thereof shall be distributed in accordance with the applicable provisions of the Plan, the Debtors will be wound down, and the Restructuring will not occur.  If the Debtors do not sell all or substantially all of their assets or the Reorganized Starry Holdings Equity under the Plan or a 363 Sale Order, they will consummate the Restructuring.

In the event of a Restructuring, the Plan will allow the Debtors to strengthen their balance sheet as described more fully herein, and will also ensure that the Debtors continue to operate as a going concern, preserving the jobs of the Debtors' employees.

The Debtors believe that the implementation of the Plan is in the best interests of the Debtors and their stakeholders.  **For all of the reasons described in this Disclosure Statement, the Debtors urge you to return your Ballot accepting the Plan by the Voting Deadline, which is May 15, 2023, at 5:00 p.m. Eastern Time**.

The following table summarizes the material terms of the Plan and certain related agreements. For additional description of the Plan, please refer to the discussion in Article V (entitled "SUMMARY OF THE PLAN") of this Disclosure Statement, and the Plan itself:

| **Treatment of Certain Claims and Interests** | As further detailed therein, the Plan contemplates the following treatment of Claims and Interests: |
| --- | --- |
| | • <u>General Administrative Claims</u>.  Except to the extent that a Holder of an Allowed General Administrative Claim and the applicable Debtor(s) agree to less favorable treatment with respect to such Allowed General Administrative Claim, each Holder of an Allowed General Administrative Claim will be paid the full unpaid amount of such Allowed General Administrative Claim in Cash:  (a) on the Effective Date or as soon as reasonably practicable thereafter or, if not then due, when such Allowed General Administrative Claim is due or as soon as reasonably practicable thereafter; (b) if a General Administrative Claim is Allowed after the Effective Date, on the date such General Administrative Claim is Allowed or as soon as reasonably practicable thereafter or, if not then due, when such Allowed General Administrative Claim is due or as soon as reasonably practicable thereafter; (c) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Reorganized Debtors, as the case may be; or (d) at such time and upon such terms as set forth in an order of the Bankruptcy Court; *provided* that Allowed General Administrative Claims that arise in the ordinary course of the Debtors' business during the Chapter 11 Cases shall be paid in full in Cash in the ordinary course of business in accordance with the terms and conditions of |

any controlling agreements, course of dealing, course of business, or industry practice; *provided, further,* that any Allowed General Administrative Claim that has been assumed by a Successful Bidder under the applicable Sale Transaction Documentation shall not be an obligation of the Debtors and shall not be entitled to any recovery from the Estates under the Plan. **These Claims are unclassified under the Plan and are <u>not</u> entitled to vote**.

- <u>Professional Fee Claims</u>. All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred on and after the Petition Date and prior to and on the Effective Date must be Filed no later than 45 days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior Bankruptcy Court orders. The Reorganized Debtors or the Plan Administrator, as applicable, shall pay Professional Fee Claims in Cash to such Retained Professionals in the amount the Bankruptcy Court Allows from funds held in the Professional Fee Escrow Account, as soon as reasonably practicable after such Professional Fee Claims are Allowed by entry of an order of the Bankruptcy Court; provided that the Debtors' and the Reorganized Debtors' obligations to pay Allowed Professional Fee Claims shall not be limited or deemed limited to funds held in the Professional Fee Escrow Account. To the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the Allowed amount of Professional Fee Claims owing to the Retained Professionals, the Reorganized Debtors or Plan Administrator, as applicable, shall pay such amounts within ten (10) Business Days after entry of the order approving such Professional Fee Claims.

No later than the Effective Date, the Reorganized Debtors or Plan Administrator, as applicable shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Retained Professionals and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full in Cash to the Retained Professionals pursuant to one or more orders of the Bankruptcy Court. No Liens, claims, or interests shall encumber the Professional Fee Escrow Account or Cash

held in the Professional Fee Escrow Account in any way. No funds held in the Professional Fee Escrow Account shall be property of the Estates of the Debtors, the Reorganized Debtors, or Plan Administrator, as applicable. Notwithstanding the foregoing sentence, funding of the Professional Fee Escrow Account will not be reported as a disbursement from the Estates, and disbursements from the Professional Fee Escrow on account of payment of Allowed Professional Fee Claims will be reported as disbursements from the Estates on the relevant monthly operating report(s). When all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full in Cash to the Retained Professionals pursuant to one or more orders of the Bankruptcy Court, any remaining funds held in the Professional Fee Escrow Account shall be remitted to the Reorganized Debtors or Plan Administrator, as applicable, without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.  Any further disbursements of such funds shall be reported in accordance with the Bankruptcy Rules.

The Retained Professionals shall deliver to the Debtors a reasonable and good-faith estimate of their unpaid fees and expenses incurred in rendering services to the Debtors (which estimate may include a cushion to cover unexpected or unknown fees) before and as of the Effective Date projected to be outstanding as of the anticipated Effective Date, and shall deliver such estimate no later than three (3) Business Days prior to the anticipated Effective Date.  For the avoidance of doubt, no such estimate shall be considered or deemed an admission or limitation with respect to the amount of the fees and expenses that are the subject of a Retained Professional's final request for payment of Professional Fee Claims Filed with the Bankruptcy Court, and such Retained Professionals are not bound to any extent by the estimates.  If a Retained Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Retained Professional for inclusion in the Professional Fee Escrow Amount.  The total aggregate amount so estimated to be outstanding as of the anticipated Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account; *provided* that the Reorganized Debtors or Plan Administrator, as applicable, shall use Cash on hand to increase the amount of the Professional Fee Escrow Account to the extent fee applications are Filed after the Effective Date in excess of

the amount held in the Professional Fee Escrow Account based on such estimates. **These Claims are unclassified under the Plan and are <u>not</u> entitled to vote**.

- <u>Priority Tax Claims</u>. Except to the extent that a Holder of an Allowed Priority Tax Claim and the Debtor(s) against which such Allowed Priority Tax Claim is asserted agree to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and the discharge of each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall receive, at the option of the Debtors, either (i) the full unpaid amount of such Allowed Priority Tax Claim in Cash on the later of the Effective Date and the date on which such Priority Tax Claim becomes an Allowed Claim or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Priority Tax Claim is due or as soon as reasonably practicable thereafter), or (ii) equal annual installment payments in Cash, of a total value equal to the Allowed amount of such Priority Tax Claim, over a period ending not later than five (5) years after the Petition Date; provided that (i) in the event of a Restructuring, notwithstanding any provision of the Plan to the contrary, any Claim on account of a "use tax" assessed or assessable under applicable state law shall be assumed by and Reinstated against the applicable Reorganized Debtor and (ii) in the event of a Sale Transaction, any Allowed Priority Tax Claim that has been expressly assumed by a Successful Bidder under the Sale Transaction Documentation shall not be an obligation of the Debtors. On the Effective Date, any Liens securing any Allowed Priority Tax Claims shall be deemed released, terminated, and extinguished, in each case without further notice to or order of the Bankruptcy Court, act, or action under applicable law, regulation, order or rule, or the vote, consent, authorization, or approval of any Person. **These Claims are unclassified under the Plan and are <u>not</u> entitled to vote**.

- <u>United States Trustee Statutory Fees and Related Reporting Requirements</u>. All fees pursuant to 28 U.S.C. § 1930(a)(6) and any interest assessed pursuant to 31 U.S.C. § 3717 ("<u>U.S. Trustee Fees</u>") that are due and owing as of the Effective Date shall be paid by the Debtors in full in Cash on the Effective Date. The Debtors shall file all monthly operating reports due prior to the Effective Date when they become due, using UST Form 11-MOR. After the Effective Date, the Debtors, Reorganized Debtors, and Plan

6

Administrator (if appointed), as applicable, shall file with the Bankruptcy Court separate UST Form 11-PCR reports when they become due. After the Effective Date, the Debtors, Reorganized Debtors, and Plan Administrator (if appointed), as applicable, shall pay any and all applicable U.S. Trustee Fees in full in Cash when due and payable. The Debtors, Reorganized Debtors, and Plan Administrator (if appointed), as applicable, shall remain obligated to pay any applicable U.S. Trustee Fees until the earliest of the closure, dismissal, or conversion to a case under Chapter 7 of the Bankruptcy Code of the case of that particular Debtor for whom the Debtors, Reorganized Debtors, or Plan Administrator (if appointed), as applicable, is responsible. The U.S. Trustee shall not be treated as providing any release under the Plan. U.S. Trustee Fees are Allowed. The U.S. Trustee shall not be required to file any proof of claim or any request for administrative expense for U.S. Trustee Fees. The provisions of this paragraph shall control notwithstanding any other provision(s) in the Plan to the contrary. **These Claims are unclassified under the Plan and are <u>not</u> entitled to vote.**

- <u>DIP Facility Claims</u>. Notwithstanding anything to the contrary in the Plan, in full and final satisfaction, settlement, release and discharge of and in exchange for release of all Allowed DIP Facility Claims, on the Effective Date, the unpaid Allowed DIP Facility Claims shall be (i) if the Restructuring is consummated, converted on a dollar-for-dollar basis into Rollover Exit Facility Loans and shall receive New Warrants in accordance with the Exit Facility Term Sheet, or (ii) if a Sale Transaction is consummated, unless otherwise agreed to by the Required DIP Lenders and Birch Grove, indefeasibly paid in full in Cash from Sale Transaction Proceeds. **These Claims are unclassified under the Plan and are <u>not</u> entitled to vote.**

- <u>Other Priority Claims</u>. On the Effective Date, except to the extent that a Holder of an Allowed Other Priority Claim and the Debtor against which such Allowed Other Priority Claim is asserted agree to less favorable treatment for such Holder, in full satisfaction of each Allowed Other Priority Claim, each Holder thereof shall receive payment in full in Cash or other treatment rendering such Claim Unimpaired. Any Allowed Other Priority Claim that has been expressly assumed by the applicable Successful Bidder under the applicable Sale Transaction Documentation, shall not be an obligation of the Debtors. **These Claims are Unimpaired**

**under the Plan and are <u>not</u> entitled to vote (deemed to accept).**

- <u>Other Secured Claims</u>.  On the Effective Date, except to the extent that a Holder of an Allowed Other Secured Claim and the Debtor against which such Allowed Other Secured Claim is asserted with the consent of the Required Consenting Lenders (not to be unreasonably withheld and after consulting with Birch Grove) agree to less favorable treatment for such Holder, each allowed Other Secured Claim shall, at the option of the applicable Debtor (i) be paid in full in Cash including the payment of any interest required to be paid under section 506(b) of the Bankruptcy Code, (ii) receive the collateral securing its allowed Other Secured Claim, or (iii)  receive any other treatment that would render such Claim Unimpaired.  **These Claims are Unimpaired under the Plan and are <u>not</u> entitled to vote (deemed to accept).**

- <u>Prepetition Term Loan Claims</u>. On the Effective Date, the Prepetition Agent shall receive Cash in an amount sufficient to pay all outstanding unreimbursed fees and expenses, if any, and except to the extent that a Holder of an Allowed Prepetition Term Loan Claim agrees to less favorable treatment, each Holder of an Allowed Prepetition Term Loan Claim shall receive, in full and final satisfaction of its Allowed Prepetition Term Loan Claim:

    o In the event of a Restructuring, its Pro Rata Share of the New Common Equity (subject to dilution by the Management Incentive Plan and New Warrants); or

    o In the event of a Sale Transaction, except as otherwise provided in and giving effect to any applicable Sale Order, its Pro Rata Share of (1) Cash held by the Debtors immediately prior to consummation less, (2) without duplication, (a) the Cash to be distributed to Holders of Claims as provided herein, (b) the amount required to fund the Professional Fee Escrow Account, and (c) the Wind-Down Budget.

    o **These Claims are Impaired under the Plan and are entitled to vote.**

- <u>General Unsecured Claims</u>. On the Effective Date, except to the extent that a Holder of an Allowed General Unsecured Claim and the Debtor against which such Allowed General

Unsecured Claim is asserted agree to less favorable treatment for such Holder, each Holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction of its Allowed General Unsecured Claim:

- o  In the event of a Restructuring:
  - ▪ Each Participating GUC Holder shall receive in full and final satisfaction of its Allowed General Unsecured Claim, its Pro Rata Share of the greater of (a) $250,000; and (b) the difference between (i) the amount of professional fees of the Debtor Professionals and Committee Professionals set forth in the Initial Budget minus (ii) the actual amount of professional fees and expenses Allowed to such Retained Professionals at any time, subject to a cap of $2,000,000; and
    Each Non-Participating GUC Holder shall receive no consideration on account of its General Unsecured Claims.
- o  In the event of a Sale Transaction:
  - ▪ Each Participating GUC Holder shall receive in full and final satisfaction of its Allowed General Unsecured Claim, its Pro Rata Share of the greatest of (a) $250,000; (b) the difference between (i) the amount of professional fees of the Debtor Professionals and Committee Professionals set forth in the Initial Budget minus (ii) the actual amount of professional fees and expenses Allowed to such Retained Professionals at any time, subject to a cap of $2,000,000; and (c) except as otherwise provided in and giving effect to any applicable Sale Order, after the Holders of Allowed Prepetition Term Loan Claims and the Holders of Allowed Claims entitled to priority of payment under 11 U.S.C. § 507 have been satisfied in full in Cash, the amount of Cash, if any, to which Allowed General Unsecured Claims are legally entitled under the Bankruptcy Code; and
    Each Non-Participating GUC Holder shall receive, except as otherwise provided in and giving effect to any applicable Sale Order, after the Holders of Allowed Prepetition Term Loan Claims and the Holders of Allowed Claims entitled to priority of

payment under 11 U.S.C. § 507 have been satisfied in full in Cash, the amount of Cash, if any, to which Allowed General Unsecured Claims are legally entitled under the Bankruptcy Code.

- o **These Claims are Impaired under the Plan and are entitled to vote.**

- Intercompany Claims. Notwithstanding any other provision of the Plan, on the Effective Date, except to the extent that a Holder of an Allowed Intercompany Claim and the Debtor against which such Allowed Intercompany Claim is asserted agree to less favorable treatment for such Holder, each Holder of an Allowed Intercompany Claim shall receive, in full and final satisfaction of its Allowed Intercompany Claim:

  - o In the event of a Restructuring, Intercompany Claims shall receive no distribution under the Plan, and all Intercompany Claims shall be adjusted, Reinstated, or discharged in the applicable Debtor's discretion (with the consent of the Prepetition Agent).
  - o In the event of a Sale Transaction, Intercompany Claims shall receive no distribution under the Plan, and all Intercompany Claims shall be adjusted, Reinstated, or discharged in the applicable Debtor's discretion, unless otherwise agreed to by the Debtors and the applicable Successful Bidder in connection with one or more Sale Transactions.

  - o **These Claims are either Impaired or Unimpaired under the Plan and in either case are <u>not</u> entitled to vote (deemed to accept or to reject)**.

- Subordinated Claims. On the Effective Date, except to the extent that a Holder of an Allowed Subordinated Claim and the Debtor against which such Allowed Subordinated Claim is asserted agree to less favorable treatment for such Holder, each Holder of an Allowed Subordinated Claim shall receive, in full and final satisfaction of its Allowed Subordinated Claim:

  - o In the event of a Restructuring, Subordinated Claims shall receive no distribution under the Plan, and all Subordinated Claims shall be cancelled, released, discharged, and extinguished, as the case may be,

and shall be of no further force or effect, whether surrendered for cancellation or otherwise.

- o In the event of a Sale Transaction, except as otherwise provided in and giving effect to any applicable Sale Order, after the Holders of Allowed Prepetition Term Loan Claims, Holders of Allowed Claims entitled to priority of payment under 11 U.S.C. § 507, and Holders of Allowed Claims in Class 4 have been satisfied in full in Cash, Holders of Allowed Subordinated Claims shall receive the amount of Cash, if any, to which Subordinated Claims are legally entitled under the Bankruptcy Code.

- o **These Claims are Impaired under the Plan and are <u>not</u> entitled to vote (deemed to reject)**.

- Intercompany Interests. On the Effective Date, except to the extent that a Holder of an Allowed Intercompany Interest and the Debtor against which such Allowed Intercompany Interest is asserted agree to less favorable treatment for such Holder, each Holder of an Allowed Intercompany Interest shall receive, in full and final satisfaction of its Allowed Intercompany Interest:

  - o In the event of a Restructuring, Intercompany Interests shall receive no distribution under the Plan, and all Intercompany Interests shall be adjusted, Reinstated, or discharged in the applicable Debtor's discretion (with the consent of the Prepetition Agent).
  - o In the event of a Sale Transaction, Intercompany Interests shall receive no distribution under the Plan, and all Intercompany Interests shall be adjusted, Reinstated, or discharged in the applicable Debtor's discretion, unless otherwise agreed to by the Debtors and the applicable Successful Bidder in connection with one or more Sale Transactions.

  - o **These Interests are either Impaired or Unimpaired under the Plan and in either case are <u>not</u> entitled to vote (deemed to accept or to reject)**.

- Equity Interests. On the Effective Date, except to the extent that a Holder of an Allowed Equity Interest and the Debtor against which such Allowed Equity Interest is asserted agree

| | |
|---|---|
| | to less favorable treatment for such Holder, each Holder of an Allowed Equity Interest shall receive, in full and final satisfaction of its Allowed Equity Interest: <br><br> o In the event of a Restructuring, Equity Interests shall receive no distribution under the Plan, and all Equity Interests shall be released, discharged, and extinguished, as the case may be, and shall be of no further force or effect, and such Holder shall receive no recovery on account of such Allowed Equity Interest. <br> o In the event of a Sale Transaction, except as otherwise provided in and giving effect to any applicable Sale Order, after the Holders of Allowed Prepetition Term Loan Claims, Holders of Allowed Claims entitled to priority of payment under 11 U.S.C. § 507, and Holders of Allowed Claims in Class 4 and Class 6 have been satisfied in full in Cash, Holders of Allowed Equity Interests shall receive the amount of Cash, if any, to which Equity Interests are legally entitled under the Bankruptcy Code. <br><br> o **These Interests are Impaired under the Plan and are <u>not</u> entitled to vote (deemed to reject).** |
| **Exit Facility** | **In the event of a Restructuring**, the Debtors' exit financing will comprise (1) new money funding to the Reorganized Debtors in the amount $11 million on a committed basis and $10 million on an uncommitted basis on terms sufficient to establish feasibility of the Plan and as otherwise set forth in the Exit Facility Term Sheet; and (2) Rollover Exit Facility Loans in the approximate amount of $80.3 million representing the estimated total amount of accrued DIP Facility Claims as of the Effective Date converted on a dollar-for-dollar basis into exit financing. |
| **Management Incentive Plan** | **In the event of a Restructuring:** The Plan provides that, in the event of a Restructuring, within 120 days after the Effective Date, the New Board shall adopt the Management Incentive Plan. Confirmation of the Plan does not constitute the Court's approval of or endorsement of the terms of the Management Incentive Plan. |
| **Corporate Governance** | **In the Event of a Restructuring** |

As of the Effective Date, the terms of the current members of the board of directors of Starry Holdings shall expire and, without further order of the Bankruptcy Court or other corporate action by the Debtors or the Reorganized Debtors, the New Board shall be approved.  The New Board or managers (as applicable) and the officers of the Reorganized Debtors shall be appointed in accordance with the respective New Organizational Documents.  The officers and overall management structure of the Reorganized Debtors, and all officers and management decisions with respect to the Reorganized Debtors (and/or any of their direct or indirect subsidiaries), compensation arrangements, and affiliate transactions shall be subject to the required approvals and consents set forth in the New Organizational Documents.

In the event of a Restructuring, the New Board will initially consist of 5 members, one of whom will be the chief executive officer of the Reorganized Debtors and the others of whom will be appointed by the holders of New Common Equity.  Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will, to the extent reasonably practicable, disclose in advance of Confirmation the identity and affiliations of any person proposed to serve on the New Board.

From and after the Effective Date, each director, officer, or manager of the Reorganized Debtors shall be appointed and serve pursuant to the terms of its respective charters and bylaws or other formation and constituent documents, and the New Organizational Documents, and applicable laws of the respective Reorganized Debtor's jurisdiction of formation.  To the extent that any such director or officer of the Reorganized Debtors is an "insider" pursuant to section 101(31) of the Bankruptcy Code, the Debtors will disclose the nature of any compensation to be paid to such director or officer.

### In the Event of a Sale Transaction

On and after the Effective Date, the Plan Administrator shall act for the Debtors in the same fiduciary capacity as applicable to a board of managers, directors, and officers, subject to the provisions of the Plan (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same).  On the Effective Date, the authority, power, and incumbency of the persons acting as managers, directors, and officers of the Debtors shall be deemed to have terminated, the persons acting as managers, directors, and officers of the Debtors shall be

| | deemed to have resigned, and a representative of the Plan Administrator shall be appointed as the sole manager and sole officer of the Debtors, and shall succeed to the powers of the Debtors' managers, directors, and officers. From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Debtors. The Plan Administrator shall use commercially reasonable efforts to operate in a manner consistent with the Wind-Down Budget. The Plan Administrator shall carry out any necessary functions required by the applicable Sale Transaction Documentation. |
| | As of the Effective Date, the Plan Administrator shall act as the sole officer, director, and manager, as applicable, of the Debtors with respect to their affairs. Subject in all respects to the terms of the Plan, the Plan Administrator shall have the power and authority to take any action necessary to wind down and dissolve any of the Debtors, and shall (a) file a certificate of dissolution for any of the Debtors, together with all other necessary corporate and company documents, to effect the dissolution of the Debtors under the applicable laws of the applicable state(s) of formation; and (b) complete and file all final or otherwise required federal, state, and local tax returns and shall pay taxes required to be paid for any of the Debtors, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of any of the Debtors or their Estates for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws. |
| | The filing by the Plan Administrator of any of the Debtors' certificate of dissolution shall be authorized and approved in all respects without further action under applicable law, regulation, order, or rule, including any action by the stockholders, members, board of directors, or board of managers of any of the Debtors or any of their Affiliates. |
| **Wind-Down and Plan Administrator** *in the Event of a Sale Transaction* | In the event of a Sale Transaction, on and after the Effective Date, in accordance with the Wind-Down Budget, the Debtors shall (1) continue in existence for purposes of (a) winding down the Debtors' businesses and affairs as expeditiously as reasonably possible, (b) resolving Disputed Claims as provided under the Plan, (c) paying Allowed Claims not assumed by the applicable Successful Bidder as provided under the Plan, (d) filing appropriate tax returns, (e) complying with their continuing obligations under the applicable Sale Transaction Documentation (including with respect to the transfer of permits to the applicable Successful Bidder as contemplated therein), |

|  | and (f) administering the Plan in an efficacious manner; and (2) thereafter liquidate and dissolve as set forth in the Plan. The Plan Administrator shall carry out these actions for the Debtors. |
|  | In the event of a Sale Transaction, on the Effective Date, the Debtors shall retain Sale Transaction Proceeds in the amount of the Wind-Down Amount in accordance with the terms of the Wind-Down Budget. Any remaining amounts in the Wind-Down Amount following all required distributions therefrom in accordance with the terms of the Wind-Down Budget shall promptly be distributed in accordance with the Bankruptcy Code and the Plan. |
| **Compensation and Benefit Arrangements** | Subject to the provisions of the Plan, all Compensation and Benefits Programs shall be treated as Executory Contracts under the Plan and, in the event of a Restructuring, with the consent of the DIP Agent and Prepetition Agent, deemed assumed on the Effective Date pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code. In the event of a Sale Transaction, the Compensation and Benefits Programs shall either be assumed and assigned upon consummation of an applicable Sale Transaction in accordance with the terms and conditions of the applicable Sale Transaction Documentation or, if no Successful Bidder assumes the Compensation and Benefits Programs, rejected. In the event of a Restructuring or assumption by a Successful Bidder of the Compensation and Benefits Programs, all Proofs of Claim filed for amounts due under any Compensation and Benefits Program shall be considered satisfied by the applicable agreement and/or program and agreement to assume and cure in the ordinary course as provided in the Plan. |
|  | The Restructuring, or any assumption of Compensation and Benefits Programs pursuant to the terms of the Plan, shall not be deemed to trigger any applicable change of control, vesting, termination, acceleration or similar provisions therein. No counterparty shall have rights under a Compensation and Benefits Program assumed pursuant to the Plan other than those applicable immediately prior to such assumption. |
| **Releases, Injunction and Exculpation** | Articles IX.B, IX.C, IX.D and IX.E of the Plan contain certain release, injunction and exculpation provisions that are set forth in Article V.G below. |
|  | **Article IX.C of the Plan contains a third-party release by Holders of Claims**. Pursuant to Article IX.C of the Plan (a) each Holder of a Claim that submits a Ballot accepting the Plan; |

| | |
|---|---|
| | (b) each Holder of a Claim that votes to reject the Plan but does not affirmatively "opt out" of the releases set forth in Article IX.C of the Plan by checking the box on their respective Ballot; (c) the DIP Lenders and the Prepetition Lenders; (d) any Successful Bidder, if applicable; and (e) all other Released Parties (other than any Debtor Releasing Party) shall be deemed to grant the Third-Party Release.  This release is discussed further in Article V.G of this Disclosure Statement. |
| **Means of Implementation** | The Plan contains standard means of implementation, including provisions authorizing the Debtors to engage in corporate restructurings (including incurring the Exit Facility and issuing the New Common Equity), provisions authorizing the steps necessary to consummate a Sale Transaction and the wind-down contemplated by Articles IV.W of the Plan (the "**Wind-Down**") (if a Sale Transaction is consummated), provisions regarding cancellation of prepetition debt agreements and equity interests, provisions specifying the sources of Plan distributions, provisions regarding the Reorganized Debtors' corporate existence and corporate governance, and the vesting of assets in the Reorganized Debtors, among other matters. |
| **Good Faith Compromise** | In consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against the Debtors and their Estates and Causes of Action against other Entities. |
| **Proofs of Claim** | On March 14, 2023, the Bankruptcy Court entered the *Order (I) Establishing Bar Dates and Related Procedures for Filing Proofs of Claim (Including for Claims Arising Under Section 503(b)(9) of the Bankruptcy Code), (II) Approving the Form* |

|  | *and Manner of Notice Thereof, and (III) Granting Related Relief* [Docket No. 128] (the "**Bar Date Order**") setting a bar date for the filing of Proofs of Claim related to certain prepetition Claims (the "**Claims Bar Date**").  The Plan expressly provides that (a) Administrative Claims must be filed by the Administrative Claims Bar Date, (b) any Claims arising from the Debtors' rejection of Executory Contracts or Unexpired Leases must be filed within thirty (30) days after entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, and (c) all other Proofs of Claim must be filed by the Claims Bar Date. |
|---|---|

### B.    Voting on the Plan

The Disclosure Statement Order (Docket No. 271) approved certain procedures governing the solicitation of votes on the Plan from Holders of Claims against the Debtors, including setting the deadline for voting, which Holders of Claims are eligible to receive Ballots to vote on the Plan, and other voting procedures.

**YOU SHOULD READ THE DISCLOSURE STATEMENT ORDER, THE CONFIRMATION HEARING NOTICE, AND THE INSTRUCTIONS ATTACHED TO YOUR BALLOT IN CONNECTION WITH THIS SECTION, AS THEY SET FORTH IN DETAIL PROCEDURES GOVERNING VOTING DEADLINES AND OBJECTION DEADLINES.**

Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims and Interests pursuant to the Bankruptcy Code.  Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.  The classification of Claims and Interests set forth in the Plan shall be deemed to apply separately with respect to each Plan proposed by each Debtor, as applicable.  The Plan provides for consolidation of the Debtors solely for purposes of voting, Confirmation, and distribution, but not for any other purpose.  The Debtors reserve the right to seek substantive consolidation of the Debtors in connection with Confirmation, but substantive consolidation shall not affect the legal and organizational structure of the Reorganized Debtors or their separate corporate existences and will not change the distributions to Holders of Claims compared to what is proposed in the Plan.

### 1.    Parties Entitled to Vote on the Plan

Under the Bankruptcy Code, only Holders of Claims or Interests in "impaired" classes are entitled to vote on the Plan (unless, for reasons discussed below, such Holders are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code).  Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" unless (i) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the Holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

The following table summarizes which Classes are Impaired and which of those Classes are entitled to vote on the Plan.  The table is qualified in its entirety by reference to the full text of the Plan.

| Class | Claim | Status | Voting Rights | Est. Amount | Est. Recovery |
|---|---|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Presumed to Accept | $0 | 100% |
| 2 | Other Secured Claims | Unimpaired | Presumed to Accept | $0 | 100% |
| 3 | Prepetition Term Loan Claims | Impaired | Entitled to Vote | $256,016 | Restructuring: 39.0%[3]<br>Sale Transaction: 39.0% |
| 4 | General Unsecured Claims[4] | Impaired | Entitled to Vote | $50,000 - $70,000 | Restructuring: 0.4 - 4.0%<br>Sale Transaction: 0.4 - 4.0% |
| 5 | Intercompany Claims | Unimpaired or Impaired | Presumed to Accept or Deemed to Reject | N/A | N/A |
| 6 | Subordinated Claims | Impaired | Deemed to Reject | $0 | 0% |
| 7 | Intercompany Interests | Unimpaired or Impaired | Presumed to Accept or Deemed to Reject | N/A | N/A |
| 8 | Equity Interests | Impaired | Deemed to Reject | $0 | 0% |

Accordingly, only Holders of record of Claims in Classes 3 and 4, as of March 31, 2023, the Voting Record Date established by the Debtors for purposes of the solicitation of votes on the Plan, are entitled to vote on the Plan.  If your Claim or Interest is not in one of these Classes, you are not entitled to vote on the Plan and you will not receive a Ballot with this Disclosure Statement.  If

---

[3]  Recovery assumes that Holders of Prepetition Term Loans in Class 3 will receive their Pro Rata Share of the New Common Equity. Equity Value estimate assumes a total enterprise value set at the reserve price of $170 million and estimated net debt at exit of $70 million.

[4]  Estimate of General Unsecured Claims comprised of vendor trade claims, landlord damages claims pursuant to 502(b)(6), and other contract rejection damages claims; subject to final reconciliation in accordance with the Plan. Recovery assumes that Holders of General Unsecured Claims in Class 4 will receive their Pro Rata share of $250,000 to $2 million, as set forth in and pursuant to the terms of the Plan.

your Claim is in one of these Classes, you should read your Ballot and follow the listed instructions carefully.  Please use only the Ballot that accompanies this Disclosure Statement.

A vote on the Plan may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not cast, solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code. The Disclosure Statement Order also sets forth assumptions and procedures for determining the amount of Claims that each creditor is entitled to vote in these Chapter 11 Cases and how votes will be counted under various scenarios.

**Your vote on the Plan is important**.   The Bankruptcy Code requires as a condition to confirmation of a plan of reorganization that each class that is impaired and entitled to vote under a plan votes to accept such plan, unless the plan is being confirmed under the "cramdown" provisions of section 1129(b) of the Bankruptcy Code.  Section 1129(b) permits confirmation of a plan of reorganization, notwithstanding the non-acceptance of the plan by one or more impaired classes of claims or equity interests, so long as at least one impaired class of claims or interests votes to accept a proposed plan, without counting votes cast by insiders.  Under that section, a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting class.   The Debtors are seeking confirmation pursuant to section 1129(b) of the Bankruptcy Code.

The Bankruptcy Code defines acceptance of a plan by a class of claims as acceptance by Holders of at least two-thirds (⅔) in dollar amount and more than one-half (½) in number of the claims of that class that cast ballots for acceptance or rejection of a plan. Thus, acceptance by a class of claims occurs only if at least two-thirds (⅔) in dollar amount and a majority in number of the Holders of claims voting cast their ballots to accept the plan.

<p style="text-align:center">2.      <strong>Solicitation Materials</strong></p>

The Solicitation Materials sent to Holders of Claims entitled to vote on the Plan contain:

- A copy of the notice of the Confirmation Hearing, the Confirmation Objection Deadline, and the Voting Deadline (the "**Confirmation Hearing Notice**");

- a copy of this Disclosure Statement together with the exhibits thereto, including the Plan;

- a copy of the Disclosure Statement Order entered by the Bankruptcy Court [Docket No. 271] (without exhibits), which approved this Disclosure Statement, established the Solicitation Procedures, scheduled a Confirmation Hearing, and set the Voting Deadline and the deadline for objecting to Confirmation of the Plan;

- a cover letter from the Debtors explaining the solicitation process and urging Holders of Claims in the voting Classes to vote to accept the Plan;

- for Holders of General Unsecured Claims, a letter from the Committee; and

- an appropriate form of Ballot, instructions on how to complete the Ballot, and a prepaid, pre-addressed Ballot return envelope.

In addition, the following materials were sent to Holders of Claims and Interests not in voting Classes and Holders of Unclassified Claims:

- a copy of the Confirmation Hearing Notice; and

- a notice informing such Holders that they are not entitled to vote under the terms of the Plan (the "**Notice of Non-Voting Status**").

The following materials were sent to counterparties to executory contracts and unexpired leases:

- a notice (the "**Contract/Lease Notice**") that gives (i) notice of the filing of the Plan; (ii) notice that such party has been identified as a party to an Executory Contract or Unexpired Lease; (iii) instructions regarding the Confirmation Hearing and how to obtain a copy of the Solicitation Package (other than a Ballot) free of charge; (iv) detailed directions for filing objections to confirmation of the Plan; and (v) notice of the scheduled time, date, and location for the Confirmation Hearing, *provided* that any contract counterparty that receives a Solicitation Package to vote to accept or reject the Plan on account of any General Unsecured Claim will not receive the Contract/Lease Notice.

Further, the Plan, the Disclosure Statement, and, once they are filed, all exhibits to both documents (including the Plan Supplement) will be made available online at no charge at the website maintained by the Debtors' Voting Agent at http://www.kccllc.net/Starry. The Debtors will provide parties in interest (at no charge) with hard copies of the Plan and/or Disclosure Statement, as well as any exhibits thereto, upon request to the Voting Agent by email at StarryInfo@kccllc.com or by telephone for U.S. callers at (866) 480-0830  and for international callers at (781) 575-2040.

### 3. Voting Procedures, Ballots, and Voting Deadline

If you are entitled to vote to accept or reject the Plan, one or more Ballots has been enclosed in your Solicitation Materials for the purpose of voting on the Plan.  Please vote and return your Ballot(s) in accordance with the instructions accompanying your Ballot(s).

Prior to voting on the Plan, you should carefully review (1) the Plan and the Plan Supplement, (2) this Disclosure Statement, (3) the Disclosure Statement Order, (4) the Confirmation Hearing Notice, and (5) the detailed instructions accompanying your Ballot(s).

Each Ballot has been coded to reflect the Class of Claims it represents.  Accordingly, in voting to accept or reject the Plan, you must use only the coded Ballot or Ballots sent to you with this Disclosure Statement.

In order to be counted, all Ballots must be properly completed in accordance with the voting instructions on the Ballot or Master Ballot and **actually received** by the Voting Agent no later than the Voting Deadline (i.e., **May 15**, **2023**, **at 5:00 p.m. (Eastern Time)**) through one of the following means:

Mail, Courier, or Personal Delivery:    Starry Group Holdings, Inc. Ballot Processing
                                                        Ballot Processing

c/o Kurtzman Carson Consultants LLC
222 N. Pacific Coast Hwy., Ste. 300
El Segundo, CA 90245

Online Upload:                     http://www.kccllc.net/Starry

Detailed instructions for completing and transmitting Ballots are included with the Ballots and provided in the Solicitation Materials.

If the Voting Agent receives more than one timely, properly completed Ballot with respect to a single Claim prior to the Voting Deadline, the vote that will be counted for purposes of determining whether sufficient acceptances required to confirm the Plan have been received will be the vote recorded on the timely, properly completed Ballot, as determined by the Voting Agent, received last with respect to such Claim, *provided that*, if both a paper Ballot and electronic Ballot are submitted timely on account of the same General Unsecured Claim(s), the electronic Ballot shall supersede and revoke the paper Ballot.

If you are a Holder of a Claim who is entitled to vote on the Plan and did not receive a Ballot, received a damaged Ballot, or lost your Ballot, or if you have any questions concerning the Disclosure Statement, the Plan, the Ballot, or the procedures for voting on the Plan, please contact the Voting Agent at the phone numbers or email address listed above.

Before voting on the Plan, each Holder of a Claim in Classes 3 or 4 should read, in its entirety, this Disclosure Statement, the Plan and the Plan Supplement, the Disclosure Statement Order (Docket No. 271), the Confirmation Hearing Notice, and the instructions accompanying the Ballot(s). These documents contain important information concerning how Claims are classified for voting purposes and how votes will be tabulated. Holders of Claims entitled to vote are also encouraged to review the relevant provisions of the Bankruptcy Code and Bankruptcy Rules and/or consult their own attorney.

### C.       <u>Confirmation Hearing and Deadline for Objections to Confirmation</u>

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on whether the Debtors have fulfilled the confirmation requirements of section 1129 of the Bankruptcy Code. The Confirmation Hearing has been scheduled for **May 24, 2023, at 1:00 p.m. (Eastern Time)**, before the Honorable Judge Karen B. Owens, United States Bankruptcy Judge for the District of Delaware, in the United States Bankruptcy Court for the District of Delaware, located at 824 North Market Street, 6th Floor, Courtroom #3, Wilmington, Delaware. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice. Any objection to Confirmation must (a) be in writing; (b) state the name and address of the objecting party and the nature of the Claim or Interest held by such party; (c) state with particularity the basis and nature of any objection or response and include, where appropriate, proposed language to be inserted in the Plan to resolve any such objection or response; and (d) be filed, together with proof of service, with the Bankruptcy Court and served so as to be actually received on or before **May 15, 2023, at 5:00 p.m. (Eastern Time)**. Any such objections must be filed and served upon the persons designated in the Confirmation Hearing Notice in the manner and by the deadline described therein.

### D.    Advisors

The Debtors' bankruptcy legal advisors are Latham & Watkins LLP and Young Conaway Stargatt & Taylor, LLP.  Their financial advisors are FTI Consulting, Inc. and their investment bankers are PJT Partners, Inc.  The Debtors' advisors can be contacted at:

| | |
|---|---|
| Latham & Watkins LLP | Latham & Watkins LLP<br>355 South Grand Avenue, Suite 100<br>Los Angeles, California 90071<br>Attn: Jeffrey E. Bjork, Ted A. Dillman, and Jeffrey T. Mispagel<br>     jeff.bjork@lw.com<br>     ted.dillman@lw.com<br>     jeffrey.mispagel@lw.com<br><br>Latham & Watkins LLP<br>330 North Wabash Avenue, Suite 2800<br>Chicago, Illinois 60611<br>Attn: Jason Gott<br>     jason.gott@lw.com |
| Young Conaway Stargatt & Taylor, LLP | Rodney Square<br>1000 North King Street<br>Wilmington, Delaware 19801<br>Attn: Michael R. Nestor, Kara Hammond Coyle, Joseph M. Mulvihill, Timothy R. Powell<br>     mnestor@ycst.com<br>     kcoyle@ycst.com<br>     jmulvihill@ycst.com |
| FTI Consulting, Inc. | Three Times Square<br>9th Floor<br>New York, NY 10036<br>Attn: Mike Katzenstein<br>     mike.katzenstein@fticonsulting.com |
| PJT Partners, Inc. | PJT Partners LP<br>280 Park Avenue<br>New York, NY 10017<br>Attn: David Travin<br>     travin@pjtpartners.com |

## II.
## OVERVIEW OF THE DEBTORS' OPERATIONS

### A.    The Debtors' Corporate Structure

Starry Holdings is the publicly-traded parent company of Starry, Inc. (Delaware).  Starry, Inc. is the direct or indirect parent of all of the other Debtors in these Chapter 11 Cases, as well as their

non-Debtor affiliates (the Debtors and their non-Debtor affiliates, together, collectively the "**Company**" or "**Starry**").

A detailed organizational chart containing both Debtor and non-Debtor affiliates is attached hereto as **Exhibit C**.  A condensed version of the chart including only the Debtors is set forth below:



## B.    **The Debtors' Corporate History**

Starry, Inc. was founded in 2014 and is headquartered in Boston, Massachusetts.  From its founding, Starry, Inc. has been focused on delivering high-quality and affordable broadband access using innovative, proprietary wideband hybrid fiber wireless technology.

The Company's founders came together with a simple but ambitious goal to fundamentally change the broadband experience. They knew that if they could make broadband more accessible and affordable it would meaningfully improve people's lives and transform society. The broadband industry has traditionally been uncompetitive and internet infrastructure deployment has been slow, resulting in legacy infrastructure that has not been able to keep pace with rapid technological change, and has left millions of people unconnected or under-connected to the internet. The Company's founders knew that they could build something better, and they understood that there was a significant market opportunity to solve the key issues of speed of deployment, cost of deployment, and customer experience.

On September 17, 2021, Starry Holdings was incorporated as a Delaware corporation and a wholly-owned subsidiary of Starry, Inc. Starry Holdings was formed solely for the purpose of effectuating the SPAC Merger (as defined below) and to serve as the publicly traded parent company of Starry, Inc. following the closing of the Acquisition Merger (as defined below). Starry Holdings owes no material liabilities and does not operate any business, and its only assets are equity interests in Starry, Inc.

On October 6, 2021, FirstMark Horizon Acquisition Corp ("**FirstMark**"), Sirius Merger Sub, Inc., a Delaware corporation and wholly-owned subsidiary of FirstMark ("**Merger Sub**"), Starry, Inc., and Starry Holdings entered into a merger agreement (the "**Merger Agreement**").

The business combination was effected in two steps:

1.  On March 28, 2022 (the "**SPAC Merger Effective Time**"), FirstMark merged with and into Starry Holdings the "**SPAC Merger**"), with Starry Holdings surviving the SPAC Merger as a publicly traded entity and sole owner of Merger Sub; and

2.  On March 29, 2022 (the "**Acquisition Merger Effective Date**"), Merger Sub merged with and into Starry Inc. (the "**Acquisition Merger**", and, together with the SPAC Merger and all other transactions contemplated by the Merger Agreement, the "**Business Combination**"), with Starry, Inc. surviving the Acquisition Merger as a wholly owned subsidiary of Starry Holdings.

Upon consummation of the Business Combination on March 29, 2022, the Debtors received gross proceeds of $3.62 million consisting of cash held by FirstMark and proceeds from FirstMark's trust account.   In addition, 4,499,443 shares of FirstMark common stock held by public stockholders converted to Class A common stock of Starry Holdings on a 1-for-1.2415 basis. Starry Holdings also assumed FirstMark's public and private warrants, each of which were converted automatically into a warrant to purchase 1.2415 shares of Starry Group Class A common stock in connection with the Business Combination.

Concurrently with the Business Combination, certain investors purchased an aggregate of 14,533,334 shares of Starry Holdings Class A common stock for a purchase price of $7.50 per share pursuant to certain subscription agreements, amounting to an aggregate purchase price of approximately $109.0 million.   Other investors purchased an aggregate of 4,133,333 shares of Series Z Preferred Stock of Starry, Inc. at a purchase price of $7.50 per share, amounting to an aggregate purchase price of approximately $31.0 million, all of which such shares were automatically converted into shares of Starry Holdings Class A common stock on a 1-for-1 basis in connection with the Business Combination.

###### C.    The Debtors' Business Operations and Revenue

The Company is in the telecommunications industry and invests in the future of fixed wireless technology.   The Company designs and builds its own fixed wireless equipment, cloud-based network control plane, and billing and operations support systems to run their network and provide their service. Services are provided to customers in the Boston, Los Angeles, New York City, Denver, Washington, D.C. and Columbus metropolitan areas. On January 31, 2023, the Company announced its intention to voluntarily leave the Columbus, Ohio market. The decommissioning commenced in March and will be completed in June of this year.

**Debtors' Main Platform & Service**

*1.  Starry Platform*

The Debtors employ a proprietary fixed wireless technology stack operating in licensed spectrums to offer a unique and innovative solution to last mile fixed broadband access (which is the last connection between a provider's network, and the end user). To this end, they have designed and prototyped their own fixed wireless equipment as well as a cloud-based network control plane which runs their network and provides their services. The Debtors' ability to successfully integrate these components allows them to efficiently deploy their broadband network across a variety of markets and provide a robust and competitively-priced service to their customers.

*2. Starry Service*

The Debtors provide a straightforward internet service for their customers, with no hidden fees and no unwanted service bundling. Privacy is also a core tenet, with the Debtors collecting as little personal information as possible. Further, they do not block or prioritize any content, and are committed to net neutrality.

The Debtors install their network equipment at high elevations to maximize coverage from each base station (known as a "**Titan**"). The Titan base stations serve the Debtors' two types of customer terminals: (a) ("**Trident**") and (b) ("**Comet**"). Tridents are installed on the roofs of larger apartment buildings (usually 60 units or greater) and then connected to existing wiring to distribute internet services to subscribers within the building. Comets have the same capacity as Tridents, but in a smaller form factor designed for smaller buildings and single-family homes and can service up to 16 customers.

Initially, the Debtors' technology restricted them to primarily targeting large multiple dwelling units ("**MDUs**") with greater than 30 units. With the launch of the Comet in the second quarter of 2021, the Debtors were able to greatly increase their number of serviceable homes (which is a key metric they track). As of year-end 2022, the Debtors had approximately 6.0 million serviceable homes, 473,000 activated MDUs, and 90,490 direct customer relationships.

*3. Inclusion*

The Debtors incorporate digital equity into their mission through their Starry Connect program. Starry Connect is a low-cost program that brings broadband to underserved communities by partnering with public and private affordable housing owners. Since launching Starry Connect in 2018, the Debtors have signed agreements with over 62 public and private affordable housing owners and managers representing more than 55,000 apartment units. The Debtors also partner with other organizations focused on digital equity, including Microsoft and PCs for People, to improve connectivity and lower barriers to device access and digital literacy programs.

*4. Research & Development*

The Debtors invest heavily in research and development in order to both drive down the cost of their network technology and improve capacity over time. As of the Petition Date, they have already invested nearly $231.9 million in research and development since their founding. This has resulted in the development of their proprietary technology stack, which includes, among other

things, smart antennas, phased arrays, transceivers, low noise amplifiers, monolithic microwave integrated circuits, and a cloud-based network control plane.

The Debtors' key innovations were based on existing technologies. Instead of building new radio technology or using the expensive mobile industry 5G ecosystem, the Debtors built their technology stack on top of the Wi-Fi 802.11 radio standard. These radios have similar characteristics to mobile 5G chips, crucially, multi-user MIMO, which is a technology that allows the radio to serve multiple end points simultaneously. In connection with their radio technology, the Debtors developed key intellectual property around the use of licensed radio spectrum domains and combined them with ultra-high spectral-efficiency smart-antenna technologies. This combination allows the Debtors to achieve cost advantages with a robust roadmap for capacity enhancements over time.

The Debtors also developed their own fixed wireless technology, which allows them to upgrade rapidly to continuously drive down the costs of equipment rather than paying vendor margins to acquire third-party equipment. Their technology also allows them to save costs by deploying on existing infrastructure such as towers, rooftops, and dark fiber. Furthermore, the Debtors built their entire network control system—network core, operations support system, and business support system—on a custom cloud platform. This platform enables the Debtors to scale up to accommodate growth in their business.

5. *Intellectual Property & FCC Licenses*

The Debtors maintain a portfolio of trademarks, patents, copyrights, domain names, trade secrets, licenses, and contractual agreements to protect their intellectual property rights. In particular, the Debtors' patent portfolio protects intellectual property related to their use of radio technology in licensed spectrum domains, smart antenna systems, a cloud-based network control plane, and other technologies related to their business. As of the Petition Date, the Debtors held nine U.S. patents and had 12 U.S. patent applications pending, as well as three patents issued and 14 patent applications pending in foreign jurisdictions. The Debtors also held 19 registered trademarks in the United States and various foreign jurisdictions.

The Debtors also hold licenses from the FCC to operate their network, including 104 licenses authorizing exclusive use of certain 24 GHz spectrum bands held by Starry Spectrum Holdings LLC and two experimental licenses authorizing operations in the 37 GHz shared license spectrum held by Starry Spectrum LLC. The Debtors also hold 154 FCC non-common carrier E-band and microwave licenses held by Widmo Holdings LLC. The Debtors' FCC 24 GHz band licenses are highly valuable assets and may be sold separately from their go-forward operating business under the Bidding Procedures, subject to FCC approval.

**Debtors' 2022 Revenue**

Revenues grew to $32.0 million for the year ended December 31, 2022, representing a 44.2% increase over the year ended December 31, 2021.

**Debtors' Employees**

As of the Petition Date, the Company had a total of 292 employees, of which 291 are full-time employees and one is a part-time employee. The Company has a fluctuating number of part time employees, most of which serve as field sales representatives. The Company's employees are not represented by a union.

   D.    **The Debtors' Prepetition Capital Structure**

**Overview of the Debtors' Funded Debt**

As described in further detail below, the Debtors' funded debt consists of Prepetition Term Loans. A summary of the Debtors' prepetition funded debt is provided below:

| Instrument | Line Size/Original Amount | Approximate Amount Outstanding as of the Petition Date (including prepayment premium payable as a result of the commencement of the Chapter 11 Cases) | Priority of Prepetition Security Interests |
|---|---|---|---|
| Prepetition Term Loans | **Tranche A**: $50mm; maturing on February 14, 2024<br><br>**Tranche B**: $75mm; maturing on February 14, 2024<br><br>**Tranche C**: $50mm; maturing on February 14, 2024<br><br>**Tranche D**: $22.2mm; maturing on March 14, 2023 | $ 81,631,321.96 in Tranche A Loans<br><br>$113,115,736.45 in Tranche B Loans<br><br>$61,268,758.77 in Tranche C Loans<br><br>$31,493,242.05 in Tranche D Loans | The Tranche A Loans, Tranche B Loans, and Tranche C Loans rank pari passu, and are secured by a senior priority security interest in substantially all of the Debtors' assets.<br>The Tranche D Loans have payment priority in the waterfall over the other tranches, and are proposed to be "rolled up" into the DIP Facility. |
| **Total** | | **$287,509,059.23** | |

Certain of the Debtors are party to the Amended and Restated Prepetition Credit Agreement dated as of February 14, 2019 (as amended and restated by that certain Amended and Restated Prepetition Credit Agreement, dated as of December 13, 2019, as amended by the First Amendment to the Prepetition Credit Agreement, dated as of September 4, 2020, the Second Amendment to the Prepetition Credit Agreement, dated as of January 28, 2021, the Third Amendment to the Prepetition Credit Agreement, dated as of June 2, 2021, the Fourth Amendment to the Prepetition Credit Agreement, dated as of August 20, 2021, the Fifth Amendment to the Prepetition Credit Agreement, dated as of October 6, 2021, the Sixth Amendment to the Prepetition

Credit Agreement, dated as of January 13, 2022, the Seventh Amendment to the Prepetition Credit Agreement, dated as of March 26, 2022, and the Eighth Amendment to the Prepetition Credit Agreement, dated as of September 13, 2022, that certain Ninth Amendment to Prepetition Credit Agreement, dated as of December 14, 2022, that certain Tenth Amendment to Prepetition Credit Agreement, dated as of January 30, 2023, and as may be further amended, amended and restated, supplemented, or otherwise modified from time to time, the "**Prepetition Credit Agreement**") by and among the Debtors party thereto[5], ArrowMark Agency Services, LLC, as administrative agent, and the lenders from time to time party thereto (the "**Prepetition Lenders**").  Pursuant to the Prepetition Credit Agreement, the Prepetition Lenders have provided a secured term loan (the "**Prepetition Term Loans**") in an initial principal amount of $175 million, excluding the $22.2 million Tranche D loans (as defined in the Prepetition Credit Agreement).[6]

The Prepetition Term Loans incur interest at a rate equal to the London Interbank Offered Rate ("**LIBOR**"), subject to a floor of 2.0%, plus an applicable margin of 9.0% (with the interest rate capped at 13.25% per annum), and such interest is accrued on a quarterly basis.  The principal balance of the Prepetition Term Loans is scheduled to mature on February 2024.

In connection with the Ninth Amendment, Starry, Inc. entered into a fee letter pursuant to which Starry, Inc. is obligated to, among other things, pay a contingent value fee (a "**Contingent Value Fee**") to the Prepetition Lenders that are party to the Ninth Amendment in the event that a business combination transaction is consummated on or before December 14, 2027, which includes a sale of the assets or equity of the Debtors to a third party or a merger or other strategic transaction with a third party (each a "**Business Combination Transaction**"), to the extent that (a) the net cash proceeds payable to the Debtors in connection with such transaction are sufficient to prepay or repay in full the Prepetition Term Loans (determined exclusive of the Contingent Value Fee) or (b) such transaction is consummated after the prepayment or repayment in full of all Prepetition Term Loans (any such transaction, a "**CV Trigger Event**").  The amount of this Contingent Value Fee is equal to 9.0% of the transaction consideration payable in connection with a CV Trigger Event.

In connection with the Tenth Amendment, Starry, Inc. entered into a fee letter substantially similar to the Ninth Amendment fee letter described above pursuant to which Starry, Inc. is obligated to, among other things, pay a Contingent Value Fee to the Prepetition Lenders that are party to the Tenth Amendment in the event that a Business Combination Transaction is consummated on or before December 14, 2027.  The amount of this Contingent Value Fee is equal to 4.5% of the transaction consideration payable in connection with a CV Trigger Event.

The obligations arising under the Prepetition Terms Loans are secured by first priority security interests in, and liens upon, all of the assets of the Debtor Obligors other than certain excluded assets.

---

[5] The obligors under the Prepetition Credit Agreement are:  Starry, Inc., Starry Spectrum Holdings LLC, Starry (MA), Inc., Starry Spectrum LLC, Testco LLC, Widmo Holdings LLC, Vibrant Composites Inc., (collectively, the "**Debtor Obligors**").

[6] Upon approval of, and subject to the occurrence of, the rollup of the Tranche D Loans into the DIP Facility, the Tranche D Loans shall be excluded from the definition of Prepetition Term Loans.

**Equity Interests**

Starry Holdings is authorized to issue 800.0 million shares of Starry Holdings Class A Common Stock, which class was previously listed on the NYSE. In addition, Starry Holdings is authorized to issue 50.0 million shares of Class X Common Stock. The rights, including the liquidation and dividend rights, of the Starry Holdings Class A Common Stock and Class X Common Stock are identical, other than voting rights. In particular, each holder of Class X Common Stock has the right to 20 votes per share of Class X Common Stock and each holder of Starry Holdings Class A Common Stock has the right to one vote per share of Starry Holdings Class A Common Stock.

As of the Petition Date, Starry Holdings had issued approximately 158.9 million shares of Starry Holdings Class A Common Stock and 9.3 million shares of Class X common stock. All of the shares of Class X common stock are owned or controlled by the Company's Chief Executive Officer or his family members.

Immediately after giving effect to the Business Combination, Starry Holdings assumed 6,853,333 private placement warrants from FirstMark (the "**Private Placement Warrants**") and 13,800,000 public warrants from FirstMark listed on the NYSE (the "**Public Warrants**" and collectively with the Private Placement Warrants and the Public Warrants, the "**Warrants**"), each of which was converted automatically into a warrant to purchase 1.2415 shares of Starry Holdings Class A Common Stock in connection with the Business Combination. As of the Petition Date, there are approximately 12,934,880 Warrants outstanding to purchase shares of Starry Holdings Class A common stock.

<div align="center">

**III.**
**EVENTS LEADING TO COMMENCEMENT OF THE CHAPTER 11 CASES**

</div>

As a growth-stage company, the Debtors have invested significant capital to developing their technology and achieving greater penetration in established markets. As a result, the Debtors have generated losses and negative cash flows from operating activities since inception. The Debtors incurred a net loss of $166.5 million in 2021 and $215.9 million in 2022. Furthermore, the Debtors have ongoing capital intensive requirements in order to maintain their subscriber base in existing markets. The Debtors' most significant costs are incurred supporting their national network service, fiber backhaul costs, site rent and utilities, research and development, and general and administrative expenses. The Debtors expect that their costs will continue to increase as they continue to grow in existing markets.

<div align="center">

**A.     Business Combination and Efforts to Improve Liquidity**

</div>

As discussed above, the Debtors went public through a de-SPAC transaction in March 2022 (the "**de-SPAC**"). While the Debtors raised approximately $156.5 million in net proceeds in connection with the de-SPAC, this amount was significantly less than originally anticipated as a result of substantial redemptions by FirstMark stockholders in connection with the consummation of the de-SPAC.

In connection with the de-SPAC, FirstMark stockholders had the right to require FirstMark to redeem their shares of FirstMark common stock in exchange for a pro rata share of the funds in FirstMark's trust account in lieu of receiving shares of Starry Holdings Class A Common Stock in

<div align="center">

29

</div>

connection with the Business Combination.  FirstMark stockholders ultimately elected to redeem 91.25% of FirstMark's total outstanding shares of common stock in connection with the consummation of the de-SPAC.  As a result of the high level of such redemptions, FirstMark's trust account was substantially depleted and the Debtors received only $3.62 million in cash in FirstMark's trust account.

In the second quarter of 2022, the Debtors engaged SVB Leerink LLC ("**SVB**") to assist with a potential refinancing of their funded indebtedness and/or a private placement sale of equity. In the third quarter of 2022, the Debtors also retained Morgan Stanley & Co. LLC ("**Morgan Stanley**") to pursue a potential sale transaction in the form of an acquisition of the Debtors by a third party. With respect to the refinancing, the Debtors received interest and term sheets from multiple parties; however, all such parties would have required an equity raise as part of the contemplated transaction.  Given this condition and the deteriorating financing environment over the course of 2022, the Debtors engaged with a limited number of potential equity partners, focusing primarily on parties that had already indicated interest to SVB.  Four parties that indicated interest in a potential transaction conducted diligence, but only one ultimately submitted a term sheet in August 2022.  However, the Debtors and such party were unable to reach a definitive agreement for a transaction.

With respect to a potential sale transaction, Morgan Stanley engaged with a limited number of potential strategic investors.  Over a period of several months, these parties conducted extensive diligence, with one party submitting a non-binding indication of interest.  The Debtors engaged in significant discussions and negotiations with such party, which, from the perspective of the Debtors, appeared likely to result in a transaction as talks progressed.  However, such party ultimately terminated discussions with the Debtors and no definitive agreement between the parties was reached.

In addition to the above, the Debtors entered into a committed equity facility during the third quarter of 2022, although no funds were able to be raised thereunder due to the Debtors' depressed stock price.

### B.      Reductions in Force and Other Cost-Saving Measures

On October 19, 2022, the Board of Directors of Starry Holdings approved a plan of cost-cutting measures to conserve capital and improve liquidity.  The measures included reducing the Debtors' workforce by approximately 500 employees, representing approximately 50% of the Debtors' workforce.  This reduction in force is expected to result in approximately $48.0 million in cash operating expense savings related to foregone salaries and benefits in aggregate over the first 12 months of the cost-cutting plan.  The Debtors also instituted a freeze on hiring and non-essential expenditures, focusing on penetrating the Debtors' deployed network and deployed buildings where the Debtors had already invested capital.  The Debtors also withdrew from participation in the Rural Digital Opportunity Fund ("**RDOF**") program and received back cash from the associated letters of credit to increase liquidity and runway.[7]  On January 18, 2023, the Debtors

---

[7]  In December 2020, the FCC tentatively awarded the Debtors $268.5 million under the RDOF to serve 108,506 homes and businesses in nine states:  Alabama, Arizona, Colorado, Illinois, Mississippi, Nevada, Ohio, Pennsylvania, and Virginia.  The FCC granted final approval in August 2022.

announced a further reduction in workforce by approximately 100 employees, representing approximately 24% of the Debtors' then-current total workforce, which became effective on January 23, 2023. The decisions to enact reductions in force were based on cost-reduction initiatives intended to reduce operating expenses and allow the Debtors to focus on serving their existing core markets and customers, and are not expected to result in liability under the federal Worker Adjustment and Retraining Notification (WARN) Act or state law equivalents.

### C. Further Exploration of Strategic Alternatives

In October 2022, the Debtors retained PJT Partners LP ("**PJT**") and FTI Consulting, Inc. ("**FTI**") to assist with strategic planning. The Debtors directed PJT to commence a process to identify financial and strategic institutional investors or other investors interested in participating in a transaction with the Debtors, and advise the Debtors as to potential mergers or acquisitions and the sale or other disposition of any of the Debtors' business or assets.

Accordingly, before the Petition Date, PJT broadly engaged with a number of parties regarding bidding for the entirety of the Debtors' business through a purchase of Starry Holding's outstanding equity securities. In total, PJT contacted 79 parties, 32 of which signed non-disclosure agreements. However, only one party submitted a letter of interest after the first round of bidding, and no party ultimately submitted a bid.

The Debtors continued to market their business after the Petition Date in the pursuit of a value-maximizing sale process under the Bidding Procedures. The Debtors have, however, already extensively marketed their business prepetition as a result of PJT's process and the earlier Morgan Stanley and SVB processes.

### D. Discussions with Prepetition Term Lenders

Throughout the above-described timeframe, the Debtors were in close communication with the Prepetition Term Lenders. When it became clear that an out-of-court transaction was unlikely to materialize, the Debtors pivoted toward negotiating the terms of a mutually agreeable in-court process, while simultaneously continuing to pursue all available out-of-court options. Over the course of several weeks, the Debtors, the Prepetition Term Lenders, and each of their respective advisors engaged in vigorous, arm's-length negotiations over the terms of debtor-in-possession financing and potential forms of restructuring transactions. These discussions culminated in the execution of the Restructuring Support Agreement, which the Debtors believe well positions them to maximize value in the Chapter 11 Cases.

### E. Amendments & Waivers

The Company has required a number of waivers in respect of the Prepetition Credit Agreement in the previous year. In March 2022, the Term Lenders waived a default relating to a failure to deliver a fiscal year budget for the 2022 fiscal year on time as well as a default resulting from the inclusion of "going concern" language in the Company's 10-K.

In September 2022, the Company entered into an amendment of the Prepetition Credit Agreement to preemptively waive the financial liquidity covenant for a limited period of time. The latest amendment to the Prepetition Credit Agreement also added certain distressed/DIP-like features to

the Prepetition Credit Agreement, including an affirmative covenant that the Company achieve certain events set forth on a non-public schedule within the time period set forth on such schedule and a requirement that the Company deliver, weekly, a 13-week cash flow forecast. The Company was also required to make its CEO and a financial officer available for weekly calls.

<div align="center">

**IV.**
**OVERVIEW OF THE CHAPTER 11 CASES**

</div>

**A.    Commencement of Chapter 11 Cases**

After the execution of the Restructuring Support Agreement, on February 20, 2023, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. To minimize disruptions to the Debtors' operations, and to facilitate the efficient and expeditious confirmation of the Plan, the Debtors filed numerous motions seeking traditional "first-day" and other substantive relief.

**B.    First Day Motions**

On the Petition Date, the Debtors filed multiple motions seeking various forms of relief from the Bankruptcy Court, including authorization for the Debtors to maintain their operations in the ordinary course (the "**First Day Motions**").  Such relief was aimed at ensuring a seamless transition between the Debtors' prepetition and postpetition business operations, facilitating a smooth reorganization through the chapter 11 process, and minimizing disruptions to the Debtors' businesses.  The Debtors sought to, among other things:

- Jointly administer the chapter 11 cases [Docket No. 2], which the Bankruptcy Court approved on February 22, 2023 [Docket No. 52];

- Retain KCC as claims and noticing agent [Docket No. 3], which the Bankruptcy Court approved on February 22, 2023 [Docket No. 61];

- Establish notice and hearing procedures for transfers of, or worthlessness deductions with respect to, common stock of Starry Holdings [Docket No. 6], which the Bankruptcy Court approved on a final basis on March 20, 2023 [Docket No. 167];

- File a consolidated list of creditors and modify certain notice and identification requirements [Docket No. 4], which the Bankruptcy Court approved on February 22, 2023 [Docket No. 63];

- Continue insurance programs [Docket No. 9], which the Bankruptcy Court approved on a final basis on March 20, 2023 [Docket No. 165];

- Pay certain prepetition taxes and fees [Docket No. 10], which the Bankruptcy Court approved on a final basis on March 20, 2023 [Docket No. 166];

- Establish procedures for utility companies to request adequate assurance of payment and to prohibit utility companies from altering or discontinuing service [Docket No. 5], which the Bankruptcy Court approved on a final basis on March 20, 2023 [Docket No. 163];

- Continue the Debtors' customer programs [Docket No. 11], which the Bankruptcy Court approved on a final basis on March 20, 2023 [Docket No. 164];

- Pay certain lien claimants and foreign vendors [Docket No. 8], which the Bankruptcy Court approved on a final basis on March 21, 2023 [Docket No. 184];

- Pay certain critical vendors [Docket No. 7], which the Bankruptcy Court approved on a final basis on March 21, 2023 [Docket No. 183];

- Continue paying employee wages and benefits and processing workers' compensation claims [Docket No. 12], which the Bankruptcy Court approved on a final basis on March 20, 2023 [Docket No. 168];

- Reject certain executory contracts and unexpired leases [Docket No. 19], which the Bankruptcy Court approved on March 22, 2023 [Docket No. 189];

- Continue the use of the Debtors' cash management system, bank accounts, and business forms [Docket No. 13], which the Bankruptcy Court approved on a final basis on March 20, 2023 [Docket No. 162]; and

- Obtain postpetition financing and consensual use of cash collateral [Docket No. 18], which the Bankruptcy Court approved on an interim basis on February 23, 2023 [Docket No. 72].

### C.    Procedural Motions

The Debtors have filed or will file in the near future various motions regarding procedural issues common to chapter 11 cases of similar size and complexity, including, without limitation:

- A motion for entry of an order establishing procedures for the interim compensation and reimbursement of expenses of professionals [Docket No. 107], which the Bankruptcy Court approved on March 20, 2023 [Docket No. 173]; and

- A motion for entry of an order authorizing the Debtors to employ professionals used in the ordinary course of business [Docket No. 108], which the Bankruptcy Court approved on March 20, 2023 [Docket No. 174].

### D.    DIP Financing

Pursuant to the *Motion of Debtors for Entry of Interim and Final Orders  (I) Authorizing Debtors to Obtain Postpetition Financing,  (II) Authorizing Debtors to use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 18], the Debtors requested authority, among other things, to enter into a superpriority senior secured credit facility (the "**DIP Facility**").

The DIP Facility consists of: $43 million in New Money DIP Loans, as well as a proposed $31,493,242.05 in "rolled-up" Tranche D Loans. $12 million of the New Money DIP Loans became available upon entry of the Interim DIP Order, $15 million of the New Money DIP Loans

shall be available upon entry of the Final DIP Order, and $16 million of the New Money DIP Loans shall be available upon the occurrence of the earlier of entry of an order by the Court (1) approving a Sale Transaction or (2) confirming a plan of reorganization in the Chapter 11 Cases. The DIP Roll-Up Loans constitute a refinancing of $15 million of the Tranche D Loans on a dollar-for-dollar basis upon entry of the Interim DIP Order, and the remaining outstanding obligations under the Tranche D Loans upon entry of the Final DIP Order.

### E.   **Appointment of Committee**

On March 3, 2023 the United States Trustee for the District of Delaware appointed a five (5) member official committee of unsecured creditors (the "**Committee**") [Docket No. 99]. The Committee subsequently chose McDermott Will & Emery LLP as its counsel.  [Docket No. 104].

### F.   **Exclusivity**

Section 1121(b) of the Bankruptcy Code provides for a period of 120 days after the commencement of a chapter 11 case during which time a debtor has the exclusive right to file a plan of reorganization (the "**Exclusive Plan Period**").  In addition, section 1121(c)(3) of the Bankruptcy Code provides that if a debtor files a plan within the Exclusive Plan Period, it has a period of 180 days after commencement of the chapter 11 case to obtain acceptances of such plan, before the expiration of which no other party in interest may file a plan (the "**Exclusive Solicitation Period**," and together with the Exclusive Plan Period, the "**Exclusive Periods**").  Pursuant to section 1121(d) of the Bankruptcy Code, the Bankruptcy Court may, upon a showing of cause, extend the Exclusive Periods.  The Debtors' Exclusive Plan Period currently runs through June 20, 2023, and their Exclusive Solicitation Period runs through August 20, 2023, both of which are subject to extension upon order of the Bankruptcy Court.

### H.   **Sale-Related Motions**

Also on the Petition Date, the Debtors filed the Bidding Procedures Motion, seeking authorization to conduct a competitive and robust sale process consistent with the Restructuring Support Agreement, which process the Debtors believe will ensure that they receive top dollar for their assets to the extent they ultimately decide to consummate a Sale Transaction rather than a Restructuring.  On March 21, 2023, the Bankruptcy Court entered the Bidding Procedures Order [Docket No. 185], which approved the Bidding Procedures.

Also on the Petition Date, the Debtors filed the motion to approve the Contract Noticing Procedures, seeking authorization to set procedures and deadlines relating to the provision of notice to and timing for objections by non-Debtor counterparties to Executory Contracts and Unexpired Leases in respect of Cure Costs and any other objections to assumption or assumption and assignment of Executory Contracts and Unexpired Leases.  On March 14, 2023, the Bankruptcy Court entered the order approving the Contract Noticing Procedures [Docket No. 127].

<div align="center">

**V.**
**SUMMARY OF THE PLAN**

</div>

**THE STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN, A COPY OF WHICH**

**IS ATTACHED AS <u>EXHIBIT A</u> HERETO, AND IN THE DOCUMENTS REFERRED TO THEREIN, WHICH ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN (AS WELL AS THE EXHIBITS THERETO AND DEFINITIONS THEREIN).**

**THE STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENT OF SUCH TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN. HOLDERS OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTORS AND OTHER INTERESTED PARTIES ARE URGED TO READ THE PLAN AND THE EXHIBITS THERETO IN THEIR ENTIRETY SO THAT THEY MAY MAKE AN INFORMED JUDGMENT CONCERNING THE PLAN.**

### A.  <u>Classification and Treatment of Claims and Interests under the Plan</u>

Under the Bankruptcy Code, only "allowed" claims and interests may receive distributions under a chapter 11 plan. In general, an "allowed" claim or "allowed" interest means that the debtor agrees (or the bankruptcy court has ruled) that the claim or interest, including the amount, is in fact, a valid obligation of the debtor.

The Bankruptcy Code also requires that, for purposes of treatment and voting, the chapter 11 plan divide the different claims against, and interests in, the debtor into separate classes based upon their legal nature.  Claims of substantially similar legal nature are usually classified together, as are interests of a substantially similar legal nature.  Because an entity may hold multiple claims or interests that give rise to different legal rights, the claims and interests themselves, rather than their Holders, are classified.

Under a chapter 11 plan, the separate classes of claims and interests must be designated either as "impaired" (affected by the plan) or "unimpaired" (unaffected by the plan). If a class of claims or interests is "impaired," the Bankruptcy Code affords certain rights to the Holders of such claims or interests, such as the right to vote on the plan (unless the plan has deemed the class to reject the plan), and the right to receive under the chapter 11 plan no less value than the Holder would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

Pursuant to section 1124 of the Bankruptcy Code, a class of claims or interests is "impaired" unless the plan (a) does not alter the legal, equitable, and contractual rights of the Holders or (b) irrespective of the Holders' acceleration rights, cures all defaults (other than those arising from the debtor's insolvency, the commencement of the case, or non-performance of a nonmonetary obligation), reinstates the maturity of the claims or interests in the class, compensates the Holders for actual damages incurred as a result of their reasonable reliance upon any acceleration rights, and does not otherwise alter their legal, equitable, and contractual rights.  Typically, this means the Holder of an unimpaired claim will receive on the later of the effective date of the plan and the date on which amounts owing are due and payable, payment in full, in cash, and the remainder of the debtor's obligations, if any, will be performed as they come due in accordance with their terms. Thus, other than the right to accelerate the debtor's obligations, the holder of an unimpaired claim

generally will be placed in the position it would have been in had the chapter 11 cases not been commenced.

Consistent with these requirements, as described in Articles I.A and I.B above, the Plan divides the Claims against, and Interests in, the Debtors into eight (8) distinct Classes. Pursuant to the Bankruptcy Code, not all Classes are entitled to vote on the Plan. Under the Plan: (a) Classes 3 and 4 are Impaired and the Holders of Claims in such Classes are entitled to vote to accept or reject the Plan; (b) Classes 1 and 2 are Unimpaired and the Holders of Claims in such Class are conclusively presumed to have accepted the Plan and are thus not entitled to vote on the Plan; (c) Classes 6 and 8 are Impaired and the Holders of Claims and Interests in such Class (i) shall receive no distributions under the Plan on account of their Claims or Interests, (ii) are deemed to have rejected the Plan, and (iii) are not entitled to vote to accept or reject the Plan; and (d) Classes 5 and 7 are either Unimpaired or Impaired and the Holders of Intercompany Claims and Intercompany Interests in such Classes are conclusively presumed to have either accepted or rejected the Plan and are thus not entitled to vote on the Plan.

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights in respect of any Unimpaired Claim, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claim.

### B.   Acceptance or Rejection of the Plan; Effect of Rejection of Plan

Article III of the Plan sets forth certain additional rules governing the tabulation of votes under the Plan and related matters.  Among other things, Article III provides that (a) the Plan constitutes a separate chapter 11 plan of reorganization for each Debtor, but the Plan consolidates Claims against all Debtors solely for purposes of voting, Confirmation, and distribution, and the Debtors reserve the right to seek substantive consolidation of the Debtors in connection with Confirmation (III.A); (b) any Class that does not have a Holder of an Allowed Claim or a Claim temporarily Allowed by this Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such class pursuant to section 1129(a)(8) of the Bankruptcy Code (III.G); if a Class contains Claims eligible to vote and no Holders of Claims eligible to vote in such class vote to accept or reject the Plan, the Plan shall be deemed accepted by such class (III.G); and (d) the Debtors will seek confirmation of the Plan pursuant to 1129(b) of the Bankruptcy Code, which permits confirmation of a plan notwithstanding the rejection or deemed rejection of one or more Classes, provided that at least one Class entitled to vote has voted to accept the plan and certain other requirements are met, including that the Plan does not discriminate unfairly and is fair and equitable with respect to each impaired, non-consenting Class of Claims or Interests under the Plan (III.E).

### C.   Treatment of Executory Contracts and Unexpired Leases; Employee Benefits; and Insurance Policies

Article V of the Plan governs the treatment of the Debtors' Executory Contracts and Unexpired Leases, among other things. Article V.A of the Plan provides that in the event any Sale Transaction is consummated, the Assumed Contracts to be assumed and assigned in connection with such Sale

Transaction will be deemed assumed and assigned to the applicable Successful Bidder in accordance with the applicable Sale Transaction Documentation.

On the Effective Date, in the event of a Restructuring, except as otherwise provided in in the Plan, any Executory Contracts and Unexpired Leases (i) not previously assumed, or (ii) not previously rejected pursuant to an order of the Bankruptcy Court, subject to the reasonable consent of the Required Consenting Lenders after consulting with Birch Grove, will be deemed assumed as of the Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code *except* any Executory Contract or Unexpired Lease (1) identified on the Rejected Contracts List (which shall initially be filed with the Bankruptcy Court on the Plan Supplement Filing Date) as a contract or lease to be rejected, (2) that is the subject of a separate motion or notice to reject pending as of the Confirmation Date, or (3) that previously expired or terminated pursuant to its own terms (disregarding any terms the effect of which is invalidated by the Bankruptcy Code).

On the Effective Date, in the event of a Sale Transaction, except as otherwise provided in the Plan, any Executory Contract or Unexpired Lease (i) not previously assumed, (ii) not assumed and assigned in accordance with any Sale Transaction Documentation, (iii) not previously rejected pursuant to an order of the Bankruptcy Court, or (iv) not the subject of a pending motion to reject, assume or assume and assign as of the Effective Date will be deemed rejected.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute an order approving the assumptions or rejections of the Debtors' Executory Contracts and Unexpired Leases pursuant to sections 365(a) and 1123 of the Bankruptcy Code and effective on the occurrence of the Effective Date or, as to rejected Executory Contracts and Unexpired Leases, on such later date as may be identified on the Rejected Contracts List or other motion or notice to reject. Each Executory Contract and Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order, and not assigned to a third party (including the applicable Successful Bidder in the event of a Sale Transaction) on or prior to the Effective Date, shall re-vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as such terms may have been modified by order of the Bankruptcy Court or agreement of the parties. To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease or the execution of any other Restructuring (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. For the avoidance of doubt, consummation of the Restructuring shall not be deemed an assignment of any Executory Contract or Unexpired Lease of the Debtors, notwithstanding any change in name, organizational form, or jurisdiction of organization of any Debtor in connection with the occurrence of the Effective Date.

Notwithstanding anything to the contrary in the Plan, the Debtors or Reorganized Debtors, as applicable, subject to the Definitive Document Consent Rights, reserve the right to amend or supplement the Rejected Contracts List in their discretion prior to the Effective Date (or such later date as may be permitted by Article V.B or Article V.E of the Plan), *provided* that the Debtors

shall give prompt notice of any such amendment or supplement to any affected counterparty and such counterparty shall have a reasonable opportunity to object thereto on any grounds.

Notwithstanding anything to the contrary in the Plan, the terms of any 363 Sale Transaction Documentation and any 363 Sale Order shall govern the cure of defaults, assumption and assignment, and compliance with section 365 of the Bankruptcy Code with respect to any Executory Contracts or Unexpired Leases assumed and assigned pursuant to such 363 Sale Transaction Documentation and 363 Sale Order.

Article V.B of the Plan provides that any monetary defaults under each Executory Contract and Unexpired Lease to be assumed or assumed and assigned pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Cost in Cash on the Effective Date or as soon as reasonably practicable, subject to the limitation described below, or on such other terms as the parties to such Executory Contract or Unexpired Lease may otherwise agree, in each case subject to any applicable Plan Sale Transaction Documentation.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full satisfaction and cure of any Claims and defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, under any assumed Executory Contract or Unexpired Lease arising at any time prior to the effective date of assumption. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption, assumption and assignment, or Cure Cost in accordance with the Contract Noticing Procedures will be deemed to have assented to such assumption, assumption and assignment, and Cure Cost.

Article V.C of the Plan addresses Claims based on rejection of Executory Contracts and Unexpired Leases and provides that unless otherwise provided by a Bankruptcy Court order, any Proofs of Claim asserting Claims arising from the rejection of Executory Contracts and Unexpired Leases must be filed with the Notice and Claims Agent within thirty (30) days after the date of the effectiveness of the rejection of the applicable Executory Contract or Unexpired Lease. **Any Proofs of Claim arising from the rejection of Executory Contracts and Unexpired Leases that are not timely filed shall be subject to disallowance by further order of the Court upon objection on such grounds.** All Allowed Claims arising from the rejection of the Executory Contracts and Unexpired Leases shall constitute General Unsecured Claims and shall be treated in accordance with Article III.B of the Plan.

Article V.D of the Plan provides that the Debtors or Reorganized Debtors, and, to the extent assigned to a Successful Bidder in the event of a Sale Transaction, the Successful Bidder, as applicable, will perform under any contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by any Debtor, and will be liable thereunder in the ordinary course of business.

Article V.E is a reservation of the Debtors' rights. Neither the exclusion nor inclusion of any contract or lease in the Rejected Contracts List or Assumed Contract List, as applicable, nor anything contained in the Plan or Sale Transaction Documentation, nor the Debtors' delivery of a notice of proposed assumption and proposed Cure Cost to any contract and lease counterparties,

shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors, Reorganized Debtors, or Plan Administrator, as applicable, shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.  If there is a dispute regarding a Debtor's or Reorganized Debtor's liability under an assumed Executory Contract or Unexpired Lease, the Reorganized Debtors or Plan Administrator, as applicable, shall be authorized to move to have such dispute heard by the Bankruptcy Court pursuant to Article X.C of the Plan.

Article V.F of the Plan concerns the Debtors' Compensation and Benefit Programs and the Debtors' Workers' Compensation Programs.  Article V.F.1 provides that subject to the provisions of the Plan, all Compensation and Benefits Programs shall be treated as Executory Contracts under the Plan and, in the event of a Restructuring, with the consent of the DIP Agent and Prepetition Agent, deemed assumed on the Effective Date pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code. In the event of a Sale Transaction, the Compensation and Benefits Programs shall either be assumed and assigned upon consummation of an applicable Sale Transaction in accordance with the terms and conditions of the applicable Sale Transaction Documentation or, if no Successful Bidder assumes the Compensation and Benefits Programs, rejected.   In the event of a Restructuring or assumption by a Successful Bidder of the Compensation and Benefits Programs, all Proofs of Claim filed for amounts due under any Compensation and Benefits Program shall be considered satisfied by the applicable agreement and/or program and agreement to assume and cure in the ordinary course as provided in the Plan.

The Restructuring, or any assumption of Compensation and Benefits Programs pursuant to the terms in the Plan, shall not be deemed to trigger any applicable change of control, vesting, termination, acceleration or similar provisions therein.  No counterparty shall have rights under a Compensation and Benefits Program assumed pursuant to the Plan other than those applicable immediately prior to such assumption.

Article V.F.2 provides that, in the event of a Restructuring, as of the Effective Date, with the consent of the DIP Agent and Prepetition Agent, except as set forth in the Plan Supplement, the Debtors and the Reorganized Debtors shall continue to honor their obligations under:  (1) all applicable state workers' compensation laws; and (2) the Debtors' written contracts, agreements, agreements of indemnity, self-insured workers' compensation bonds, policies, programs, and plans for workers' compensation and workers' compensation Insurance Contracts (collectively, the "**Workers' Compensation Contracts**").  In the event of a Restructuring, all Proofs of Claims on account of workers' compensation shall, provided that the Debtors or Reorganized Debtors continue to honor such obligations, be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided* that nothing in the Plan shall limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors' defenses, Causes of Action, or other rights under applicable non-bankruptcy law with respect to the Workers' Compensation Contracts; *provided*, *further*, that nothing in the Plan shall be deemed to impose any obligations on the Debtors in addition to what is provided for under applicable state law and/or the Workers' Compensation Contracts.

In the event of a Sale Transaction, the Workers' Compensation Contracts shall either be assumed and assigned upon consummation of an applicable Sale Transaction in accordance with the terms and conditions of the applicable Sale Transaction Documentation or, if no Successful Bidder assumes the Workers' Compensation Programs, rejected.

### D.    Provisions Governing Distributions

Article VI of the Plan sets forth the mechanics by which Plan distributions will be made. As set forth more fully therein, Article VI of the Plan provides, among other things, that: (a) subject to certain exceptions, distributions under the Plan of the full amount provided for thereunder (i) on account of Claims and Interests Allowed on or before the Effective Date will generally be made on the Initial Distribution Date, and (ii) on account of Disputed Claims Allowed after the Effective Date will generally be made on the next Periodic Distribution Date that is at least thirty (30) days after the Claim is Allowed (VI.A-C); (b) distributions will be made based on the Debtors' books and records as of the Distribution Record Date and at the address for the relevant Holder in the Debtors' records as of the relevant distribution date (VI.D.1-2); (c) distributions on account of DIP Facility Claims will be made to the applicable DIP Agent (VI.D.3); (d) the Debtors or Plan Administrator, as applicable, are authorized to employ Distribution Agents on the terms set forth in the Plan (VI.D.5); (e) except for Claims in Classes 1 and 2, the Debtors, Plan Administrator, and the Distribution Agent, as applicable, shall not be required to make distributions of less than $100 (whether Cash or otherwise) or to make partial distributions or payments of fractions of dollars or securities (which amounts will instead be rounded down to the nearest whole dollar or share of New Common Equity (VI.D.6); (f) the Debtors or Plan Administrator, as applicable will hold undeliverable distributions, and will continue to honor un-negotiated checks, only for limited time-periods, after which the distributions shall revert to the Reorganized Debtors or Plan Administrator, as applicable (VI.D.7); (g) to the extent applicable, the Reorganized Debtors, Plan Administrator, or Distribution Agent, as applicable, shall comply with all tax withholding and reporting requirements, and all distributions pursuant to the Plan shall be subject to such requirements (VI.E); (h) on the Effective Date or as soon as reasonably practicable thereafter, each Holder of a certificate or instrument evidencing a Claim or Interest shall be deemed to have surrendered the same, and such certificate or instrument will be canceled with respect to the Debtors, and, except as provided otherwise under the Plan, including the Debtor Release and the Third-Party Release, such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another (including with respect to any agreement that governs the rights of a Holder of a Claim or Interest, which shall continue in effect to, *inter alia*, allow Holders to receive distributions under the Plan) (VI.F); and (i) no distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Contract (VI.G).

### E.    Procedures for Resolving Disputed, Contingent, and Unliquidated Claims or Interests

Article VII of the Plan governs the resolution of Disputed Claims and Interests. Pursuant to Article VII.A, after the Effective Date, and except as otherwise provided in the Plan, the Reorganized Debtors or Plan Administrator, as applicable, shall have and shall retain any and all available rights and defenses that the Debtors had with respect to any Claim, including, without limitation, the

right to assert any objection to Claims based on the limitations imposed by section 502 of the Bankruptcy Code. The Debtors and the Reorganized Debtors, or Plan Administrator, as applicable, may contest the amount and validity of any Disputed Claim or contingent or unliquidated Claim in the ordinary course of business in the manner and venue in which such Claim would have been determined, resolved or adjudicated if the Chapter 11 Cases had not been commenced.

Article VII.B provides that, except as otherwise specifically provided in the Plan, the Reorganized Debtors, or Plan Administrator, as applicable, shall have the authority: (1) to file, withdraw, or litigate to judgment objections to Claims; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

Article VII.C addresses estimation of claims. It provides that before or after the Effective Date, the Debtors, Reorganized Debtors, or Plan Administrator, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection; and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection; *provided* that if the Bankruptcy Court resolves the Allowed amount of a Claim, the Debtors and Reorganized Debtors or Plan Administrator, as applicable, shall not be permitted to seek an estimation of such Claim. Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor or Plan Administrator, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim subject to applicable law.

Article VII.D provides that if any portion of a Claim is Disputed, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until such Claim becomes an Allowed Claim; *provided* that if only a portion of a Claim is Disputed, such Claim shall be deemed Allowed in the amount not Disputed and payment or distribution shall be made on account of such undisputed amount.

Article VII.E provides that any objections to Claims shall be Filed on or before the Claims Objection Deadline, subject to any extensions thereof approved by the Bankruptcy Court.

F.      **Conditions Precedent to Confirmation and the Effective Date**

Article VIII of the Plan sets forth the conditions precedent to Confirmation, the Effective Date, and related matters. The conditions precedent set forth at Article VIII.A include that:

1. The Disclosure Statement Order shall have been entered by the Bankruptcy Court in form and substance reasonably acceptable to the Debtors.

2. In the event of a Plan Sale Transaction, the Plan Sale Transaction Documentation shall not have been terminated in accordance with its terms.

The conditions precedent set forth at Article VIII.B include that:

1. the Bankruptcy Court shall have entered the Confirmation Order and such order shall (A) be in form and substance consistent with the Restructuring Support Agreement and the Restructuring Support Agreement Term Sheet, or otherwise acceptable to the Company Parties and Required Consenting Lenders (in consultation with Birch Grove), (B) not have been vacated, and (C) not be subject to a stay pending appeal;

2. each of the applicable Definitive Documents shall (A) have been executed and effectuated and remain in full force and effect, (B) be in form and substance reasonably acceptable to the Debtors and the Required Consenting Lenders (in consultation with Birch Grove), and (C) be consistent with the Restructuring Support Agreement and the Restructuring Support Agreement Term Sheet, and any conditions precedent related thereto or contained therein shall have been satisfied before or contemporaneously with the occurrence of the Effective Date or otherwise waived in accordance with such applicable Definitive Document(s);

3. all governmental and third-party approvals, authorizations, rulings, documents, and consents that may be necessary in connection with the Restructuring and related transactions or Plan Sale Transaction (as applicable), including from the FCC, shall have been obtained, not be subject to unfulfilled conditions, and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on the Restructuring and related transactions or Plan Sale Transaction (as applicable);

4. no court of competent jurisdiction or other competent governmental or regulatory authority shall have issued a final and non-appealable order making illegal or otherwise restricting, limiting, preventing, or prohibiting the consummation of any Sale Transaction or Restructuring, as applicable, or any related transactions;

5. the Restructuring Support Agreement shall be in full force and effect, no termination event or event that would give rise to a termination event under the Restructuring Support Agreement upon the expiration of the applicable grace period shall have occurred, and the Restructuring Support Agreement shall not have been validly terminated before the Effective Date;

6. in the event of a Restructuring, the relevant Debtors shall have entered into the Exit Facility pursuant to documents in form and substance consistent with the Restructuring Support Agreement;

7. the releases and exculpation consistent with the terms of the Restructuring Support Agreement shall have been approved; and

8.   (A) all of the Prepetition Lenders' reasonable and documented fees and expenses payable under the Restructuring Support Agreement shall have been paid in full as of the Effective Date, and (B) amounts sufficient to pay Retained Professionals in full shall have been placed in the Professional Fee Escrow Account pending approval of payment of such fees and expenses by the Bankruptcy Court.

Article VIII.C provides that the Debtors, with the consent of the Required Consenting Lenders (in consultation with Birch Grove), which shall not be unreasonably withheld,  may waive any of the conditions to the Effective Date set forth above at any time, without any notice to parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than a proceeding to confirm the Plan.

Article VIII.D addresses the effect of non-occurrence of the Effective Date.  It provides that if the Effective Date does not occur on or before the termination of the Restructuring Support Agreement, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan, the Confirmation Order, or the Disclosure Statement shall:  (a) constitute a waiver or release of any Claims, Interests, or Causes of Action; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity.

Article IX of the Plan addresses releases, injunctions and related provisions.  These provisions include discharge of Claims and Interests under the Plan (IX.A); preservation of the rights of the Reorganized Debtors to setoff and recoup against Allowed Claims (IX.F); and release of Liens (IX.G).  In addition, Articles IX.B, IX.C, IX.D, and IX.E of the Plan contain important releases, injunctions, and exculpatory provisions.  These provisions are highlighted below.

**Article IX.C. contains a third-party release.  Pursuant to Article IX.C of the Plan, (a) each Holder of a Claim that submits a Ballot accepting the Plan; (b) each Holder of a Claim that votes to reject the Plan but does not affirmatively "opt out" of the releases set forth in Article IX.C of the Plan by checking the box on their respective Ballot; (c) the DIP Lenders and the Prepetition Lenders; (d) any Successful Bidder, if applicable; and (e) all other Released Parties (other than any Debtor Releasing Party) shall be deemed to grant the Third-Party Release.  This release is discussed further in Article V.G of this Disclosure Statement.**

Notwithstanding any language to the contrary in this Disclosure Statement, the Plan and/or the Confirmation Order, no provision herein shall (i) preclude the SEC from enforcing its police or regulatory powers; or (ii) enjoin, limit, impair or delay the SEC from commencing or continuing any claims, causes of action, proceeding or investigations against any non-Debtor person or non-Debtor entity in any forum.

## G.   Releases

The following definitions are important to understanding the scope of the releases being given under the Plan:

"**Exculpated Party**" means (a) the Debtors; (b) the Debtors' directors and officers who served at any time between the Petition Date and the Effective Date of the Plan; (c) the Committee; (d) the members of the Committee, and the individuals who served on the Committee on behalf of each member; (e) the Retained Professionals; (f) as to all Debtors who are limited liability companies, their managing members; and (g) with respect to each of the foregoing in clauses (a) and (c), solely to the extent they are estate fiduciaries, and without duplication of parties otherwise set forth above, each such Entity's current and former affiliates, and each such Entity's and its current and former affiliates' current and former subsidiaries, officers, directors (including any sub-committee of directors), managers, principals, members (including ex officio members and managing members), employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such on or after the Petition Date and prior to or on the Effective Date.

"**Non-Debtor Releasing Parties**" means, (a) all Holders of Claims that vote to accept the Plan; (b) all Holders of Claims that vote to reject the Plan but do not "opt out" of the releases set forth in Article IX.C of the Plan by checking the box on their respective Ballot; (c) the DIP Agent and the Prepetition Agent; (e) the DIP Lenders and the Prepetition Lenders; (d) any Successful Bidder, if applicable, and (e) all other Released Parties (other than (1) any Debtor Releasing Party and (2) any Related Person of any Released Parties, except to the extent such Released Party is legally entitled to bind such Related Person to the releases contained in the Plan under applicable non-bankruptcy law).

"**Released Party**" means, collectively: (a) the Debtors; (b) the Reorganized Debtors; (c) the DIP Agent and the Prepetition Agent; (d) the DIP Lenders and the Prepetition Lenders; (e) any Successful Bidder, if any; and (f) the respective Related Persons for each of the foregoing provided, that, any party identified in clauses (a) through (e) hereof shall not be a Released Party unless such party is also a Releasing Party.

"**Releasing Party**" means, collectively, Debtor Releasing Parties and Non-Debtor Releasing Parties, including each Related Person of each Debtor Releasing Party and Non-Debtor Releasing Party, but solely in their capacity as such to the extent such Debtor Releasing Party and Non-Debtor Releasing Party is legally entitled to bind such Related Person to the releases contained in the Plan under applicable non-bankruptcy law.

In January 2023, as it became apparent that the Debtors' marketing process for an out-of-court transaction might not be achievable, and that a bankruptcy filing might be necessary to maximize the Company's value, the Company initiated an investigation to determine whether, in the context of a bankruptcy, it might be appropriate to grant releases to various parties and constituencies affiliated with the Company in connection with a plan of reorganization. Such investigations are frequently undertaken in this context.

To that end, the Company directed Young Conaway Stargatt & Taylor, LLP ("**Young Conaway**") to investigate potential claims that the Company might hold against its directors, officers, employees, lenders, stockholders, or advisors. The investigation focused on the following types of claims: (i) breach of fiduciary duty by the Company's directors, officers, and (if applicable) any controlling stockholder(s); (ii) breach of contract; (iii) fraud; (iv) fraudulent transfer or conveyance

against the Company's lenders and stockholders; and (v) any other actions that might give rise to claims such as equitable subordination or re-characterization.  The investigation included, without limitation, review of the de-SPAC and related transactions, the prepetition capital structure and related documents, and the various financing and sale processes undertaken by the Company to raise capital and provide liquidity to support the Company's business.  In furtherance of the investigation, Young Conaway received and reviewed numerous documents for the period of 2020 through the present.

These documents included, among other things, (i) minutes of meetings of the board of directors and resolutions adopted by the board of directors; (ii) credit documents relating to the Company's financing arrangements; (iii) any material contracts between the Company, on the one hand, and any potentially released parties, on the other; (iv) audited financial statements of the Company; and (v) organizational documents of the Company.  Young Conaway, on behalf of the Company, reviewed each responsive document.

In addition to a review of documents, Young Conaway interviewed six members of the board and upper management, including all four of the Company's present directors, as well as the CEO, the principal financial officer, and the general counsel.  Interviewees were asked a number of questions to help determine whether the Company might hold claims against any potentially released party, including its lenders, or against its directors and officers, for the period from 2020 to the present.  Interviewees were questioned on, as applicable, corporate governance and management, potential conflicts, Starry's financing arrangements and fund-raising efforts, material contracts, potential and executed transactions, director and officer compensation, and other topics.

The investigation remains ongoing; however, based on the review of documents provided to the board of directors and the interviews completed by Young Conaway to date, the investigation has not yielded evidence that would support a colorable claim against any of Starry's directors, officers, employees, stockholders, lenders, or advisors arising during the period from 2020 to the present, or that would otherwise warrant not providing releases.

        a.      Releases by the Debtors (IX.B)

**Pursuant to section 1123(b) and any other applicable provisions of the Bankruptcy Code, and except as otherwise expressly provided in the Plan, effective as of the Effective Date, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, the Debtor Releasing Parties will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full release, to the maximum extent permitted by law, to each of the Released Parties (and each such Released Party so released shall be deemed forever released by the Debtor Releasing Parties) and their respective assets and properties (the "<u>Debtor Release</u>") from any and all claims, Causes of Action, and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state statutory or common laws, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or**

**taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of the Debtors, including, without limitation, (i) the Chapter 11 Cases, the Disclosure Statement, the Plan, the Restructuring Support Agreement, the Restructuring Documents, or the Sale Process; (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan; (iii) the business or contractual arrangements between any Debtor and any Released Parties; (iv) the negotiation, formulation or preparation of the Restructuring Support Agreement, the Plan, the Disclosure Statement, the Plan Supplement, the Restructuring Documents, any Sale Transaction Documentation, or any agreements, instruments or other documents related to any of the foregoing; (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases; (vi) the purchase, sale, or rescission of the purchase or sale of any Equity Interest of the Debtors or the Reorganized Debtors; and/or (vii) the Confirmation or consummation of the Plan or the solicitation of votes on the Plan that such Debtor Releasing Party would have been legally entitled to assert (whether individually, collectively, or on behalf of any Holder of a Claim or Equity Interest) or that any Holder of a Claim or Equity Interest or other Entity would have been legally entitled to assert for, or on behalf or in the name of, any Debtor, its respective Estate or any Reorganized Debtor (whether directly or derivatively) against any of the Released Parties; *provided, however*, that the foregoing provisions of this Debtor Release shall not operate to waive or release: (i) any Causes of Action arising from willful misconduct, actual fraud, or gross negligence of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; and/or (ii) the rights of such Debtor Releasing Party to enforce the Plan, any Sale Transaction Documentation and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with the Plan or any Sale Transaction or assumed pursuant to the Plan or any Sale Transaction or assumed pursuant to Final Order of the Bankruptcy Court.  The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person, and the Confirmation Order will permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Debtor Release. Notwithstanding the foregoing, nothing in this <u>Article IX.B</u> shall or shall be deemed to (i) prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors and/or (ii) operate as a release or waiver of any Intercompany Claims, in each case unless otherwise expressly provided for in the Plan.**

<div style="text-align:center">b.      Third-Party Release (IX.C)</div>

**Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) and any other applicable provisions of the Bankruptcy Code, effective as of the Effective Date, to the fullest extent permitted by applicable law, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, and without limiting or otherwise modifying the scope of the Debtor Release**

provided by the Debtor Releasing Parties above, each Non-Debtor Releasing Party, on behalf of itself and any other Persons that might seek to claim under or through such Non-Debtor Releasing Party, including any affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, Representatives, consultants, and agents, will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full release to each of the Released Parties (and each such Released Party so released shall be deemed forever released by the Non-Debtor Releasing Parties) and their respective assets and properties (the "<u>Third-Party Release</u>") from any and all claims, interests, Causes of Action, and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, matured or unmatured, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state statutory or common laws, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, based on or relating to, or in any manner arising from, in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of the Debtors, including, without limitation, (i) the Chapter 11 Cases, the Disclosure Statement, the Plan, the Restructuring Support Agreement, the Restructuring Documents, or the Sale Process; (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan; (iii) the business or contractual arrangements between any Debtor and any Released Parties; (iv) the negotiation, formulation or preparation of the Restructuring Support Agreement, the Plan, the Disclosure Statement, the Plan Supplement, the Restructuring Documents, any Sale Transaction Documentation, or any agreements, instruments or other documents related to any of the foregoing; (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases; (vi) the purchase, sale, or rescission of the purchase or sale of any Equity Interest of the Debtors or the Reorganized Debtors; and/or (vii) the Confirmation or consummation of the Plan or the solicitation of votes on the Plan that such Non-Debtor Releasing Party would have been legally entitled to assert (whether individually or collectively) against any of the Released Parties; *provided, however*, that the foregoing provisions of this Third-Party Release shall not operate to waive or release: (i) any Causes of Action arising from willful misconduct, actual fraud, or gross negligence of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; and/or (ii) the rights of such Non-Debtor Releasing Party to enforce the Plan, any Sale Transaction Documentation and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with the Plan or any Sale Transaction or assumed pursuant to the Plan or any Sale Transaction or Final Order of the Bankruptcy Court. The foregoing release shall be effective as of the Effective Date, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person, and the Confirmation Order will permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Third-Party Release.

        c.      Exculpation (IX.D)

Effective as of the Effective Date, the Exculpated Parties shall neither have nor incur any liability to any Person or Entity for any claims or Causes of Action or for any act taken or omitted to be taken on or after the Petition Date and prior to or on the Effective Date in connection with, or related to, the administration of the Chapter 11 Cases, commencement of the Chapter 11 Cases, pursuit of Confirmation and consummation of the Plan, making Distributions, the Disclosure Statement, the Sale Process, the Sale Order, or the solicitation of votes for, or Confirmation of, the Plan; the occurrence of the Effective Date; the administration of the Plan or the property to be distributed under the Plan; the issuance of securities under or in connection with the Plan; the purchase, sale, or rescission of the purchase or sale of any asset or security of the Debtors; or the transactions or documentation in furtherance of any of the foregoing, including but not limited to the Restructuring Support Agreement; or any other postpetition, pre-Effective Date act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, the approval of the Disclosure Statement or Confirmation or consummation of the Plan; *provided, however,* that the foregoing provisions of this exculpation shall not operate to waive or release: (i) any Causes of Action arising from willful misconduct, actual fraud, or gross negligence of such applicable Exculpated Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; and/or (ii) the rights of any Person or Entity to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements and documents delivered under or in connection with the Plan or assumed pursuant to the Plan or Final Order of the Bankruptcy Court; provided, further, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning its respective duties pursuant to, or in connection with, the above referenced documents, actions or inactions. The foregoing exculpation shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person. Notwithstanding the foregoing, nothing in this **Article IX.D** shall or shall be deemed to prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors, in each case unless otherwise expressly provided for in the Plan. The Exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability.

> d.    Injunction (IX.E)

Except as otherwise provided in the Plan or the Confirmation Order (and, for the avoidance of doubt, subject to Article III.C), all entities who have held, hold, or may hold Claims, Interests, Causes of Action, or liabilities that: (a) are subject to compromise and settlement pursuant to the terms of the Plan; (b) have been released pursuant to Article IX.B of the Plan; (c) have been released pursuant to Article IX.C of the Plan, (d) are subject to exculpation pursuant to Article IX.D of the Plan (but only to the extent of the exculpation provided in Article IX.D of the Plan), or (e) are otherwise discharged, satisfied, stayed or terminated pursuant to the terms of the Plan, are permanently enjoined and precluded, from and after the Effective Date, from commencing or continuing in any manner, any action or other proceeding on account of any such claims, interests, Causes of Action, or liabilities that

**have been compromised, released, exculpated, or settled, as applicable, against the Debtors, the Reorganized Debtors, or any Entity so released or exculpated (or the property or estate of any Entity, directly or indirectly, so released or exculpated) pursuant to the terms of the Plan.**

H.     <u>**Standards Applicable to Releases**</u>

The breadth of the releases as set forth above is consistent with those regularly approved in this jurisdiction. "[T]he debtor should be given considerable latitude in addressing" whether to release claims as part of its plan. *In re Zenith Electronics Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999). *See, e.g.*, *In re VER Techs. HoldCo LLC*, No. 18-10834 (KG) (Bankr. D. Del. July 26, 2018) (approving release provisions including directors, officers, direct and indirect equity holders, and professional and financial advisors); *In re Clover Techs. Grp.*, LLC, No. 19-12680 (KBO) (Bankr. D. Del. Jan. 22, 2020) (approving similar debtor and third-party release provisions including, among other categories, directors, officers, direct and indirect equity holders, and professional and financial advisors).

The Released Parties, including the Prepetition Lenders and such parties' professionals and agents, certain of the Debtors' other key stakeholders, and the Debtors' officers and members of their board of directors, played an integral role in the formation of the Plan and the restructuring and sale processes contemplated thereby, and contributed to the Plan, restructuring and sale process, devoting significant time and resources to ensure the success of the Plan and transactions contemplated thereby.

The Debtors believe that the releases set forth in the Plan are appropriate because, among other things, the releases are expressly or impliedly consensual. Courts in the Third Circuit "have consistently held that a plan may provide for a release of third party claims against a non-debtor upon consent of the party affected." *In re Indianapolis Downs, LLC*, 486 B.R. 286, 305 (Bankr. D. Del. 2013). In addition to consent demonstrated by acceptance of the Plan by Holders entitled to vote, consent is also demonstrated as to the Holders of Claims who are provided instructions on how to opt out of such releases and do not do so by voting against the Plan but not opting out of the releases. *Id.* at 305 (citing *In re DBSD N. Am., Inc.*, 419 B.R. 179, 218-19 (Bankr. S.D.N.Y. 2009); *In re Conseco, Inc.*, 301 B.R. 525, 528 (Bankr. N.D. Ill. 2003)); *In re Arsenal Intermediate Holdings, LLC*, et al., Case No. 23-10097 (CTG) (Bankr. D. Del. March 27, 2023) [Docket No. 176] (approving opt-out construct and noting that "in the typical case, so long as the disclosure is prominent and conspicuous, and impaired creditors are given the ability to opt out simply by marking their ballot or by some other comparable device, it is appropriate to infer consent from a creditor's failure to opt out").

Here, consistent with the above case law, the releases by Holders of Claims against non-Debtors are given upon express or implied consent by Holders entitled to vote to accept or reject the Plan who either vote to accept the Plan or vote to reject the Plan but do not (in the latter case) opt out by appropriately marking their Ballots.

## VI.
## WIND-DOWN PROCESS IN THE EVENT OF A SALE TRANSACTION / CAPITAL STRUCTURE AND CORPORATE GOVERNANCE OF REORGANIZED DEBTORS IN THE EVENT OF A RESTRUCTURING

### A.    Sale Transaction

Article IV.C of the Plan provides that, if a Plan Sale Transaction is to be consummated, upon entry of the Confirmation Order, the Debtors shall be authorized to consummate the applicable Plan Sale Transaction to the applicable Successful Bidder pursuant to the terms of the applicable Plan Sale Transaction Documentation, the Plan, and the Confirmation Order.  In the event any Sale Transaction is consummated, the Sale Transaction Proceeds, the Professional Fee Escrow Amount, the Wind-Down Amount, any reserves required pursuant to the applicable Sale Transaction Documentation, the Debtors' rights under the applicable Sale Transaction Documentation, payments made directly by the applicable Successful Bidder on account of any Assumed Liabilities under the applicable Plan Sale Transaction Documentation, payments of Cure Costs made by the applicable Successful Bidder pursuant to sections 365 or 1123 of the Bankruptcy Code, and/or all Causes of Action not previously settled, released, or exculpated under the Plan, if any, shall be used to fund the distributions to Holders of Allowed Claims against the Debtors in accordance with the treatment of such Claims and subject to the terms provided in the Plan. Unless otherwise agreed in writing by the Debtors and the applicable Successful Bidder, distributions required by the Plan on account of Allowed Claims that are Assumed Liabilities shall be the sole responsibility of the applicable Successful Bidder even if such Claim is Allowed against the Debtors, and such Claims shall have no recovery from the Debtors under the terms of the Plan.

### B.    Wind-Down, Plan Administrator, Dissolution of the Boards of Directors/Managers, and Closing of the Chapter 11 Cases (In the Event of a Sale Transaction)

#### 1.    Wind-Down

Article IV.W of the Plan provides that, in the event of a Sale Transaction, on and after the Effective Date, in accordance with the Wind-Down Budget, the Debtors shall (1) continue in existence for purposes of (a) winding down the Debtors' businesses and affairs as expeditiously as reasonably possible, (b) resolving Disputed Claims as provided in the Plan, (c) paying Allowed Claims not assumed by the applicable Successful Bidder as provided in the Plan, (d) filing appropriate tax returns, (e) complying with their continuing obligations under the applicable Sale Transaction Documentation (including with respect to the transfer of permits to the applicable Successful Bidder as contemplated therein), and (f) administering the Plan in an efficacious manner; and (2) thereafter liquidate and dissolve as set forth in the Plan. The Plan Administrator shall carry out these actions for the Debtors.

#### 2.    Wind-Down Amount

Article IV.X of the Plan provides that in the event of a Sale Transaction, on the Effective Date, the Debtors shall retain proceeds from the Wind-Down Amount in accordance with the terms of the Wind-Down Budget. Any remaining amounts in the Wind-Down Amount following all required

distributions therefrom in accordance with the terms of the Wind-Down Budget shall promptly be distributed in accordance with the Bankruptcy Code and the Plan.

### 3.    Plan Administrator

Article IV.O of the Plan provides that, in the event of a Sale Transaction, on and after the Plan Effective Date, the Plan Administrator shall act for the Debtors in the same fiduciary capacity as applicable to a board of managers, directors, and officers, subject to the provisions of the Plan (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same).  On the Effective Date, the authority, power, and incumbency of the persons acting as managers, directors, and officers of the Debtors shall be deemed to have terminated, the persons acting as managers, directors, and officers of the Debtors shall be deemed to have resigned, and a representative of the Plan Administrator shall be appointed as the sole manager and sole officer of the Debtors, and shall succeed to the powers of the Debtors' managers, directors, and officers.  From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Debtors.  The Plan Administrator shall use commercially reasonable efforts to operate in a manner consistent with the Wind-Down Budget. The Plan Administrator shall carry out any necessary functions required by the applicable Sale Transaction Documentation.

### 4.    Dissolution of the Debtors

Article IV.Y of the Plan provides that, in the event of a Sale Transaction, as of the Effective Date, the Plan Administrator shall act as the sole officer, director, and manager, as applicable, of the Debtors with respect to their affairs. Subject in all respects to the terms of the Plan, the Plan Administrator shall have the power and authority to take any action necessary to wind down and dissolve any of the Debtors, and shall be authorized to (a) file a certificate of dissolution for any of the Debtors, together with all other necessary corporate and company documents, to effect the dissolution of the Debtors under the applicable laws of the applicable state(s) of formation; and (b) complete and file all final or otherwise required federal, state, and local tax returns and shall pay taxes required to be paid for any of the Debtors, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of any of the Debtors or their Estates for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

The filing by the Plan Administrator of any of the Debtors' certificate of dissolution shall be authorized and approved in all respects without further action under applicable law, regulation, order, or rule, including any action by the stockholders, members, board of directors, or board of managers of any of the Debtors or any of their Affiliates.

### 5.    Closing the Chapter 11 Cases

Article IV.Z of the Plan provides that when all Disputed Claims have become Allowed or disallowed, the Reorganized Debtors or Plan Administrator, as applicable, may seek authority from the Bankruptcy Court to close any remaining Chapter 11 Cases of the Debtors in accordance with the Bankruptcy Code and the Bankruptcy Rules.

As of the Effective Date, the Reorganized Debtors or Plan Administrator, as applicable, may submit separate orders to the Bankruptcy Court under certification of counsel closing the Chapter 11 Cases of all of the Debtors except for Debtor Starry Holdings and changing the caption of the Chapter 11 Cases accordingly.  Nothing in the Plan shall authorize the closing of any case retroactive to a date that precedes the date any such order is entered.  Any request for retroactive relief shall be made on motion served on the United States Trustee, and the Bankruptcy Court shall rule on such request after notice and a hearing.  Upon the Filing of a motion to close the Chapter 11 Case of Starry Holdings, the Reorganized Debtors or Plan Administrator, as applicable, shall file a final report with respect to all of the Chapter 11 Cases pursuant to Local Rule 3022-1(c).

### C.   Summary of Capital Structure of Reorganized Debtors (in the event of a Restructuring)

#### 1.   Post-Emergence Capital Structure

The following table summarizes the capital structure of the Reorganized Debtors (in the event of a Restructuring), including the post-Effective Date financing arrangements the Reorganized Debtors expect to enter into to fund their obligations under the Plan and provide for, among other things, their post-Effective Date working capital needs.  This summary of the Reorganized Debtors' capital structure is qualified in its entirety by reference to the Plan and the Exit Facility, as applicable.

| Exit Facility | $ Amount |
|---|---|
| **New Money Funding** | • $11 million on a committed basis, and $10 million on an uncommitted basis |
| **Rollover Exit Facility** | • Approximately $80.3 million representing the estimated total amount of accrued DIP Facility Claims as of the Effective Date converted on a dollar-for-dollar basis into exit financing. |

#### 2.   Exit Facility

Article IV.I of the Plan provides that in the event of a Restructuring, Confirmation of the Plan shall be deemed to constitute approval by the Bankruptcy Court of the Exit Facility and related agreements (including all transactions contemplated thereby, such as any supplementation or additional syndication of the Exit Facility, and all actions to be taken, undertakings to be made and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities and expenses provided for therein) and, subject to the occurrence of the Effective Date, authorization for the applicable Reorganized Debtors to enter into and perform their obligations in connection with the Exit Facility.

In the event of a Restructuring, on the Effective Date, the agreements with respect to the Exit Facility shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms.  The financial accommodations to be extended pursuant to the Exit Facility are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances, or

other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy law. On the Effective Date, all of the Liens and security interests to be granted in connection with the Exit Facility (1) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted in accordance with the Exit Facility, (2) shall be deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under in connection with the Exit Facility, and (3) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law.  The Reorganized Debtors and the Entities granted such Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

### 3.       Reorganized Starry Holdings Equity, New Common Equity and New Warrants

Article IV.J of the Plan provides that in the event of a Restructuring, on the Effective Date, in accordance with the terms of the Plan and as further set forth in the Plan Supplement, (i) New Starry shall acquire all of the Reorganized Starry Holdings Equity, (ii) New Starry shall issue all of the New Common Equity to Holders of Prepetition Term Loan Claims (subject to dilution by the Management Incentive Plan and New Warrants), and (iii) New Starry shall issue all of the New Warrants in accordance with the terms of the Exit Facility.  The issuance of (x) Reorganized Starry Holdings Equity and (y) New Common Equity and New Warrants by New Starry, pursuant to the Plan, is authorized without the need for further corporate action, and all of the Reorganized Starry Holdings Equity, New Common Equity and New Warrants issued or issuable pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.

Article IV.K of the Plan provides that the offering, issuance, and distribution of any Securities, including the New Common Equity and New Warrants in exchange for Claims pursuant to Article III of the Plan, shall be exempt from, among other things, the registration requirements of Section 5 of the Securities Act pursuant to section 1145 of the Bankruptcy Code.  Except as otherwise provided in the Plan or the governing certificates or instruments, any and all such New Common Equity and New Warrants  so issued under the Plan will be freely tradable under the Securities Act by the recipients thereof, subject to: (1) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in Section 2(a)(11) of the Securities Act, and compliance with any applicable state or foreign securities laws, if any, and any rules and regulations of the SEC, if any, applicable at the time of any future transfer of such Securities or instruments; (2) the restrictions, if any, on the transferability of such Securities and instruments; and (3) any other applicable regulatory approval.

Notwithstanding anything to the contrary in the Plan, no Entity shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New Common Equity or New Warrants are exempt from registration.

### D. Corporate Governance and Management of the Reorganized Debtors (In the Event of a Restructuring)

#### 1. Debtors' Organizational Matters

Article IV.D of the Plan provides that, except as otherwise provided in the Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate Entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended by the Plan, by the Debtors, or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval.

Article IV.E of the Plan provides that, in the event of a Restructuring or Equity Sale, except as otherwise provided in the Plan (including in Article III.B) or any agreement, instrument, or other document incorporated in the Plan, including the Restructuring Memorandum and agreements with respect to the Exit Facility, on the Effective Date, all property of each Estate, including all Excluded Assets (if applicable) and all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.  On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, including for the avoidance of doubt any restrictions on the use, acquisition, sale, lease, or disposal of property under section 363 of the Bankruptcy Code.

Article IV.L of the Plan provides that, in the event of a Restructuring or Equity Sale, subject to Articles IV.E and IV.F of the Plan, the Reorganized Debtors shall enter into such agreements and amend their corporate governance documents to the extent necessary to implement the terms and provisions of the Plan, which shall: (1) contain terms consistent with the Plan Supplement; (2) authorize the issuance, distribution, and reservation of the Reorganized Starry Holdings Equity, New Common Equity and New Warrants to the Entities entitled to receive such issuances, distributions and reservations, as applicable under the Plan; and (3) pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, and limited as necessary to facilitate compliance with non-bankruptcy federal laws, prohibit the issuance of non-voting equity securities.  Without limiting the generality of the foregoing, as of the Effective Date, Reorganized Starry Holdings shall be governed by the New Organizational Documents applicable to it.  From and after the Effective Date, the organizational documents of each of the Reorganized Debtors will comply with section 1123(a)(6) of the Bankruptcy Code, as applicable.  On or immediately before

the Effective Date, each Reorganized Debtor will file its New Organizational Documents with the applicable Secretary of State and/or other applicable authorities in its state of incorporation or formation in accordance with the applicable laws of its state of incorporation or formation, to the extent required for such New Organizational Documents to become effective.  After the Effective Date, the Reorganized Debtors may amend and restate the formation, incorporation, organizational, and constituent documents, as applicable, as permitted by the laws of its jurisdiction of formation or incorporation, as applicable, and the terms of such documents.

### 2.    Directors and Officers of the Reorganized Debtors

Article IV.P.1 of the Plan provides that, as of the Effective Date, the terms of the current members of the board of directors of Starry Holdings shall expire and, without further order of the Bankruptcy Court or other corporate action by the Debtors or the Reorganized Debtors, the New Board shall be approved.  The New Board or managers (as applicable) and the officers of the Reorganized Debtors shall be appointed in accordance with the respective New Organizational Documents.  The officers and overall management structure of the Reorganized Debtors, and all officers and management decisions with respect to the Reorganized Debtors (and/or any of their direct or indirect subsidiaries), compensation arrangements, and affiliate transactions shall be subject to the required approvals and consents set forth in the New Organizational Documents.

In the event of a Restructuring, the New Board will initially consist of 5 members, one of whom will be the chief executive officer of the Reorganized Debtors and the others of whom will be appointed by the holders of New Common Equity.  Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will, to the extent reasonably practicable, disclose in advance of Confirmation the identity and affiliations of any person proposed to serve on the New Board.

From and after the Effective Date, each director, officer, or manager of the Reorganized Debtors shall be appointed and serve pursuant to the terms of their respective charters and bylaws or other formation and constituent documents, the New Organizational Documents, and the applicable laws of the respective Reorganized Debtor's jurisdiction of formation.  To the extent that any such director or officer of the Reorganized Debtors is an "insider" pursuant to section 101(31) of the Bankruptcy Code, the Debtors will disclose the nature of any compensation to be paid to such director or officer.

Article IV.P.2 of the Plan provides that the existing officers of the Debtors as of the Effective Date shall remain in their current capacities as officers of the Reorganized Debtors, subject to the ordinary rights and powers of the New Board to remove or replace them and any applicable employment agreements that are assumed pursuant to the Plan.

### VII.
### CONFIRMATION OF THE PLAN

The Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met. Among the requirements for confirmation are that the Plan is (A) accepted by all impaired Classes of Claims and Interests or, if rejected or deemed rejected by an impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such

Class; (B) in the "best interests" of the Holders of Claims and Interests impaired under the Plan; and (C) feasible.

A.    **<u>Confirmation Hearing</u>**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a confirmation hearing upon appropriate notice to all required parties. The Confirmation Hearing is scheduled for **May 24, 2023, at 1:00 p.m. (Eastern Time)**. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the continuation date made at the Confirmation Hearing, at any subsequent continued Confirmation Hearing, or pursuant to a notice filed on the docket for the Chapter 11 Cases.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan. Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules and the Local Bankruptcy Rules, must set forth the name of the objector, the nature and amount of Claims or Interests held or asserted by the objector against the Debtors' estates or properties, the basis for the objection and the specific grounds therefore, and include, where appropriate, proposed language to be inserted in the Plan to resolve any such objection or response, and must be filed with the Bankruptcy Court, with a copy to the chambers of Judge Karen B. Owens, together with proof of service thereof, and served upon all of the below parties.

| Debtors | Counsel to the Debtors |
|---|---|
| Starry Holdings, Inc.<br>38 Chauncy Street, Suite 200,<br>Boston, Massachusetts 02111<br>Attn: William J. Lundregan | Latham & Watkins LLP<br>355 South Grand Avenue, Suite 100<br>Los Angeles, California 90071<br>Attn: Jeff E. Bjork, Ted A. Dillman, and Jeffrey T. Mispagel<br>     jeff.bjork@lw.com<br>     ted.dillman@lw.com<br>     jeffrey.mispagel@lw.com<br><br>-and-<br><br>Latham & Watkins LLP<br>330 North Wabash Avenue, Suite 2800<br>Chicago, Illinois 60611<br>Attn: Jason Gott<br>     jason.gott@lw.com<br><br>-and-<br><br>Young Conaway Stargatt & Taylor LLP<br>Rodney Square, 1000 North King Street<br>Wilmington, Delaware 19801<br>Attn: Michael R. Nestor, Kara Hammond Coyle, and Joseph M. Mulvihill<br>     mnestor@ycst.com<br>     kcoyle@ycst.com<br>     jmulvihill@ycst.com |

| Counsel to the Committee | Counsel to the DIP Agent and Prepetition Agent |
|---|---|
| McDermott Will & Emery LLP<br>The Nemours Building<br>1007 North Orange Street, 10th Floor<br>Wilmington, DE 19801<br>Attn: David R. Hurst (I.D. No. 3743)<br>    dhurst@mwe.com<br><br>-and-<br><br>McDermott Will & Emery LLP<br>One Vanderbilt Avenue<br>New York, NY 10017-3852<br>Attn: Darren Azman, Kristin Going, Stacy A. Lutkus, and Natalie Rowles<br>    dazman@mwe.com<br>    kgoing@mwe.com<br>    salutkus@mwe.com<br>    rowles@mwe.com | Sheppard Mullin Richter & Hampton LLP<br>333 South Hope Street, 43rd Floor<br>Los Angeles, California 90071<br>Attn:  Kyle J. Mathews, Esq<br>    kmathews@sheppardmullin.com<br><br>-and-<br><br>Sheppard Mullin Richter & Hampton LLP<br>30 Rockefeller Plaza<br>New York, New York 10112<br>Attn:  Bijal N. Vira, Esq<br>    bvira@sheppardmullin.com<br><br>-and-<br><br>Sheppard Mullin Richter & Hampton LLP<br>321 North Clark Street, 32nd Floor<br>Chicago, IL 60654<br>Attn:  Justin Bernbrock; Bryan V. Uelk, Catherine Jun, Esq.<br>    jbernbrock@sheppardmullin.com<br>    buelk@sheppardmullin.com<br>    cjun@sheppardmullin.com<br><br>-and-<br><br>Potter Anderson & Corroon LLP, Hercules Plaza, 1313 North Market Street, 6th Floor, P.O. Box 951, Wilmington, Delaware, 19801<br>Attn:  L. Katherine Good<br>    kgood@potteranderson.com |

B.    **Confirmation**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of section 1129(a) of the Bankruptcy Code have been satisfied with respect to the Plan.

1.    **Confirmation Requirements.**

Confirmation of a chapter 11 plan under section 1129(a) of the Bankruptcy Code requires, among other things, that:

- the plan complies with the applicable provisions of the Bankruptcy Code;

- the proponent of the plan has complied with the applicable provisions of the Bankruptcy Code;

- the plan has been proposed in good faith and not by any means forbidden by law;

- any plan payment made or to be made by the proponent under the plan for services or for costs and expenses in, or in connection with, the chapter 11 case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable;

- the proponent has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in the plan with the debtor, or a successor to the debtor under the plan. The appointment to, or continuance in, such office by such individual must be consistent with the interests of creditors and equity security holders and with public policy, and the proponent must have disclosed the identity of any insider that the reorganized debtor will employ or retain, and the nature of any compensation for such insider;

- with respect to each impaired class of claims or interests, either each holder of a claim or interest of such class has accepted the plan, or will receive or retain under the plan, on account of such claim or interest, property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated on such date under chapter 7 of the Bankruptcy Code;

- subject to the "cramdown" provisions of section 1129(b) of the Bankruptcy Code, each class of claims or interests has either accepted the plan or is not impaired under the plan;

- except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that allowed administrative expenses and priority claims will be paid in full on the effective date (except that holders of priority tax claims may receive on account of such claims deferred cash payments, over a period not exceeding 5 years after the petition date of a value, as of the effective date, equal to the allowed amount of such claims);

- if a class of claims is impaired, at least one (1) impaired class of claims has accepted the plan, determined without including any acceptance of the plan by any insider holding a claim in such class; and

- confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

The Debtors believe that:

- the Plan satisfies all of the statutory requirements of chapter 11 of the Bankruptcy Code;

- the Debtors, as the proponents of the Plan, have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and

- the Plan has been proposed in good faith.

Set forth below is a summary of certain relevant statutory confirmation requirements.

<p style="text-align:center">a.      Acceptance</p>

Claims in Classes 3 and 4 are Impaired under the Plan and are entitled to vote to accept or reject the Plan; Classes 1 and 2 are Unimpaired and are therefore conclusively deemed to accept the Plan; Classes 6 and 8 are Impaired and will receive no distributions under the Plan and therefore are conclusively deemed to reject the Plan; Classes 5 and 7 will either be Unimpaired or Impaired and receive no distributions, and will be conclusively deemed to accept or to reject the Plan, as applicable.

The Debtors also will seek confirmation of the Plan over the objection of any individual Holders of Claims who are members of an accepting Class.

<p style="text-align:center">b.      Unfair Discrimination and Fair and Equitable Test</p>

To obtain nonconsensual confirmation of the Plan, it must be demonstrated to the Bankruptcy Court that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each impaired, non-accepting Class. The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable" for, respectively, secured creditors, unsecured creditors and holders of equity interests. In general, section 1129(b) of the Bankruptcy Code permits confirmation notwithstanding non-acceptance by an impaired class if that class and all junior classes are treated in accordance with the "absolute priority" rule, which requires that the dissenting class be paid in full before a junior class may receive anything under the plan.

The test sets forth different standards for what is fair and equitable, depending on the type of claims or interests in such class. In order to demonstrate that a plan is "fair and equitable," the plan proponent must demonstrate the following:

i.    *Secured Creditors*. With respect to a class of impaired secured claims, a proposed plan must provide the following: (a) that the holders of secured claims retain their liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims, and receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estates' interest in such property, or (b) for the sale, subject to section 363 of the Bankruptcy Code, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (a) or (b) of this paragraph,

<p style="text-align:center">60</p>

or (c) that the holders of secured claims receive the "indubitable equivalent" of their allowed secured claim.

ii.   *Unsecured Creditors*. With respect to a class of impaired unsecured claims, a proposed plan must provide the following: either (i) each holder of an impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

iii.  *Equity Interests.* With respect to a class of impaired equity interests, each interest holder receives or retains property having a present value, as of the effective date of the plan, equal to the greatest of the allowed dollar amount of any fixed liquidation preference, fixed redemption price, or the value of the equity interest.

A chapter 11 plan does not "discriminate unfairly" with respect to a non-accepting class if the value of the Cash and/or securities to be distributed to the non-accepting class is equal to, or otherwise fair when compared to, the value of the distributions to other classes whose legal rights are the same as those of the non-accepting class. The Debtors believe the Plan will not discriminate unfairly against any non-accepting Class.

c.      Feasibility; Financial Projections

The Bankruptcy Code permits a plan to be confirmed only if confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successor to the Debtors, unless such liquidation or reorganization is proposed in the Plan.  For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed the ability of the Reorganized Debtors to meet their obligations under the Plan and retain sufficient liquidity and capital resources to conduct their business. Under the terms of the Plan, in the event of a Restructuring, the Allowed Claims potentially being paid in whole or in part in Cash are the General Administrative Claims, Professional Fee Claims, DIP Facility Claims, U.S. Trustee Fees, Priority Tax Claims, Other Priority Claims, Other Secured Claims, and General Unsecured Claims.

In connection with developing the Plan, the Debtors have prepared detailed financial projections (the "**Financial Projections**"), attached as **Exhibit D** hereto, which detail, among other things, the financial feasibility of the Plan.  The Financial Projections indicate, on a *pro forma* basis, that the projected level of Cash flow is sufficient to satisfy the Debtors' obligations under the Plan, to satisfy all of the Reorganized Debtors' future debt and debt related interest cost, research and development, capital expenditure and other obligations during this period.  Accordingly, the Debtors believe that confirmation of the Plan is not likely to be followed by the liquidation or further reorganization of the Reorganized Debtors.

**THE FINANCIAL PROJECTIONS, INCLUDING THE UNDERLYING ASSUMPTIONS, SHOULD BE CAREFULLY REVIEWED IN EVALUATING THE PLAN. WHILE MANAGEMENT BELIEVES THE ASSUMPTIONS UNDERLYING THE FINANCIAL PROJECTIONS, WHEN CONSIDERED ON AN OVERALL BASIS, WERE REASONABLE WHEN PREPARED IN LIGHT OF CURRENT CIRCUMSTANCES AND EXPECTATIONS, NO ASSURANCE CAN BE GIVEN THAT THE FINANCIAL**

**PROJECTIONS WILL BE REALIZED. THE DEBTORS MAKE NO REPRESENTATION OR WARRANTY AS TO THE ACCURACY OF THE FINANCIAL PROJECTIONS. THE PROJECTIONS ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES AND ASSUMPTIONS, INCLUDING THOSE DESCRIBED BELOW UNDER ARTICLE XI. IN LIGHT OF THESE RISKS AND UNCERTAINTIES, ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE ANTICIPATED IN THE FINANCIAL PROJECTIONS**.

The Financial Projections have not been examined or compiled by independent accountants. Moreover, such information is not prepared in accordance with accounting principles generally accepted in the United States ("**GAAP**"). The Debtors make no representation as to the accuracy of the Financial Projections or their ability to achieve the projected results. Many of the assumptions on which the Financial Projections are based are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management. Inevitably, some assumptions will not materialize and unanticipated events and circumstances may affect the actual financial results. Therefore, the actual results achieved may vary from the projected results and the variations may be material. All Holders of Claims that are entitled to vote to accept or reject the Plan are urged to examine carefully all of the assumptions on which the Financial Projections are based in connection with their evaluation of the Plan.

> ### 2. Valuation of the Debtors

Under the Bidding Procedures Order, the Debtors are also pursuing a competitive sale process for their assets as permitted by the Restructuring Support Agreement. The Debtors have, therefore, concluded that the best estimate of the going concern value of the Debtors will be revealed through the sale process. The Debtors reserve the right to further supplement this Disclosure Statement with any appropriate valuation analysis in their discretion.

> ### 3. Best Interests Test

The "best interests" test requires that the Bankruptcy Court find either:

- that all members of each impaired class have accepted the plan; or

- that each holder of an allowed claim or interest in each impaired class of claims or interests will receive or retain under the plan on account of such claim or interest, property of a value, as of the effective date of the plan, that is not less than the amount such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code on such date.

To determine what the Holders of Claims and Interests in each impaired Class would receive if the Debtors were liquidated under chapter 7 on the Confirmation Date, the Bankruptcy Court must determine the dollar amount that would have been generated from the liquidation of the Debtors' assets and properties in a liquidation under chapter 7 of the Bankruptcy Code.

The Cash that would be available for satisfaction of Claims and Interests would consist of the proceeds from the disposition of the assets and properties of the Debtors, augmented by the Cash held by the Debtors. Such Cash amount would be: (i) first, reduced by the amount of the Allowed DIP Facility Claims and the secured portion (if any) of the Allowed Other Secured Claims and Allowed Prepetition Term Loan Claims; (ii) second, reduced by the costs and expenses of liquidation under chapter 7 (including the fees payable to a chapter 7 trustee and the fees payable to professionals that such trustee might engage) and such additional administrative claims that might result from the termination of the Debtors' business; and (iii) third, reduced by the amount of the Allowed General Administrative Expense Claims, Allowed Professional Fee Claims, U.S. Trustee Fees, Allowed Priority Tax Claims, and Allowed Other Priority Claims, in the order of priority set out in section 507 of the Bankruptcy Code. Any remaining net Cash would be allocated to creditors and stakeholders in strict order of priority contained in section 726 of the Bankruptcy Code. Additional claims would be expected to arise by reason of the breach or rejection of obligations under unexpired leases and executory contracts.

To determine if the Plan is in the best interests of each impaired Class, the present value of the distributions from the proceeds of a liquidation of the Debtors' assets and properties, after subtracting the amounts discussed above, must be compared with the value of the property offered to each such Class under the Plan.

After considering the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors, the Debtors have determined that confirmation of the Plan will provide each Holder of an Allowed Claim or Interest with a recovery that is not less than such Holder would have received pursuant to the liquidation of the Debtors under chapter 7.

Moreover, the Debtors believe that the value of distributions to each voting Class of Allowed Claims in a chapter 7 case would be materially less than the value of distributions under the Plan and any distribution in a chapter 7 case would not occur for a substantial period of time. It is likely that a liquidation of the Debtors' assets could take approximately three-months to complete. If litigation becomes necessary to resolve claims or issues asserted in the Chapter 7 cases by creditors or by the estates, distributions to creditors may be further delayed, which both decreases the present value of those distributions and increases administrative expenses that could diminish the liquidation proceeds available to creditors.

The Debtors, with the assistance of their advisors, have prepared a liquidation analysis that summarizes the Debtors' best estimate of recoveries by Holders of Claims and Interests if the Chapter 11 Cases were converted to cases under chapter 7 beginning on July 1, 2023 (the "**Liquidation Analysis**"), which is attached hereto as **Exhibit E**. The Liquidation Analysis provides a summary of the liquidation values of the Debtors' assets, assuming a chapter 7 liquidation in which a trustee appointed by the Bankruptcy Court would liquidate the assets of the Debtors' estates.

The Liquidation Analysis contains a number of estimates and assumptions that, although developed and considered reasonable by the Debtors' management, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management. The Liquidation Analysis also is based on assumptions with regard

to liquidation decisions that are subject to change and significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management. Accordingly, the values reflected might not be realized.  The chapter 7 liquidation period is assumed to last 3 months following the conversion of the case to chapter 7, allowing for, among other things, the discontinuation and wind-down of operations, the sale of the operations as individual assets, the collection of receivables and the finalization of tax affairs.  All Holders of Claims that are entitled to vote to accept or reject the Plan are urged to examine carefully all of the assumptions on which the Liquidation Analysis is based in connection with their evaluation of the Plan.

### B.     Classification of Claims and Interests

The Debtors believe that the Plan complies with the classification requirements of the Bankruptcy Code, which require that a chapter 11 plan place each claim and interest into a class with other claims or interests that are "substantially similar."

### C.     Consummation

The Plan will be consummated on the Effective Date. The Effective Date will occur on the first Business Day on which the conditions precedent to the effectiveness of the Plan (*see* Article V.F hereof and Article VIII of the Plan) have been satisfied or waived pursuant to the Plan.  The Plan is to be implemented pursuant to its terms, consistent with the provisions of the Bankruptcy Code.

### D.     Exemption from Certain Transfer Taxes

To the fullest extent permitted by applicable law, all transfers consummated by the Debtors and approved by the Bankruptcy Court on and after the Confirmation Date through and including the Effective Date, including any transfers effectuated under the Plan, the sale by the Debtors of any owned property pursuant to section 363(b) of the Bankruptcy Code, and any assumption, assignment, and/or sale by the Debtors of their interests in unexpired leases of non-residential real property or executory contracts pursuant to section 365(a) of the Bankruptcy Code, shall constitute a "transfer under a plan" within the purview of section 1146 of the Bankruptcy Code, and shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.

### E.     Retiree Benefits

Although the Debtors did not provide any retiree benefits as of, and subsequent to, the Petition Date, on and after the Effective Date, pursuant to section 1129(a)(13) of the Bankruptcy Code, the Reorganized Debtors shall continue to pay all retiree benefits (within the meaning of, and subject to the limitations of, section 1114 of the Bankruptcy Code), if any, at the level established in accordance with section 1114 of the Bankruptcy Code, at any time prior to the Confirmation Date, for the duration of the period for which any Debtor had obligated itself to provide such benefits. Nothing in the Plan shall: (a) restrict the Debtors' or the Reorganized Debtors' right to modify the terms and conditions of the retiree benefits, if any, as otherwise permitted pursuant to the terms of the applicable plans, non-bankruptcy law, or section 1114(m) of the Bankruptcy Code; or (b) be construed as an admission that any such retiree benefits are owed by the Debtors.

F.    **Dissolution of Committee**

The Committee shall dissolve, and the current and former members of the Committee shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases on the Effective Date; *provided* that the Committee and its professionals shall have the right to file, prosecute, review, and object to any applications for compensation and reimbursement of expenses filed in accordance with Article II.A.2 of the Plan.

G.    **Amendments**

Subject to the limitations contained in the Plan, the Debtors, Reorganized Debtors, or Plan Administrator, as applicable, reserve the right to, in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Restructuring Support Agreement, and subject to the Definitive Document Consent Rights: (1) amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code, in accordance with section 1127(a) of the Bankruptcy Code; (2) amend or modify the Plan after the entry of the Confirmation Order and before substantial consummation of the Plan in accordance with section 1127(b) of the Bankruptcy Code and the Restructuring Support Agreement upon order of the Bankruptcy Court; and (3) remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan upon order of the Bankruptcy Court.

H.    **Revocation or Withdrawal of the Plan**

Subject to the conditions to the Effective Date, the Debtors reserve the right, subject to the terms of the Restructuring Support Agreement, to revoke or withdraw the Plan prior to the entry of the Confirmation Order and to file subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan or if entry of the Confirmation Order or the Effective Date does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of executory contracts or leases effected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (3) nothing contained in the Plan shall:  (a) constitute a waiver or release of any claims by or against, or any Equity Interests in, such Debtor or any other Entity; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission of any sort by the Debtors or any other Entity.

I.    **Post-Confirmation Jurisdiction of the Bankruptcy Court**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, except to the extent set forth in the Plan, and in addition to the matters over which the Bankruptcy Court shall have retained jurisdiction pursuant to the Sale Order, if any, or any other order of the Bankruptcy Court, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

- allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the

resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

- decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Retained Professionals required by the Bankruptcy Code or the Plan;

- resolve any matters related to: (1) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure Costs arising therefrom, including Cure Costs pursuant to section 365 of the Bankruptcy Code; (2) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; and (3) any dispute regarding whether a contract or lease is or was executory or expired;

- ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

- adjudicate, decide or resolve any motions, adversary proceedings, contested, or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

- adjudicate, decide or resolve any and all matters related to Causes of Action;

- adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

- resolve any cases, controversies, suits, or disputes that may arise in connection with General Unsecured Claims, including the establishment of any bar dates, related notices, claim objections, allowance, disallowance, estimation and distribution;

- enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

- enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

- resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the interpretation or enforcement of the Plan or any contract, instrument, release or other agreement or document that is entered into or delivered pursuant to the Plan, or any Entity's rights arising from or obligations incurred in connection with the Plan;

66

- issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with enforcement of the Plan;

- resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

- resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid;

- enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

- determine any other matters that may arise in connection with or related to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

- enter one or more orders or final decrees concluding or closing the Chapter 11 Cases;

- adjudicate any and all disputes arising from or relating to distributions under the Plan;

- consider any modification of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

- determine requests for payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

- hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan (other than any dispute arising after the Effective Date under, or directly with respect to, the Exit Facility, if any, which such disputes shall be adjudicated in accordance with the Exit Facility, if any);

- hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

- hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree

benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

- hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the releases, injunctions, and exculpations provided under Article IX of the Plan;

- enforce all orders previously entered by the Bankruptcy Court; and

- hear any other matter not inconsistent with the Bankruptcy Code.

As of the Effective Date, notwithstanding anything in Article X of the Plan to the contrary, the Exit Facility shall be governed by the respective jurisdictional provisions therein.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, including the matters set forth in Article X of the Plan, the provisions of Article X of the Plan shall have no effect on and shall not control, limit, or prohibit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

Unless otherwise specifically provided in the Plan or in an order of the Bankruptcy Court, the Bankruptcy Court shall have exclusive jurisdiction to hear and determine disputes concerning Claims against or Interests in the Debtors that arose prior to the Effective Date.

## VIII.
## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Plan reflects a consensus among the Debtors and the Consenting Prepetition Lenders. The Debtors have determined that the Plan is the best alternative available for their successful emergence from chapter 11. If the Plan is not confirmed and consummated, the alternatives to the Plan are (A) continuation of the Chapter 11 Cases, which could lead to the filing of an alternative plan of reorganization or plan of liquidation, (B) a liquidation under chapter 7 of the Bankruptcy Code, or (C) dismissal of the Chapter 11 Cases, leaving Holders of Claims and Interests to pursue available non-bankruptcy remedies. These alternatives to the Plan are not likely to benefit Holders of Claims and Interests.

### A.    Continuation of Chapter 11 Cases

If the Plan is not confirmed, the Debtors (or, if the Debtors' exclusive period in which to file a plan of reorganization has expired, any other party in interest) could attempt to formulate a different plan. Such a plan might involve either a reorganization and continuation of the Debtors' business, or an orderly liquidation of the Debtors' assets. In addition, if the Plan is not confirmed pursuant to the terms of the Restructuring Support Agreement, the Consenting Prepetition Lenders have the right to terminate the Restructuring Support Agreement and all obligations thereunder.

**B.**     **Liquidation under Chapter 7**

If no plan can be confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, in which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution to their creditors in accordance with the priorities established by the Bankruptcy Code. The effect a chapter 7 liquidation would have on the recovery of Holders of Allowed Claims and Interests is set forth in the Liquidation Analysis attached hereto as **Exhibit E**.

As demonstrated in the Liquidation Analysis, the Debtors believe that liquidation under chapter 7 would result in smaller and later distributions to creditors than those provided for in the Plan because of, among other things, the delay resulting from the conversion of the Chapter 11 Cases to cases under chapter 7, the additional administrative expenses associated with the appointment of a trustee and the trustee's retention of professionals, and the loss in value attributable to an expeditious liquidation of the Debtors' assets as required by chapter 7.

**C.**     **Dismissal of Chapter 11 Cases**

If the Chapter 11 Cases were dismissed, Holders of Claims would be free to pursue non-bankruptcy remedies in their attempts to satisfy such Claims against the Debtors.  However, in that event, Holders of Claims would be faced with the costs and difficulties of attempting, each on its own, to recover on its Claims.  Additionally, it could result in a race to the courthouse, whereby there may be insufficient assets to distribute assets to creditors on an equitable basis. Accordingly, the Debtors believe that the Plan will enable all creditors to realize the greatest possible recovery on their respective Claims with the least delay.

<div align="center">

IX.
**FACTORS TO CONSIDER BEFORE VOTING**

</div>

**BEFORE VOTING TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS ENTITLED TO VOTE SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS SET FORTH BELOW, IN ADDITION TO THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, TOGETHER WITH ANY ATTACHMENTS, EXHIBITS, OR DOCUMENTS INCORPORATED BY REFERENCE HERETO.  THE FACTORS BELOW SHOULD NOT BE REGARDED AS THE ONLY RISKS ASSOCIATED WITH THE PLAN OR ITS IMPLEMENTATION.**

**A.**     **Certain Bankruptcy Law Considerations**

**1.**     **Risk of Non-Confirmation of Plan**

Although the Debtors believe that the Plan will satisfy all requirements necessary for Confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modification to the Plan will not be required for Confirmation or that such modifications would not necessitate re-solicitation of votes.  Moreover, the Debtors can make no assurances that they will receive the requisite acceptances to confirm the Plan, and even if both voting Classes voted in favor of the Plan or the requirements for "cramdown" are met with respect

to any Class that rejects the Plan, the Bankruptcy Court, which may exercise substantial discretion as a court of equity, may choose not to confirm the Plan.  If the Plan is not confirmed, it is unclear what distributions Holders of Claims ultimately would receive with respect to their Claims in a subsequent plan of reorganization or otherwise.

<div style="text-align:center">

**2.**    **Non-Consensual Confirmation**

</div>

Even where an impaired class of Claims or Interests does not accept or is deemed not to accept a plan of reorganization, a bankruptcy court may nevertheless confirm such plan at the proponent's request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has rejected the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to such dissenting impaired class. Should any Class vote to reject the Plan, then these requirements must be satisfied with respect to such rejecting Class. The Debtors believe that the Plan satisfies these requirements, both as to those Classes that have been deemed to reject the Plan, and as to individual Classes that are entitled to vote on the Plan.

<div style="text-align:center">

**3.**    **Risks Related to Parties in Interest Objecting to the Debtors' Classification of Claims and Interests**

</div>

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other clams or interests in such class.  The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code.  However, there can be no assurance that a party in interest will not object or that the Bankruptcy Court will approve the classifications.

<div style="text-align:center">

**4.**    **Risks Related to Possible Objections to the Plan**

</div>

There is a risk that certain parties could oppose and object to either the entirety of the Plan or specific provisions of the Plan.  Although the Debtors believe that the Plan complies with all relevant Bankruptcy Code provisions, there can be no guarantee that a party in interest will not file an objection to the Plan or that the Bankruptcy Court will not sustain such an objection.

<div style="text-align:center">

**5.**    **Releases, Injunctions, Exculpation Provisions May Not Be Approved**

</div>

Article IX of the Plan provides for certain releases, injunctions, and exculpations for claims and Causes of Action that may otherwise be asserted against the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties, as applicable.  The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved.  If the releases and exculpations are not approved, certain parties may not be considered Releasing Parties, Released Parties, or Exculpated Parties, and certain Released Parties or Exculpated Parties may withdraw their support for the Plan.

<div style="text-align:center">

**6.**    **Risk of Non-Occurrence of Effective Date**

</div>

Although the Debtors believe that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to the timing or occurrence of the Effective Date.  If the conditions

<div style="text-align:center">

70

</div>

precedent to the Effective Date set forth in the Plan have not occurred or have not been waived as set forth in Article VIII of the Plan, then the Confirmation Order may be vacated, in which event no distributions would be made under the Plan, the Debtors and all Holders of Claims or Interests would be restored to the status quo as of the day immediately preceding the Confirmation Date, and the Debtors' obligations with respect to Claims and Interests would remain unchanged.

### 7.    Risks of Termination of the Restructuring Support Agreement

The Restructuring Support Agreement contains certain provisions that give the parties thereto the ability to terminate the applicable agreement upon the occurrence or non-occurrence of certain events, including failure to achieve certain milestones in these Chapter 11 Cases.  Termination of the Restructuring Support Agreement could result in highly contested and potentially protracted Chapter 11 Cases, which could significantly and detrimentally impact the Debtors' relationships with vendors, suppliers, employees, and major customers.

### 8.    Conversion into Chapter 7 Cases

If no plan of reorganization can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of Holders of Claims and Interests, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code.

### B.    Risks Relating to the Capital Structure of the Reorganized Debtors

### 1.    Variances from Financial Projections

The Debtors have prepared financial projections on a consolidated basis with respect to the Reorganized Debtors (in the event of a Restructuring) based on certain assumptions, as set forth in **Exhibit D** hereto.  The projections have not been compiled, audited, or examined by independent accountants, and neither the Debtors nor their advisors make any representations or warranties regarding the accuracy of the projections or the ability to achieve forecasted results.

The Financial Projections reflect numerous assumptions, which involve significant levels of judgment and estimation concerning the anticipated future performance of the Reorganized Debtors, as well as assumptions with respect to the prevailing market, economic and competitive conditions, which are beyond the control of the Reorganized Debtors, and which may not materialize, particularly given the current difficult economic environment. Any significant differences in actual future results versus estimates used to prepare the Financial Projections, such as lower sales, lower volume, lower pricing, increases in production costs, technological changes, environmental or safety issues, workforce disruptions, competition or changes in the regulatory environment, could result in significant differences from the Financial Projections. The Debtors believe that the assumptions underlying the Financial Projections are reasonable. However, unanticipated events and circumstances occurring subsequent to the preparation of the Financial Projections may affect the Debtors' and the Reorganized Debtors' ability to initiate the endeavors and meet the financial benchmarks contemplated by the Plan. Therefore, the actual results achieved throughout the period covered by the Financial Projections necessarily will vary from the projected results, and these variations may be material and adverse.

### 2. Leverage

Although the Reorganized Debtors will have less indebtedness than the Debtors, the Reorganized Debtors will still have a significant amount of secured indebtedness.  In the event of a Restructuring, on the Effective Date, after giving effect to the transactions contemplated by the Plan, in addition to payment of Claims, if any, that require payment beyond the Effective Date and ordinary course debt, the Reorganized Debtors will have approximately $101.3 million in secured indebtedness.

The degree to which the Reorganized Debtors will be leveraged could have important consequences because, among other things, it could affect the Reorganized Debtors' ability to satisfy their obligations under their secured indebtedness following the Effective Date; a portion of the Reorganized Debtors' Cash flow from operations will be used for debt service and unavailable to support operations, or for working capital, capital expenditures, expansion, acquisitions or general corporate or other purposes; the Reorganized Debtors' ability to obtain additional debt financing or equity financing in the future may be limited; and the Reorganized Debtors' operational flexibility in planning for, or reacting to, changes in their businesses may be severely limited.

### 3. Ability to Service Debt

Although the Reorganized Debtors will have less indebtedness than the Debtors, the Reorganized Debtors will still have significant interest expense and principal repayment obligations.  The Reorganized Debtors' ability to make payments on and to refinance their debt will depend on their future financial and operating performance and their ability to generate cash in the future.  This, to a certain extent, is subject to general economic, business, financial, competitive, legislative, regulatory and other factors that are beyond the control of the Reorganized Debtors.

Although the Debtors believe the Plan is feasible, there can be no assurance that the Reorganized Debtors will be able to generate sufficient cash flow from operations.  The Reorganized Debtors may need to refinance all or a portion of their debt on or before maturity; however, there can be no assurance that the Reorganized Debtors will be able to refinance any of their debt on commercially reasonable terms or at all.

### 4. Obligations Under Certain Financing Agreements

The Reorganized Debtors' obligations under the Exit Facility will be secured by liens on substantially all of the assets of the Reorganized Debtors (subject to certain exclusions set forth therein).  If the Reorganized Debtors become insolvent or are liquidated, or if there is a default under certain financing arrangements, including, but not limited to, the Exit Facility, and payment on any obligation thereunder is accelerated, the Holders of the Exit Facility Loans would be entitled to exercise the remedies available to a secured lender under applicable law, including foreclosure on the collateral that is pledged to secure the indebtedness thereunder, and they would have a claim on the assets securing the obligations under the Exit Facility that would be superior to any claim of the holders of unsecured debt.

### 5.      Restrictive Covenants

The financing agreements governing the Reorganized Debtors' indebtedness will contain various covenants that may limit the discretion of the Reorganized Debtors' management by restricting the Reorganized Debtors' ability to, among other things, incur additional indebtedness, incur liens, pay dividends or make certain restricted payments, consummate certain asset sales, enter into certain transactions with affiliates, merge, consolidate and/or sell or dispose of all or substantially all of their assets.  In addition, it is expected that such agreements will require the Reorganized Debtors to meet certain financial covenants.  As a result of these covenants, the Reorganized Debtors will be limited in the manner in which they conduct their business and they may be unable to engage in favorable business activities or finance future operations or capital needs.

Any failure to comply with the restrictions of the financing agreements may result in an event of default. An event of default may allow the creditors to accelerate the related debt as well as any other debt to which a cross-acceleration or cross-default provision applies.

### 6.      Market for Securities

There is currently no market for the New Common Equity and there can be no assurance as to the development or liquidity of any market for such securities.

Therefore, there can be no assurance that the securities will be tradable or liquid at any time after the Effective Date.  If a trading market does not develop or is not maintained, holders of the securities may experience difficulty in reselling such securities or may be unable to sell them at all.  Even if such a market were to exist, such securities could trade at prices higher or lower than the estimated value set forth in this Disclosure Statement depending upon many factors including prevailing interest rates, markets for similar securities, industry conditions, and the performance of, and investor expectations for, the Reorganized Debtors.  Accordingly, holders of the securities may bear certain risks associated with holding securities for an indefinite period of time.

### 7.      Potential Dilution

The ownership percentage represented by the New Common Equity distributed under the Plan as of the Effective Date will be subject to dilution from the equity issued in connection with the (a) Management Incentive Plan; (b) any other equity that may be issued post-emergence; (c) conversion of the New Warrants; and (d) the conversion of any options, warrants, convertible securities, exercisable securities, or other securities that may be issued post-emergence.  In the future, similar to all companies, additional equity financings or other equity issuances by the Reorganized Debtors could adversely affect the value of the New Common Equity.  The amount and dilutive effect of any of the foregoing could be material.

### 8.      Significant Holders of New Common Equity

In the event of a Restructuring, certain Prepetition Lenders are expected to acquire a significant ownership interest in the New Common Equity.  Such holders could be in a position to control the outcome of all actions of the Reorganized Debtors requiring the approval of equityholders, including the election of directors or managers, without the approval of other equityholders.  This

concentration of ownership could also facilitate or hinder a negotiated change of control of the Reorganized Debtors and, consequently, have an impact upon the value of the New Common Equity.

9.   **Possible Restrictions on, and Consequences of Potential Transfer of, New Common Equity**

As discussed further in Article XI.d.2, if the consummation of the Plan meets the requirements of IRC Section 382(l)(5), the Debtors intend to apply such section.  As further discussed in Article XI.d.2, if IRC Section 382(l)(5) is utilized, any subsequent Ownership Change within the two-year period following the date of the Plan Ownership Change will result in the Debtors being unable to use any Pre-Change Tax Attributes (as defined below) in any taxable year ending after such subsequent Ownership Change.  In light of the foregoing, it is possible that the New Starry LLC Agreement will contain restrictions on the transfer of New Common Equity to ensure that such an Ownership Change will be avoided.  In the absence of such restrictions, it is possible that post-Effective Date transfers of New Common Equity would give rise to an Ownership Change within two years of the Effective Date, in which case the Debtors would be unable to use Pre-Change Tax Attributes after such an Ownership Change.

10.   **Interests Subordinated to the Reorganized Debtors' Indebtedness**

In any subsequent liquidation, dissolution, or winding up of the Reorganized Debtors, the New Common Equity would rank below all debt claims against the Reorganized Debtors.  As a result, holders of the New Common Equity will not be entitled to receive any payment or other distribution of assets upon the liquidation, dissolution, or winding up of the Reorganized Debtors until after all applicable holders of debt have been paid in full.

11.   **Dividends**

The Reorganized Debtors may not pay any dividends on the New Common Equity.  In such circumstances, the success of an investment in the New Common Equity will depend entirely upon any future appreciation in the value of the New Common Equity.  There is, however, no guarantee that the New Common Equity will appreciate in value or even maintain its initial value.

C.   <u>**Risks Relating to the Reorganized Debtors' Business Operations and Financial Conditions**</u>

**THE FOLLOWING PROVIDES A SUMMARY OF CERTAIN OF THE RISKS ASSOCIATED WITH THE DEBTORS' BUSINESSES.  HOWEVER, THIS SECTION IS NOT INTENDED TO BE EXHAUSTIVE.   ADDITIONAL RISK FACTORS CONCERNING THE DEBTORS' BUSINESSES ARE CONTAINED IN THE DEBTORS' PREVIOUSLY-FILED ANNUAL REPORT ON FORM 10-K FOR THE FISCAL YEAR ENDED DECEMBER 31, 2021.**

1.      **The Chapter 11 Cases May Negatively Impact Future Operations**

While the Debtors believe that they will be able to emerge from chapter 11 relatively expeditiously, there can be no assurance as to timing for approval of the Plan or the Debtors' emergence from chapter 11.  Although the Plan is designed to minimize the length of the Chapter 11 Cases, it is impossible to predict with certainty the amount of time that one or more of the Debtors may spend in bankruptcy or to assure parties in interest that the Plan will be confirmed.  Even if confirmed on a timely basis, bankruptcy proceedings to confirm the Plan could have an adverse effect on the Debtors' business.  Among other things, it is possible that bankruptcy proceedings could adversely affect the Debtors' relationships with their key customers, suppliers and employees.  The process will also involve additional expense and may divert some of the attention of management away from business operations.

2.      **The Reorganized Debtors May be Unable to Obtain the Necessary FCC Approvals**

The FCC finalizes the regulations that dictate the ultimate use of the Debtors' licenses. These licenses need be renewed by the FCC for the Reorganized Debtors to continue to operate on the same basis in which they have been operating. In the future, the FCC may not renew certain licenses for all or some of the markets in which the Debtors currently have rights to operate. The FCC may also adopt final regulations for the spectrum bands that will remove or limit the Reorganized Debtors' ability to continue to operate in their spectrum band. If the FCC does not renew the Reorganized Debtors' licenses for some or all of their existing markets, it would have a material adverse effect on their ability to continue to operate their business in those markets, and impact their ability to grow their network and subscribers.

3.      **The Global Outbreak of COVID-19 Could Continue to Have an Adverse Impact on the Reorganized Debtors' Business**

COVID-19 and measures to prevent its spread may have a material adverse impact on the Reorganized Debtors' business, financial condition and results of operations. The severity and timing of the impact will depend on a number of factors, including the level and rapidity of infection, duration of containment measures, changes in consumer spending patterns, measures imposed or taken by governmental authorities in response to the pandemic, macroeconomic conditions in the Reorganized Debtors' markets and negative effects on the financial condition of their customers.

Under difficult economic conditions, including prolonged unemployment and employment furloughs, demand for the Company's products and services could decline and some customers may be unable or unwilling to pay for the Company's products and services. The occupancy rates in some apartment buildings may decline significantly, particularly in buildings where the population has an alternative housing location such as a second home or parental housing. Additionally, in order to prioritize the demands of the business, the Reorganized Debtors may delay certain capital investments or other new initiatives, products or services, which may adversely affect their business in the future.

Governmental and non-governmental initiatives to reduce the transmission of COVID-19, such as the imposition of restrictions on work and public gatherings, and the promotion of social distancing, have impacted and could continue to impact the Company's operations and financial results. Suppliers and vendors also may be affected by such measures in their ability to provide products and services to the Company, and these measures could also make it more difficult for the Company to serve its customers. Further, if access restrictions imposed by building owners are implemented in the future, the Debtors' network deployment, network coverage, subscriber growth, and subscriber penetration could be lower than projected.

### 4. Financial Conditions of the Markets Could Affect Supply and Demand

The Debtors' business operations have historically been, and the Reorganized Debtors' business operations may in the future be, materially affected by adverse conditions in the financial markets and depressed economic conditions generally, both in the United States and elsewhere around the world.

Moreover, the Debtors' customers and suppliers rely on access to credit to adequately fund their own operations. Disruptions in financial markets and economic slowdown may adversely impact the ability of the Reorganized Debtors' customers to finance the purchase of their products as well as the creditworthiness of those customers. These same factors may also impact the ability and willingness of suppliers to provide the Reorganized Debtors with raw materials for their businesses.

### 5. Competition Could Have an Adverse Impact on the Debtors' Business

The Company operates in a highly competitive, consumer-driven industry and competes against providers that offer a variety of fixed broadband services, including cable, terrestrial fixed wireless service, DSL, fiber, and fixed satellite. The Company also competes against providers of mobile broadband service to the extent that a consumer considers mobile broadband service a substitute for fixed broadband service.

Additionally, most incumbent broadband communications companies, which already have wired networks and an existing customer base and other operational functions in place, offer broadband over DSL, cable or FTTH/FTTP. These services may be offered at promotional prices comparable to or lower than the Company's services. In addition, to the extent that these providers' networks are more ubiquitously deployed, such as traditional telephone networks, they may be in a better position to offer internet services to consumers and businesses passed by their networks on a more economic or timely basis than the Company can, even if the services they offer are arguably inferior. The Company's competitors may also increasingly have the ability to offer a combination of video services, mobile services and telephone and internet services to their customers as a bundle, either directly or through co-marketing agreements with other service providers. As an internet-only company, the Company does not currently offer any bundled services that could compete with these offerings.

6.    **Unsuccessful execution of strategic initiatives could have a material adverse effect on the Company's business**

The success of the Debtors' business is contingent on, among other things, the ability to continue to attract more customers in each of their markets. The Debtors' marketing efforts may not succeed for a variety of reasons, including but not limited to, changes to search engine algorithms, ineffective campaigns across marketing channels and limited experience in certain marketing channels, like traditional media. External factors beyond their control may also affect the success of the marketing initiatives, such as filtering of targeted communications by email servers, potential customers failing to respond to marketing initiatives, and competition from third parties.

The Company's business model relies on its ability to scale rapidly and to decrease incremental customer acquisition costs as they grow. If the Reorganized Debtors are unable to recover marketing costs or if their marketing campaigns are not successful or are terminated, it could have a material adverse effect on the Reorganized Debtors' growth and financial condition.

7.    **Difficulties with our vendors may adversely impact our business.**

The Company depends on a limited number of third-party service providers, suppliers, and licensors to supply some of the services, hardware, software, and operational support necessary to provide some of the Company's services. Some of the hardware, software, and operational support vendors, and service providers represent the Company's sole source of supply or have, either through contract or as a result of intellectual property rights, a position of some exclusivity. If any of these parties breach or terminate or elect not to renew their agreements with the Company or otherwise fail to perform their obligations in a timely manner, demand exceeds these vendors' capacity, tariffs are imposed that impact vendors' ability to perform their obligations or significantly increase the amount the Company pays, they experience operating or financial difficulties, or they cease production of any necessary product due to lack of demand, profitability or a change in ownership or are otherwise unable to provide the equipment or services the Company needs in a timely manner, at the Company's specifications and at reasonable prices, the Company's ability to provide some services might be materially adversely affected, or the need to procure or develop alternative sources of the affected materials or services might interrupt or delay the Company's ability to serve its customers. In addition, the existence of only a limited number of vendors of key technologies can lead to less product innovation and higher costs. For these reasons, negative developments in its vendor relationships could materially and adversely affect the Company's operations, business, financial results, and financial condition, as well as its ability to retain and attract customers.

8.    **Cyber security attacks and disruptions to information systems may also create risk.**

The Company's network and information systems technologies are critical to its operating activities, both for internal and external uses, such as network management and supplying services to customers, including customer service operations and programming delivery. Network or information system shutdowns or other service disruptions caused by events such as computer hacking, phishing, dissemination of computer viruses, worms, and other destructive or disruptive

software, "cyber-attacks," process breakdowns, denial of service attacks and other malicious activity pose increasing risks. Both unsuccessful and successful "cyber-attacks" on companies have continued to increase in frequency, scope, and potential harm in recent years. Although the Company develops and maintains systems seeking to prevent systems-related events and security breaches from occurring, the development and maintenance of these systems is costly and requires ongoing monitoring and updating as techniques used in such attacks become more sophisticated and change frequently. Third parties, and the third parties on which they rely, may be unable to anticipate these techniques or implement adequate preventive measures. While from time to time attempts have been made to access the Company's network, those attempts have not as yet resulted in any material release of information, degradation, or disruption to the Company's network and information systems.

   D.     **Additional Factors**

   1.     **Debtors Could Withdraw Plan**

Subject to, and without prejudice to, the rights of any party in interest, the Plan may be revoked or withdrawn before the Confirmation Date by the Debtors.

   2.     **Debtors Have No Duty to Update**

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  Additionally, the Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

   3.     **No Representations Outside this Disclosure Statement Are Authorized**

No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than those contained in, or included with, this Disclosure Statement should not be relied upon in making the decision to accept or reject the Plan.

   4.     **No Legal or Tax Advice Is Provided by this Disclosure Statement**

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each Holder of a Claim or Interest should consult its own legal counsel and accountant as to legal, tax, and other matters concerning their Claim or Interest.

This Disclosure Statement is not legal advice to you.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

### 5.    No Admission Made

Nothing contained herein or in the Plan shall constitute an admission of, or shall be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or Holders of Claims or Interests.

## X.
## SECURITIES LAW MATTERS

### A.    Issuance & Transfer of 1145 Securities

### 1.    Issuance

The Plan provides for the offer, issuance, sale or distribution of shares of New Common Equity and New Warrants in the event of a Restructuring. The Debtors believe that the offer, issuance, sale or distribution by the Reorganized Debtors of the New Common Equity and the New Warrants (the "**1145 Securities**") will be exempt from registration under section 5 of the Securities Act, all rules and regulations promulgated thereunder, and under any state or local laws requiring registration for offer or sale of a security pursuant to section 1145(a) of the Bankruptcy Code, except with respect to an entity that is deemed to be an underwriter as defined in section 1145(b) of the Bankruptcy Code (see below).

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under section 5 of the Securities Act and state or local securities laws if three principal requirements are satisfied: (i) the securities must be offered and sold under a plan of reorganization and must be securities issued by the debtor, an affiliate participating in a joint plan with the debtor, or a successor to the debtor under the plan; (ii) the securities must be in exchange for a claim against, an interest in, or a claim for an administrative expense in the case concerning, the debtor or such affiliate; and (iii) the securities must be issued entirely in exchange for such a claim or interest, or "principally" in exchange for such claim or interest and "partly" for cash or property. The issuance of the New Common Equity on account of Prepetition Term Loan Claims satisfies the requirements of section 1145(a)(1) of the Bankruptcy Code.

The exemptions of section 1145(a)(1) do not apply to an entity that is deemed an "underwriter" as such term is defined in section 1145(b) of the Bankruptcy Code.

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as an entity who, except with respect to ordinary trading transactions of an entity that is not an issuer (see below): (A) purchases a claim against, an interest in, or a claim for an administrative expense against the debtor with a view to distributing any security received or to be received in exchange for such claim or interest ("**accumulators**"); (B) offers to sell securities offered or sold under the plan for the holders of such securities ("**distributors**"); (C) offers to buy securities offered or sold under the  plan from the holders of such securities, if the offer to buy is: (i) with a view to distributing such securities; and (ii) under an agreement made in connection with the plan, the consummation of the plan, or with the offer or sale of securities under the plan; and (D) is an "issuer" (as defined in section 2(a)(11) of the Securities Act) with respect to the securities.

The definition of an "issuer" for purposes of whether a person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code includes persons directly or indirectly controlling, controlled by, or under common control with the issuer.  "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract or otherwise.  Such persons are referred to as "affiliates" of the issuer.

## 2.    Subsequent Transfers

Section 1145(c) of the Bankruptcy Code provides that securities issued pursuant to section 1145(a) are deemed to have been issued in a public offering.  In general, therefore, resales of and subsequent transactions in the 1145 Securities will be exempt from registration under the Securities Act pursuant to section 4(a)(1) of the Securities Act, unless the holder thereof is deemed to be an "issuer," an "underwriter" or a "dealer" with respect to such securities.  A "dealer," as defined in section 2(a)(12) of the Securities Act, is any person who engages either for all or part of his or her time, directly or indirectly, as agent, broker or principal, in the business of offering, buying, selling or otherwise dealing or trading in securities issued by another person.

Notwithstanding the provisions of section 1145(b) regarding accumulators and distributors referred to above, the staff of the SEC has taken the position that resales of securities distributed under a plan of reorganization by accumulators and distributors of securities who are not affiliates of the issuer of such securities are exempt from registration under the Securities Act if effected in "ordinary trading transactions."  The staff of the SEC has indicated in this context that a transaction by such non-affiliates may be considered an "ordinary trading transaction" if it is made on a national securities exchange or in the over-the-counter market and does not involve any of the following factors:

(a)    (i) concerted action by the recipients of securities issued under a plan in connection with the sale of such securities or (ii) concerted action by distributors on behalf of one or more such recipients in connection with such sales;

(b)    the use of informational documents concerning the offering of the securities prepared or used to assist in the resale of such securities, other than a Bankruptcy Court-approved disclosure statement and supplements thereto, and documents filed with the SEC pursuant to the Exchange Act; or

(c)    the payment of special compensation to brokers and dealers in connection with the sale of such securities designed as a special incentive to resell such securities (other than the compensation that would be paid pursuant to arm's-length negotiations between a seller and a broker or dealer, each acting unilaterally, not greater than the compensation that would be paid for a routine similar-sized sale of similar securities of a similar issuer).

The staff of the SEC has not provided any guidance for privately arranged trades.  The views of the staff of the SEC on these matters have not been sought by the Debtors and, therefore, no assurance can be given regarding the proper application of the "ordinary trading transaction"

exemption described above. Any persons intending to rely on such exemption is urged to consult their counsel as to the applicability thereof to their circumstances.

To the extent that persons who receive 1145 Securities pursuant to the Plan are deemed to be underwriters (and who do not qualify for the treatment of "ordinary trading transactions" described above), resales by such persons of 1145 Securities would not be exempted from registration under the Securities Act or other applicable laws by reason of section 1145 of the Bankruptcy Code and section 4(a)(1) of the Securities Act. However, persons deemed to be underwriters may be permitted to resell such 1145 Securities without registration pursuant to the limited safe harbor resale provisions of Rule 144 promulgated under the Securities Act ("**Rule 144**") or another available exemption under the Securities Act.

Generally, Rule 144 permits the public sale of securities if certain conditions are met, including a required holding period, certain current public information regarding the issuer being available and compliance with the volume, manner of sale and notice requirements. If the issuer is not subject to the reporting requirements of section 13 or 15(d) of the Securities Exchange Act of 1934 (the "**Exchange Act**"), adequate current public information as specified under Rule 144 is deemed to be available if certain company information specified in section (c)(2) of Rule 144 is made publicly available. It is not expected that reorganized Starry will be subject to the reporting requirements of section 13 or 15(d) of the Exchange Act. The staff of the SEC has taken the position that persons who are deemed to be underwriters solely because they are affiliates of a reorganized debtor are not subject to the holding period requirements of Rule 144.

Whether or not any particular person would be deemed to be an "underwriter" with respect to the 1145 Securities or any other security to be issued pursuant to the Plan depends upon various facts and circumstances applicable to that person. Accordingly, the Debtors express no view as to whether any particular person receiving 1145 Securities or any other securities under the Plan would be considered an "underwriter" under section 1145(b) of the Bankruptcy Code with respect to such securities, or whether such person may freely resell such securities or the circumstances under which they may resell such securities.

## XI.
## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.    Introduction

The following discussion summarizes certain U.S. federal income tax consequences expected to result from the consummation of the Plan. This discussion is only for general information purposes and only describes the expected tax consequences to the Debtors and Holders of Prepetition Term Loan Claims and General Unsecured Claims (collectively, the "**Voting Claims**"). It is not a complete analysis of all potential U.S. federal income tax consequences and does not address any tax consequences arising under any state, local or foreign tax laws or any U.S. federal tax laws other than U.S. federal income tax laws (such as estate and gift tax laws). This discussion is based on the Internal Revenue Code of 1986, as amended (the "**IRC**" or "**Tax Code**"), Treasury Regulations promulgated thereunder, judicial decisions, and published rulings and administrative pronouncements of the Internal Revenue Service (the "**IRS**"), all as in effect on the date of this Disclosure Statement. These authorities may change, possibly with retroactive effect, resulting in

U.S. federal income tax consequences different from those discussed below. No ruling has been or will be sought from the IRS, and no legal opinion of counsel will be rendered, with respect to the matters discussed below. There can be no assurance that the IRS will not take a contrary position regarding the U.S. federal income tax consequences resulting from the consummation of the Plan or that any contrary position would not be sustained by a court.

This discussion assumes that Holders of Prepetition Term Loan Claims have held such property as "capital assets" within the meaning of IRC Section 1221 (generally, property held for investment) and will hold the New Common Equity as capital assets. This discussion also assumes that the Claims to which any of the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of Section 897 of the Tax Code.

This discussion does not address all U.S. federal income tax considerations that may be relevant to a particular Holder in light of that Holder's particular circumstances, including the impact of the tax on net investment income imposed by Section 1411 of the Tax Code. In addition, it does not address considerations relevant to Holders subject to special rules under the U.S. federal income tax laws, such as "qualified foreign pension funds" (as defined in Section 897(l)(2) of the Tax Code), entities all of the interests of which are held by qualified foreign pension funds, banks or other financial institutions, insurance companies, brokers, dealers or traders in securities, commodities or currencies, tax-exempt entities, tax-qualified retirement plans, partnerships and other pass-through entities and equityholders therein, Holders subject to the alternative minimum tax, Holders who utilize installment method reporting with respect to their Claims, Holders holding their Claims or interests as part of a hedge, straddle or other risk reduction strategy or as part of a conversion transaction or other integrated investment, Holders subject to special tax accounting rules as a result of any item of gross income with respect to their Claims being taken into account in an applicable financial statement, U.S. Holders (as defined below) who have a functional currency other than the U.S. dollar, former citizens or former long-term residents of the United States and U.S. Holders that hold their Prepetition Term Loan Claims or New Common Equity through non-U.S. brokers or other non-U.S. intermediaries. This discussion also does not address the U.S. federal income tax consequences to Holders (a) whose Claims are Unimpaired or otherwise entitled to payment in full under the Plan, or (b) that are deemed to accept or deemed to reject the Plan. Additionally, this discussion does not address any consideration being received other than in a person's capacity as a Holder of a Claim. This summary also does not discuss the treatment of the receipt of New Common Equity pursuant to the Management Incentive Plan.

HOLDERS SHOULD CONSULT THEIR TAX ADVISORS REGARDING THE U.S. FEDERAL INCOME TAX CONSEQUENCES TO THEM OF THE CONSUMMATION OF THE PLAN AND THE OWNERSHIP AND DISPOSITION OF NEW COMMON EQUITY RECEIVED PURSUANT TO THE PLAN, AS WELL AS ANY TAX CONSEQUENCES ARISING UNDER ANY STATE, LOCAL OR FOREIGN TAX LAWS, OR ANY OTHER FEDERAL TAX LAWS. THE DEBTORS AND THE REORGANIZED DEBTORS SHALL NOT BE LIABLE TO ANY PERSON FOR ANY HOLDERS' TAX LIABILITY IN WHATSOEVER MANNER.

**B.      Restructuring Steps, Alternative Structures and Steps Memorandum**

It is currently contemplated, and this tax disclosure assumes, that the Restructuring will occur in the following manner and in the following order: (i) Reorganized Starry Holdings will issue all of its stock (as defined in the Plan, the "**Reorganized Starry Holdings Equity**") to Starry, Inc.; (ii) Starry, Inc. will transfer the Reorganized Starry Holdings Equity to the Holders of Prepetition Term Loan Claims in exchange for, and in complete satisfaction of, the Prepetition Term Loan Claims; and (iii) the Holders of the Prepetition Term Loan Claims will contribute the Reorganized Starry Holdings Equity to New Starry in exchange for the New Common Equity (subject to dilution by the Management Incentive Plan and New Warrants) (collectively, the "**Restructuring Alternative**").   As discussed below, this Restructuring Alternative and the Sale Transaction should, for U.S. federal income tax purposes, each generally result in the Holders recognizing gain or loss with respect to their Claims.  If the Restructuring Alternative is implemented in a manner that would result in materially different tax consequences to the Holders of the Prepetition Term Loan Claims, the Debtors will include a description of the transaction steps and the related U.S. federal income tax consequences in a Restructuring Memorandum that will be filed as part of the Plan Supplement.

The Restructuring Alternative should not result in a change in the tax basis of the assets of the Starry Group (as defined below).  It is possible that the Debtors will implement a different form of Restructuring Alternative (the "**Taxable Transaction**") that is intended to result in the Reorganized Debtors taking a fair market value basis in all or substantially all of their assets owned by the members of the Starry Group.  In such case, none of the Reorganized Debtors or their affiliates should generally succeed to any Pre-Change Tax Attributes (as defined below).  If a Taxable Transaction is implemented, the Debtors will include a description of the transaction steps and the related U.S. federal income tax consequences in a Restructuring Memorandum that will be filed as part of the Plan Supplement.

It is not expected that the Debtors would incur any material U.S. federal income taxes under the Restructuring Alternative or in a Sale Transaction.

**C.      New Starry**

Under applicable Treasury Regulations, a Delaware limited liability company with at least two members may either be treated as an association taxable as a corporation or as a partnership for U.S. federal income tax purposes.  If a Delaware limited liability company does not make an election to be an association taxable as a corporation, it generally will be treated as a partnership for U.S. federal income tax purposes by default.  New Starry, a Delaware limited liability company, does not intend to make an election to be treated as an association taxable as a corporation and intends to be classified as a partnership for U.S. federal income tax purposes.

New Starry will own all of the Reorganized Starry Holdings Equity, and New Starry will not directly engage, nor be deemed to engage, in a trade or business for U.S. federal income tax purposes.  Accordingly, it is expected, and this tax disclosure assumes, that New Starry will not generate "effectively connected income" or "unrelated business taxable income" for U.S. federal income tax purposes.  In addition, because the only material asset of New Starry will be the Reorganized Starry Holdings Equity (or a stock of an entity that is classified as a corporation for

federal income tax purposes), it is expected that New Starry will not be taxable as a corporation under the publicly traded partnership rules—without regard to the nature of trading in its equity—because it should be able to satisfy the "qualifying income" exception under those rules in light of not directly conducting any trade or business.  Accordingly, this tax disclosure assumes that New Starry will be classified as a partnership for U.S. federal income tax purposes and its only income will be passive in nature.

In the event that New Starry's income tax returns are audited by the IRS, the tax treatment of New Starry's income and deductions generally will be determined at the New Starry level in a single proceeding, rather than in individual audits of the Holders of New Common Equity (the "**Equityholders**").  New Starry's "partnership representative" (as that term is used in the Tax Code) will have considerable authority under the Tax Code and the New Starry LLC Agreement to make decisions affecting the tax treatment and procedural rights of the Equityholders.

If New Starry is audited and as a result of such audit the IRS successfully challenges New Starry's treatment of items of income, gain, loss, deduction or credit, including the allocation of such items among the Equityholders, subject to the election described in the following paragraph, any resulting increase in taxes, interest or penalties will be paid by New Starry in the year in which the tax audit is finally resolved (as opposed to adjusting the income or loss of the persons who were Equityholders in New Starry in the year being audited). Thus, tax liabilities relating to earlier years can result in taxes being indirectly imposed on Equityholders in later years, including Equityholders who acquired their New Common Equity after the taxable year to which the adjustment relates and it is anticipated that transferees will be required to be liable for such amounts as a condition to becoming Equityholders. Tax liabilities imposed on New Starry under these partnership audit procedures may be greater than the tax liabilities that would have been imposed directly on an Equityholder pursuant to a partner-level audit, because the determination of the New Starry-level tax liability does not fully take into account an Equityholder's particular circumstances.

If New Starry is audited by the IRS, New Starry expects to be able to make an election under Section 6226 of the Tax Code to cause any audit adjustments to be imposed on those persons who were partners during the taxable year to which the audit relates (rather than the partners in the year the audit is resolved), instead of on New Starry. Under this alternative procedure, the adjustments in taxable items would be made by such Equityholders on their U.S. federal income tax returns for the year to which the audit is resolved, and those Equityholders would also be liable for any applicable penalties, additions to tax and interest. Each Equityholder in New Starry will be required to take any actions required under the Tax Code and applicable Treasury Regulations if New Starry makes such an election.  New Starry is not obligated to make the election permitted by Section 6226 of the Tax Code.

### D.     U.S. Federal Income Tax Consequences to the Debtors

Starry Holdings is the parent of the Debtors' consolidated U.S. federal income tax group (the "**Starry Group**").  For U.S. federal income tax purposes, Starry, Inc. is the borrower with respect to the Prepetition Term Loan Claims.

1.      **Cancellation of Indebtedness and Reduction of Tax Attributes**

The Starry Group generally should realize cancellation of indebtedness ("**COD**") income to the extent the adjusted issue price of the Prepetition Term Loan Claims and the amount of General Unsecured Claims exceeds the sum of the amount of cash and the fair market value of the Reorganized Starry Holdings Equity received by Holders on account of such Claims, except that COD does not arise to the extent that payment of the liability would have given rise to a deduction. The amount of COD income that will be realized by the Starry Group is uncertain because, among other things, it will depend on the fair market value of the Reorganized Starry Holdings Equity / New Common Equity on the Effective Date.

Under IRC Section 108, COD income realized by a debtor will be excluded from gross income if the discharge of debt occurs in a case brought under the Bankruptcy Code, the debtor is under the court's jurisdiction in such case and the discharge is granted by the court or is pursuant to a plan approved by the court (the "**Bankruptcy Exception**"). Because the Bankruptcy Exception will apply to the transactions consummated pursuant to the Plan, Starry, Inc. will be entitled to exclude from gross income any COD income realized as a result of the implementation of the Plan.

Under IRC Section 108(b), a debtor that excludes COD income from gross income under the Bankruptcy Exception generally must reduce certain tax attributes by the amount of the excluded COD income. Attributes subject to reduction include net operating losses ("**NOLs**"), NOL carryforwards and certain other losses, credits and carryforwards, and the debtor's tax basis in its assets (including stock of subsidiaries). The reduction in a debtor's tax basis in its assets generally does not have to exceed the excess of (i) its tax basis in assets held immediately after the discharge of indebtedness over (ii) the amount of liabilities remaining immediately after the discharge of indebtedness (the "**Liability Floor**"). NOLs for the taxable year of the discharge and NOL carryovers to such year generally are the first attributes subject to reduction. However, a debtor may elect under IRC Section 108(b)(5) (a "**Section 108(b)(5) Election**") to reduce its basis in its depreciable property first. If a debtor makes a Section 108(b)(5) Election, the Liability Floor does not apply to the reduction in basis of depreciable property. The Starry Group has not determined whether it will make a Section 108(b)(5) Election.

For tax periods through the tax year ending December 31, 2021, the Starry Group reported on its consolidated U.S. federal income tax return approximately $485 million of consolidated NOLs and NOL carryforwards. The Starry Group believes that it likely generated additional NOLs for the tax year ending December 31, 2022. However, the amount of the Starry Group's 2022 NOLs, if any, will not be determined until it prepares its U.S. federal income tax return for such period. Moreover, the Starry Group's NOLs are subject to audit and possible challenge by the IRS. Accordingly, the amount of the Starry Group's NOLs ultimately may vary from the amounts set forth above.

The Starry Group currently anticipates that the application of IRC Section 108(b) (assuming no Section 108(b)(5) Election is made) will result in the reduction of a portion of its consolidated NOLs, but may not result in a reduction in its other tax attributes. However, the ultimate effect of the attribute reduction rules is uncertain because, among other things, it will depend on the amount of COD income realized by Starry, Inc.

## 2.    Section 382 Limitation on Net Operating Losses and Built-In Losses

Under IRC Section 382, if a corporation or a consolidated group of corporations with NOLs, interest deductions suspended under Section 163(j) of the Tax Code (collectively with NOL carryforwards and certain other tax attributes, the "**Pre-Change Tax Attributes**") or built-in losses (a "**loss corporation**") undergoes an "ownership change," the loss corporation's use of its Pre-Change Tax Attributes and, if it has a NUBIL (as defined below), recognized built-in losses ("**RBILs**"), generally will be subject to an annual limitation in the post-change period. In general, an "ownership change" occurs if the percentage of the value of the loss corporation's stock owned by one or more direct or indirect "five percent shareholders" increases by more than fifty percentage points over the lowest percentage of value owned by the five percent shareholders at any time during the applicable testing period (an "**Ownership Change**"). The testing period generally is the shorter of (i) the three-year period preceding the testing date or (ii) the period of time since the most recent Ownership Change of the corporation.

Subject to the special bankruptcy rules discussed below, the amount of the annual limitation on a loss corporation's use of its Pre-Change Tax Attributes and RBILs is generally equal to the product of the applicable long-term tax-exempt rate (as published by the IRS for the month in which the Ownership Change occurs) and the value of the loss corporation's outstanding stock immediately before the Ownership Change (excluding certain capital contributions). If a loss corporation has a net unrealized built-in gain ("**NUBIG**") immediately prior to the Ownership Change, the annual limitation may be increased as certain gains are recognized during the five-year period beginning on the date of the Ownership Change (the "**Recognition Period**") or deemed recognized pursuant to the safe harbors provided in IRS Notice 2003-65.  If a loss corporation has a net unrealized built-in loss ("**NUBIL**") immediately prior to the Ownership Change, certain losses recognized during the Recognition Period also would be subject to the annual limitation and thus may reduce the amount of Pre-Change Tax Attributes that could be used by the loss corporation during the Recognition Period.

A NUBIG or NUBIL is generally the difference between the fair market value of a loss corporation's assets (or, if greater, the relevant amount of a loss corporation's relevant liabilities) and its tax basis in the assets, subject to a statutorily-defined threshold amount. The amount of a loss corporation's NUBIG or NUBIL must be adjusted for built-in items of income or deduction that would be attributable to a pre-change period if recognized during the Recognition Period. The NUBIG or NUBIL of a consolidated group generally is calculated on a consolidated basis, subject to special rules.

If a loss corporation has a NUBIG immediately prior to an Ownership Change, any recognized built-in gains ("**RBIGs**") will increase the annual limitation in the taxable year the RBIG is recognized.  An RBIG generally is any gain (and certain income) with respect to an asset held immediately before the date of the Ownership Change that is recognized during the Recognition Period to the extent of the fair market value of the asset over its tax basis immediately prior to the Ownership Change. However, the annual limitation will not be increased to the extent that the aggregate amount of all RBIGs that are recognized during the Recognition Period exceed the NUBIG. On the other hand, if a loss corporation has a NUBIL immediately prior to an Ownership Change, any RBILs will be subject to the annual limitation in the same manner as Pre-Change Tax Attributes. An RBIL generally is any loss (and certain deductions) with respect to an asset held

immediately before the date of the Ownership Change that is recognized during the Recognition Period to the extent of the excess of the tax basis of the asset over its fair market value immediately prior to the Ownership Change. However, once the aggregate amount of all RBILs that are recognized during the Recognition Period exceeds the NUBIL, such excess RBILs are not subject to the annual limitation. RBIGs and RBILs may be recognized during the Recognition Period for depreciable and amortizable assets that are not actually disposed. It is not clear whether the Starry Group will have a NUBIG or NUBIL on the Effective Date, in part because that will depend on the value of its assets on the Effective Date.

The Debtors expect the consummation of the Plan to result in an Ownership Change of Starry Holdings.  Because the Ownership Change will occur in a case brought under the Bankruptcy Code, one of the following two special rules should apply in determining the Starry Group's ability to utilize in post-Effective Date tax periods Pre-Change Tax Attributes and RBILs (if any) attributable to tax periods preceding the Effective Date provided there is no Ownership Change of Starry Holdings prior to the Effective Date, which the Debtors believe to be the case.

Under IRC Section 382(l)(5), an Ownership Change in bankruptcy will not result in any annual limitation on the debtor's Pre-Change Tax Attributes and RBILs (if any) arising during the Recognition Period if the stockholders and qualified creditors of the debtor receive at least 50% of the stock (by vote and value) of the reorganized debtor in the bankruptcy reorganization as a result of being shareholders or creditors of the debtor. Instead, the debtor's pre-change NOLs are reduced by the amount of any interest deductions with respect to debt converted into stock in the bankruptcy reorganization that were allowed in the three full taxable years preceding the taxable year in which the Ownership Change occurs and in the part of the taxable year prior to and including the date of the Ownership Change attributable to the bankruptcy reorganization (the "**Plan Ownership Change**"). However, if any Pre-Change Tax Attributes and built-in losses of the debtor already are subject to an annual usage limitation under IRC Section 382 at the time of an Ownership Change subject to IRC Section 382(l)(5), those Pre-Change Tax Attributes and built-in losses generally will continue to be subject to such limitation.

A qualified creditor is any creditor who has held the debt of the debtor for at least eighteen months prior to the petition date or who has held "ordinary course indebtedness" that has been owned at all times by such creditor. A creditor who does not become a direct or indirect five percent shareholder of the reorganized debtor generally may be treated by the debtor as having always held any debt owned immediately before the Ownership Change, unless the creditor's participation in formulating the plan of reorganization makes evident to the debtor that the creditor has not owned the debt for the requisite period.

A debtor may elect not to apply IRC Section 382(l)(5) to an Ownership Change that otherwise satisfies its requirements.  This election must be made on the debtor's U.S. federal income tax return for the taxable year in which the Ownership Change occurs.  If IRC Section 382(l)(5) applies to an Ownership Change (and the debtor does not elect out), any subsequent Ownership Change of the debtor within the two-year period following the date of the Plan Ownership Change will result in the debtor being unable to use any pre-change losses in any taxable year ending after such subsequent Ownership Change to offset future taxable income.

If an Ownership Change pursuant to a bankruptcy plan does not satisfy the requirements of IRC Section 382(l)(5), or if a debtor elects not to apply IRC Section 382(l)(5), the debtor's use of its Pre-Change Tax Attributes and RBILs (if any) arising during the Recognition Period will be subject to an annual limitation as determined under IRC Section 382(l)(6). In such case, the amount of the annual limitation generally will be equal to the product of the applicable long-term tax-exempt rate (3.04% for April 2023) and the value of the debtor's outstanding stock immediately after the bankruptcy reorganization, provided such value may not exceed the value of the debtor's gross assets immediately before the Ownership Change, subject to certain adjustments. However, if any Pre-Change Tax Attributes and built-in losses of the debtor already are subject to an annual limitation at the time of an Ownership Change subject to IRC Section 382(l)(6), those Pre-Change Tax Attributes and built-in losses will generally be subject to the lower of the two annual limitations.

Assuming that a sufficient amount of the Prepetition Term Loans and DIP Facility continue to be held by the original Holders, the Debtors currently intend to take the position that the Ownership Change resulting from the consummation of the Plan would qualify under IRC Section 382(l)(5), although there is no assurance that this will be the case. Provided that such an Ownership Change qualifies under IRC Section 382(l)(5), the Debtors currently intend to apply IRC Section 382(l)(5) and elect out of IRC Section 382(l)(6). The determination as to whether the consummation of the Plan will meet the requirements of Section 382(l)(5) is subject to uncertainty, and such determination will depend on, among other things, the extent to which Holders of the Prepetition Term Loan Claims and DIP Facility immediately prior to consummation of the Plan may be treated as qualified creditors for purposes of IRC Section 382(l)(5). Pre-Change Tax Attributes not utilized in a given year due to the annual limitation may be carried forward for use in future years. To the extent the annual limitation of the reorganized Starry Group (the "**Reorganized Debtor Group**") exceeds the Reorganized Debtor Group's taxable income (for purposes of Section 382) in a given year, the excess will increase the annual limitation in future taxable years.

### E.    U.S. Federal Income Tax Consequences to Holders of Certain Claims

#### 1.    Definition of U.S. Holder and Non-U.S. Holder

A "U.S. Holder" is a beneficial owner of the Voting Claims or New Common Equity received in exchange therefor that, for U.S. federal income tax purposes, is or is treated as:

- an individual who is a citizen or resident of the United States;

- a corporation created or organized under the laws of the United States, any state thereof, or the District of Columbia;
- an estate, the income of which is subject to U.S. federal income tax regardless of its source; or

- a trust that (1) is subject to the primary supervision of a U.S. court and the control of one or more "United States persons" (within the meaning of Section 7701(a)(30) of the Tax Code), or (2) has a valid election in effect to be treated as a United States person for U.S. federal income tax purposes.

A "Non-U.S. Holder" means a beneficial owner of the Voting Claims or New Common Equity that is not a U.S. Holder and, for U.S. federal income tax purposes, is or is treated as an individual, corporation, estate or trust.

If an entity or arrangement classified as a partnership for U.S. federal income tax purposes holds Voting Claims or New Common Equity, the tax treatment of a partner in such partnership generally will depend upon the status of the partner and the activities of the partnership. Partnerships that hold Voting Claims and partners in such partnerships should consult their tax advisors.

**2.    U.S. Holders**

**(a)    U.S. Holders of Prepetition Term Loan Claims**

**(i)    Exchanges of Prepetition Term Loan Claims for Reorganized Starry Holdings Equity**

The Debtors intend to take the position that the exchange of the Prepetition Term Loan Claims for Reorganized Starry Holdings Equity (collectively, the "**Exchanges**") will be taxable exchanges under Section 1001 of the Tax Code.

Other than with respect to any amounts received that are attributable to accrued but untaxed interest or original issue discount ("**OID**"), each U.S. Holder of a Prepetition Term Loan Claim should recognize gain or loss equal to the difference between the (a) fair market value of Reorganized Starry Holdings Equity received, and (b) such U.S. Holder's adjusted basis in such Prepetition Term Loan Claim. A U.S. Holder's ability to deduct any loss recognized on the exchange of its Prepetition Term Loan Claims will depend on such U.S. Holder's own circumstances and may be restricted under the Tax Code.

The character of any gain or loss as capital gain or loss or ordinary income or loss and, in the case of capital gain or loss, as short-term or long-term, will depend on a number of factors, including: (i) the nature and origin of a  Prepetition Term Loan Claim; (ii) the tax status of the U.S. Holder of such Prepetition Term Loan Claim; (iii) whether such Prepetition Term Loan Claim has been held for more than one year; (iv) the extent to which the U.S. Holder previously claimed a loss or bad debt deduction with respect to such Prepetition Term Loan Claim; and (v) whether such Prepetition Term Loan Claim was acquired at a market discount.  A U.S. Holder that purchased its Prepetition Term Loan Claims from a prior holder at a market discount may be subject to the market discount rules of the Tax Code.  Under those rules (subject to a de minimis exception), assuming that such U.S. Holder has made no election to accrue the market discount and include it in income on a current basis, any gain recognized on the exchange of such Prepetition Term Loan Claims generally would be characterized as ordinary income to the extent of the accrued market discount on such Prepetition Term Loan Claims as of the date of the Exchange.

A portion of the consideration received by a U.S. Holder of a Prepetition Term Loan Claim may be attributable to accrued interest or OID on such Prepetition Term Loan Claim.  Such amount should be taxable to that U.S. Holder as interest income if such accrued interest or OID has not been previously included in the U.S. Holder's gross income for U.S. federal income tax purposes. Conversely, U.S. Holders of Prepetition Term Loan Claims may be able to recognize a deductible loss to the extent any accrued interest or OID on such Prepetition Term Loan Claims was

previously included in the U.S. Holder's gross income but was not paid in full by the Debtors. If the fair value of the consideration is not sufficient to fully satisfy all principal, interest or OID on the Prepetition Term Loan Claims, the extent to which such consideration will be attributable to accrued interest and OID is unclear. The Debtors intend to take the position, and the Plan provides, that the consideration distributed pursuant to the Plan will first be allocable to the principal amount of an Allowed Claim and then, to the extent necessary, to any accrued interest or OID thereon. See "—*Accrued Interest*" below for additional discussion of the tax considerations relating to accrued interest under the Plan.

<div align="center">

**(ii)**     **New Common Equity**

</div>

The recipients of Reorganized Starry Holdings Equity in the Exchanges will immediately contribute their Reorganized Starry Holdings Equity to New Starry in exchange for New Common Equity. Such contribution should generally be treated as a tax-free exchange governed by Section 721 of the Tax Code and should result in a recipient having a basis in, and holding period with respect to, the New Common Equity equal to the recipient's basis in, and holding period with respect to, the Reorganized Starry Holdings Equity exchanged therefor.

As a partnership, New Starry itself will not be subject to U.S. federal income tax. Instead, New Starry will file an annual partnership information return with the IRS which will report the results of New Starry's operations. Each U.S. Holder of New Common Equity (a "**U.S. Equityholder**") will be required to report on its U.S. federal income tax return, and will be subject to tax in respect of, its distributive share of each item of New Starry's income, gain, loss, deduction and credit for each taxable year of New Starry ending with or within the U.S. Equityholder's taxable year. Each item generally will have the same character as if the U.S. Equityholder had realized the item directly. U.S. Equityholders will be required to report these items regardless of the extent to which, or whether, they receive cash distributions from New Starry for such taxable year, and thus may incur income tax liabilities in excess of any cash distributions from New Starry.

As discussed above in "—New Starry," the only material asset of New Starry will be the Reorganized Starry Holdings Equity, and New Starry will not directly engage, nor be deemed to engage, in a trade or business for federal income tax purposes. As a result, New Starry anticipates that it may recognize income attributable to distributions on the Reorganized Starry Holdings Equity, a portion of which will be allocated to the U.S. Equityholders. U.S. Equityholders may also be allocated other items of income, gain, loss and deduction from New Starry, including capital gain arising from the sale or the taxable disposition of all or a portion of the Reorganized Starry Holdings Equity.

New Starry generally will be required to include in gross income as ordinary dividend income the amount of any distributions paid on the Reorganized Starry Holdings Equity to the extent such distributions are paid out of Reorganized Starry Holdings' current or accumulated earnings and profits as determined for U.S. federal income tax purposes. Distributions not treated as dividends for U.S. federal income tax purposes will constitute a return of capital and will first be applied against and reduce adjusted tax basis in the Reorganized Starry Holdings Equity (on a share-by-share basis), but not below zero. Any excess amount will be treated as gain from a sale or exchange of the Reorganized Starry Holdings Equity (on a share-by-share basis).

<div align="center">

90

</div>

New Starry will generally recognize gain or loss upon the sale or other taxable disposition by New Starry of Reorganized Starry Holdings Equity equal to the difference between the amount realized upon the disposition and the adjusted tax basis in the Reorganized Starry Holdings Equity.

A U.S. Equityholder generally will not recognize gain or loss on the receipt of an actual or deemed distribution of cash or property from New Starry, other than gain to the extent a cash distribution exceeds such U.S. Equityholder's adjusted tax basis in its New Common Equity, and such gain should generally be treated as gain from the sale or exchange of the New Common Equity.

New Starry will provide each U.S. Equityholder with the necessary information to report its allocable share of New Starry's tax items for U.S. federal income tax purposes.  However, no assurance can be given that New Starry will be able to provide such information prior to the initial due date of the U.S. Equityholder's U.S. federal income tax return and U.S. Equityholders may therefore be required to apply to the IRS for an extension of time to file their own income tax returns.  The terms of the New Starry LLC Agreement will generally determine how items will be reported on New Starry's U.S. federal income tax returns, and all U.S. Equityholders will be required under the Tax Code to treat the items consistently on their own returns, unless they file a statement with the IRS disclosing the inconsistency.

A U.S. Equityholder generally will not recognize gain or loss on the receipt of a distribution of cash or property from New Starry.  A U.S. Equityholder, however, will recognize gain on the receipt of a distribution of cash (or a deemed distribution) to the extent such distribution exceeds such U.S. Equityholder's adjusted tax basis in its New Common Equity, and such gain should generally be treated as gain from the sale or exchange of the New Common Equity.

A U.S. Equityholder's adjusted tax basis in its New Common Equity generally will be equal to such member's initial tax basis (discussed above), increased by the sum of (i) the amount of any additional capital contribution such U.S. Equityholder makes to New Starry and (ii) the U.S. Equityholder's allocable share of the income of New Starry, and reduced, but not below zero, by the sum of (i) the U.S. Equityholder's allocable share of New Starry's losses, and (ii) the amount of money or the adjusted tax basis of property distributed to such U.S. Equityholder.  Additional rules would apply if New Starry were to directly incur any liabilities.

A sale of all or some of the New Common Equity will result in the recognition of gain or loss in an amount equal to the difference between the amount of the sales proceeds (including any constructive proceeds) and such member's adjusted tax basis for the portion of the New Common Equity disposed of.  Subject to the recapture rules under Section 108(e)(7), any gain or loss recognized with respect to such a sale generally will be treated as capital gain or loss, and will be long-term capital gain or loss if the New Common Equity has been held for more than one year (a U.S. Equityholder may have a split holding period in the New Common Equity if it contributes property to New Starry or otherwise acquires New Common Equity on multiples dates).  Under the Section 108(e)(7) recapture rules, a U.S. Equityholder may be required to treat gain recognized on the taxable disposition of New Common Equity (as a result of it receiving Reorganized Starry Holdings Equity in an Exchange and then exchanging the Reorganized Starry Holdings Equity for the New Common Equity) as ordinary income to the extent that the U.S. Equityholder took a bad debt deduction with respect to the Prepetition Term Loan Claims.  A U.S. Equityholder's ability

to deduct any loss recognized on the sale of its New Common Equity will depend on the U.S. Equityholder's own circumstances and may be restricted under the Tax Code.

<p style="text-align:center;">(iii)   <strong>Receipt of Cash in Sale Transaction</strong></p>

U.S. Holders of Prepetition Term Loan Claims should receive cash in exchange for their Claims in connection with a Sale Transaction that should be treated as a taxable exchange under IRC Section 1001. The tax consequences of such an exchange should generally be the same as those with respect to the Exchanges (as described in "—*U.S. Holders of Prepetition Term Loan Claims—Exchanges of Prepetition Term Loan Claims for Reorganized Starry Holdings Equity*").

<p style="text-align:center;">(b)   <strong>U.S. Holders of General Unsecured Claims</strong></p>

A U.S. Holder of a General Unsecured Claim should generally be treated as receiving its distribution of cash (if any) under the Plan in a taxable exchange under IRC Section 1001. Other than with respect to any amounts received that are attributable to accrued but untaxed interest, each U.S. Holder of a General Unsecured Claim should recognize gain or loss equal to the difference between the (a) amount of cash actually or constructively received in exchange for its General Unsecured Claim, and (b) such U.S. Holder's adjusted tax basis, if any, in such General Unsecured Claim. A U.S. Holder's ability to deduct any loss recognized on the exchange of its General Unsecured Claim will depend on such U.S. Holder's own circumstances and may be restricted under the Tax Code.

The character of any gain or loss as capital gain or loss or ordinary income or loss and, in the case of capital gain or loss, as short-term or long-term, will depend on a number of factors, including: (i) the nature and origin of a General Unsecured Claim; (ii) the tax status of the U.S. Holder of such General Unsecured Claim; (iii) whether such General Unsecured Claim has been held for more than one year; (iv) the extent to which the U.S. Holder previously claimed a loss or bad debt deduction with respect to such General Unsecured Claim; and (v) whether such General Unsecured Claim was acquired at a market discount. A U.S. Holder that purchased its General Unsecured Claim from a prior holder at a market discount may be subject to the market discount rules of the Tax Code. Under those rules (subject to a de minimis exception), assuming that such U.S. Holder has made no election to accrue the market discount and include it in income on a current basis, any gain recognized on the exchange of such General Unsecured Claim generally would be characterized as ordinary income to the extent of the accrued market discount on such General Unsecured Claim as of the date of the exchange.

A portion of the consideration received by a U.S. Holder of a General Unsecured Claim may be attributable to accrued interest on such General Unsecured Claim. Such amount should be taxable to that U.S. Holder as interest income if such accrued interest has not been previously included in the U.S. Holder's gross income for U.S. federal income tax purposes. Conversely, U.S. Holders of General Unsecured Claims may be able to recognize a deductible loss (which may be a capital loss) to the extent any accrued interest on such General Unsecured Claims was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors. If the fair value of the consideration is not sufficient to fully satisfy all principal or interest on the General Unsecured Claim, the extent to which such consideration will be attributable to accrued interest is unclear. The Debtors intend to take the position, and the Plan provides, that the consideration distributed

<p style="text-align:center;">92</p>

pursuant to the Plan will first be allocable to the principal amount of an Allowed Claim and then, to the extent necessary, to any accrued interest thereon.  See "—*Accrued Interest*" below for additional discussion of the tax considerations relating to accrued interest under the Plan.

### 3.      Non-U.S. Holders

The rules governing U.S. federal income taxation of a Non-U.S. Holder are complex. The following discussion includes only certain U.S. federal income tax consequences of the Plan to Non-U.S. Holders. Non-U.S. Holders should consult with their own tax advisors to determine the effect of U.S. federal, state, and local tax laws, as well as any other applicable non-U.S. tax laws and/or treaties, with regard to their participation in the transactions contemplated by the Plan, their ownership of Claims and the ownership and disposition of New Common Equity.

Whether a Non-U.S. Holder realizes gain or loss on an exchange of their Voting Claim for Reorganized Starry Holdings Equity or cash, as the case may be, the amount of such gain or loss and any interest is determined in the same manner as set forth above in connection with U.S. Holders.

#### (a)      Gain Recognition

Subject to the discussions below regarding FATCA (as defined below) and backup withholding, any gain recognized by a Non-U.S. Holder in connection with the consummation of the Plan or a subsequent sale or other taxable disposition of New Common Equity (as described above in "—U.S. Holders of Prepetition Term Loan Claims—New Common Equity") generally will not be subject to U.S. federal income taxation unless (a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the relevant sale, exchange or other taxable disposition occurs and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States.

If the first exception applies, to the extent that any gain is recognized, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed certain capital losses allocable to U.S. sources during the taxable year of the exchange, provided the Non-U.S. Holder has timely filed U.S. federal income tax returns with respect to such losses.

If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax, on a net income basis at the regular rates, with respect to any gain recognized in the same manner as a U.S. Holder, unless an applicable income tax treaty provides otherwise. In order to claim an exemption from withholding tax, such Non-U.S. Holder generally will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates). In addition, if such Non-U.S. Holder is a corporation for U.S. federal income tax purposes, it may be subject to a branch profits tax equal to 30% (or such lower rate provided by an applicable income tax treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

(b)      **New Common Equity**

Non-U.S. Holders of New Common Equity ("**Non-U.S. Equityholders**") treated as engaged in a U.S. trade or business are subject to U.S. federal income tax at the graduated rates applicable to U.S. persons on their net income that is considered to be effectively connected with such U.S. trade or business.  Non-U.S. Equityholders that are corporations may also be subject to a 30% branch profits tax on effectively connected earnings and profits, subject to certain adjustments.  It is expected that the New Starry's method of operation will not result in a determination that the New Starry is engaged in a U.S. trade or business. See "—*New Starry*" above for additional discussion of the tax classification of New Starry and the nature of its activities and income.

As discussed above in "—*New Starry*," the only material asset of New Starry will be the Reorganized Starry Holdings Equity.  Accordingly, New Starry anticipates that it may recognize the following types of income with the related tax consequences set forth below:

- Dividend income attributable to distributions from Reorganized Starry Holdings that are allocable to a Non-U.S. Equityholder may be subject to withholding at a 30% rate. A Non-U.S. Equityholder who is resident for tax purposes in a country with respect to which the United States has an income tax treaty may be eligible for a reduced rate of withholding on such Non-U.S. Equityholder's distributive share of dividends, provided the Non-U.S. Equityholder provides New Starry with a valid IRS Form W-8BEN or W-8BEN-E (or other applicable documentation) certifying qualification for the lower treaty rate.  A Non-U.S. Equityholder generally will not qualify for treaty benefits unless New Starry is treated as fiscally transparent under the laws of the Non-U.S. Equityholder's country of residence for tax purposes.

- U.S. source interest income of New Starry that is allocable to a Non-U.S. Equityholder will also be subject to 30% withholding (or a lower treaty rate) unless the interest qualifies as portfolio interest and the Non-U.S. Equityholder provides New Starry the appropriate IRS Form W-8 certifying that it is not a "United States person" within the meaning of Section 7701(a)(30) of the Tax Code.

- Gain from the sale of Reorganized Starry Holdings Equity should generally not be subject to U.S. federal income tax provided the Non-U.S. Equityholder provides New Starry with the properly completed applicable IRS Form W-8 as described in the prior bullet.

Special rules apply if any of the foregoing types of income are effectively connected with the Non-U.S. Equityholder's conduct of a trade or business in the United States.

(c)      **Additional Withholding Tax on Payments Made to Foreign Accounts**

Withholding taxes may be imposed under Sections 1471 to 1474 of the Tax Code (such Sections commonly referred to as the Foreign Account Tax Compliance Act, or "**FATCA**") on certain types of payments made to non-U.S. financial institutions and certain other non-U.S. entities, whether beneficial owners or acting as intermediaries.. Specifically, a 30% withholding tax may be imposed on interest (including OID) or dividends paid to a "foreign financial institution" or a "non-

financial foreign entity" (each as defined in the Tax Code), unless (1) the foreign financial institution undertakes certain diligence, reporting and withholding obligations, (2) the non-financial foreign entity either certifies it does not have any "substantial United States owners" (as defined in the Tax Code) or furnishes identifying information regarding each substantial United States owner, or (3) the foreign financial institution or non-financial foreign entity otherwise qualifies for an exemption from these rules. If the payee is a foreign financial institution and is subject to the diligence, reporting and withholding requirements in (1) above, it must enter into an agreement with the U.S. Department of the Treasury requiring, among other things, that it undertake to identify accounts held by certain "specified United States persons" or "United States-owned foreign entities" (each as defined in the Tax Code), annually report certain information about such accounts, and withhold 30% on certain payments to non-compliant foreign financial institutions and certain other account holders. Foreign financial institutions located in jurisdictions that have an intergovernmental agreement with the United States governing FATCA may be subject to different rules.

Under the applicable Treasury Regulations and administrative guidance, withholding under FATCA generally applies to payments of interest and dividends. While withholding under FATCA would have applied also to payments of gross proceeds from the sale or other disposition of Voting Claims and New Common Equity on or after January 1, 2019, proposed Treasury Regulations eliminate FATCA withholding on payments of gross proceeds entirely. Taxpayers generally may rely on these proposed Treasury Regulations until final Treasury Regulations are issued.

### 4.    Accrued Interest

To the extent a Holder of a Claim receives consideration that is attributable to indebtedness and unpaid accrued interest thereon, the Debtors intend to take the position, and the Plan provides, that for U.S. federal income tax purposes, such consideration should be allocated to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing unpaid accrued interest.  Notwithstanding this Plan provision, there is general uncertainty regarding the extent to which the receipt of cash or other property should be attributable to unpaid accrued interest.  To the extent any property received pursuant to the Plan is considered attributable to unpaid accrued interest, a Holder will recognize ordinary income to the extent the value of the property exceeds the amount of unpaid accrued interest previously included in gross income by the Holder.  A Holder's tax basis in such property should be equal to the amount of interest income treated as satisfied by the receipt of the property, and its holding period in the property should begin on the day after the Effective Date. A Holder generally will be entitled to recognize a loss (which may be a capital loss) to the extent any accrued interest previously included in its gross income is not paid in full.

HOLDERS SHOULD CONSULT THEIR TAX ADVISORS REGARDING THE EXTENT TO WHICH CONSIDERATION RECEIVED UNDER THE PLAN SHOULD BE TREATED AS ATTRIBUTABLE TO UNPAID ACCRUED INTEREST.

### 5.    Information Reporting and Withholding; Required Tax Return Disclosure

The Debtors and applicable withholding agents will withhold all amounts required by law to be withheld with respect to distributions under the Plan and will comply with all applicable

information reporting requirements. The IRS may make the information returns available to the tax authorities in the country in which a Non-U.S. Holder is resident or organized. In general, information reporting requirements may apply to distributions or payments under the Plan. Additionally, under the backup withholding rules, a Holder may be subject to backup withholding (currently at a rate of 24%) with respect to distributions or payments made pursuant to the Plan unless that Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding (generally in the form of a properly executed IRS Form W-9 for a U.S. Holder, and, for a Non-U.S. Holder, in the form of a properly executed applicable IRS Form W-8) or otherwise establishes such Holder's eligibility for an exemption. Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; provided that the required information is timely provided to the IRS.

In addition, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders should consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

THE FOREGOING DISCUSSION OF U.S. FEDERAL INCOME TAX CONSIDERATIONS IS FOR GENERAL INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. EACH HOLDER SHOULD CONSULT ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN DESCRIBED HEREIN. NEITHER THE PROPONENTS NOR THEIR PROFESSIONALS WILL HAVE ANY LIABILITY TO ANY PERSON OR HOLDER ARISING FROM OR RELATED TO THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN OR THE FOREGOING DISCUSSION.

## <u>CONCLUSION AND RECOMMENDATION</u>

The Debtors believe the Plan is in the best interests of all stakeholders and urge the holders of Claims in Classes 3 and 4 to vote in favor thereof.

Respectfully submitted, as of the date first set forth above,

**Starry Group Holdings, Inc. (on behalf of itself and all other Debtors)**

By:     */s/ Chaitanya Kanojia*
Name:   Chaitanya Kanojia

Title:   Chief Executive Officer

## Exhibit A

**Plan**

**Exhibit B**

**Restructuring Support Agreement**

## **Exhibit C**

**Organizational Chart**

## **Exhibit D**

**Financial Projections**

*Solicitation Version*

## Exhibit E

**Liquidation Analysis**